**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOLUNTEER ENERGY SERVICES, INC., | ) | Case No. 22-50804 |
|  | ) |  |
| Debtor.[1] | ) | Judge C. Kathryn Preston |
|  | ) |  |

**DECLARATION OF DAVID WARNER IN SUPPORT OF
THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, David Warner, declare under penalty of perjury:

1.      I am the Chief Financial Officer of Volunteer Energy Services, Inc. ("VESI" or the "Debtor") and have served in such capacity since January 2016. As such, I am familiar with the Debtor's day-to-day operations, business, and financial affairs.

2.      I have nearly 35 years of leadership experience in executive roles in the energy industry, including with respect to management, products, markets, and finance. Prior to my current role, I have served as the CFO of multiple companies in the retail energy space, including one of the largest independent retail energy distributors in the United States.

3.      On March 25, 2022(the "Petition Date"), the Debtor commenced a voluntary case (this "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      I submit this declaration to provide the Court and other parties in interest with an overview of the Debtor's business and to describe the circumstances compelling the commencement of this Chapter 11 Case. I also submit this declaration in support of the first day

---

[1]     The last four digits of the Debtor's federal tax identification are (2693), and the address of the Debtor's corporate headquarters is 790 Windmiller Drive, Pickerington, Ohio 43147.

motions and applications (collectively, the "<u>First Day Pleadings</u>") filed by the Debtor, by which the Debtor seeks relief enabling the Debtor to operate effectively, minimize certain of the potential adverse effects of the commencement of this Chapter 11 Case, and preserve and maximize the value of the Debtor's estate.

5.    Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management team and the Debtor's advisors, my review of relevant documents and information concerning the Debtor's operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this declaration on that basis. I am authorized to submit this declaration on behalf of the Debtor.

6.    Parts I and II of this declaration describe the Debtor's business operations and the events leading to this Chapter 11 Case. Part III of this declaration describes the Debtor's capital structure. Part IV of this declaration sets forth the relevant facts in support of the First Day Pleadings.

## I.    <u>THE DEBTOR'S BUSINESS</u>

### A.    Overview

7.    The Debtor is a family-owned retail energy provider headquartered in Pickerington, Ohio. Since 2001, the Debtor has supplied retail electricity and natural gas to its various commercial, industrial, and residential customers across Ohio, Michigan, Pennsylvania, and Kentucky. The Debtor also manages interstate transportation contracts, gas storage, and gas supplies via interstate and intrastate pipelines, and administers energy purchases, monitors energy deliveries, and reconciles all deliveries and imbalances with local distribution companies.

8.      The Debtor serves gas customers in eleven utility regions throughout Ohio,

Michigan, Kentucky, and Pennsylvania, and power customers in three utility regions throughout

Ohio. The Debtor currently has approximately 212,000 customers that consume approximately

25 billion cubic feet of annualized gas and approximately 500,000 megawatt hours of annualized

power.

9.      The Debtor offers its customers "energy choice"—the ability to receive electricity

and natural gas commodity needs from a source other than the local utility in certain markets that

have been restructured to permit retail competition, which allows customers to tailor energy

supply to their specific needs. The deregulation process that has permitted retail competition for

electricity and natural gas is briefly described below.

**B.      Deregulation of Electricity and Natural Gas Markets**

10.      Prior to significant legislative and industry reforms, end users of electricity or

natural gas in the United States typically were obligated to purchase from their local utility a

single, bundled product consisting of the generation, transmission, distribution services and the

actual commodity consumed. The local utility held a monopoly in a particular geographic region

in exchange for the obligation to serve all customers, subject to state public utility commission

regulation of the local utility's rates and other activities.

11.      Commencing in the 1990s, in the wake of federal efforts in the 1980s to unbundle

sales of electricity and natural gas commodities from the associated transmission and

transportation services and other pro-competitive measures, a number of state legislatures

enacted laws allowing competitive retail sales of electricity and natural gas commodities to end

use customers, while at the same time preserving the local utilities' right to be compensated for

transmission, transportation, and distribution services, and the ultimate obligation to serve

captive customers. Typically referred to as state unbundling programs or retail choice programs,

these states determined that it was in the best interest of consumers of electricity and natural gas

to introduce competition among third party providers. Third party providers are required to be

licensed in the states in which they sell electricity or natural gas, and once licensed, are

authorized to compete to sell such products to end users subject to applicable state regulations.

12.     Today, approximately 29 states have at least partially deregulated electricity or

natural gas markets whereby energy customers may choose between their incumbent local utility

and an array of independent, competitive suppliers. The Debtor currently holds licenses or is

permitted to sell retail electricity in Ohio and retail natural gas in Ohio, Michigan, Kentucky, and

Pennsylvania.

### C.    Sales Channels

13.     As of the Petition Date, the Debtor has 20 full-time employees, after taking into

account certain reductions in force that were necessary in the months leading up to this Chapter

11 Case.

14.     Prior to the Petition Date, the Debtor utilized a variety of sales channels to sell

electricity and natural gas to a diverse customer base. The Debtor's primary sales channels were

as follows:

(a)     **Broker and Agent Network**. The Debtor generated a material portion of
its business through municipal aggregations, of which the majority were
retained by the Debtor's independent network of over 200 brokers and
agents. The Debtor maintained good relationships with its broker network,
which controlled a large customer base and typically did not exclusively
sell the Debtor's products. Brokers received compensation based on the
monthly energy usage for customers that they brought to the Debtor. A
typical broker commission structure was paid based on kilowatt hours
(electricity) and various forms of measurement (natural gas) sold over the
life of a customer contract. Brokers were generally paid based on metered
consumption throughout the contract life, so long as the customer had
made payment to the Debtor for the electricity and/or natural gas
consumed.

4

      (b)    **Internal Sales Team**. The Debtor employed individuals who were part of a dedicated sales team responsible for conducting direct marketing to customers and managing broker relationships.

15.    As of the Petition Date, the Debtor effectively ceased all new sales efforts.

**D.    Customer Contracts**

16.    As of the Petition Date, the Debtor has approximately 212,000 accounts. Eighty-one percent of those accounts are held under the Debtor's 139 municipal aggregation contracts, with the remaining 19% of accounts being general business and residential.[2]

17.    Depending on the circumstances and needs of its customers, the Debtor negotiated contracts of various durations, ranging from month-to-month contracts to contracts with terms up to several years. Thirty percent of all customers in the Debtor's existing book have been with the Debtor for more than 5 years (up to 17 years), and more than 60% of all customers have been with the Debtor for more than 2 years.

18.    The Debtor bills roughly 90-98% of its sold gas volumes through utility consolidated billing programs. The remaining volumes are billed by the Debtor directly to its end use customers. Under utility consolidated billing programs, the local utility generates and sends one monthly invoice to the end use customer for both the utility's distribution service charges and the Debtor's commodity charge. Further, in the "Choice" gas markets that the Debtor operates via utility consolidated billing, the utilities generally offer Purchase of Receivable ("POR") programs whereby the utility purchases the end use customer receivable from the Debtor for the Debtor's commodity charges, and the utility remits payment to the Debtor for such purchased receivable per utility specified remittance dates. The utility assumes the credit

---

[2]    Municipal aggregation is the process by which a municipality combines (or "aggregates") the retail electric and/or natural gas load of its residential and small commercial constituents and negotiates a rate with a competitive energy supplier to provide the customers' electric and/or natural gas supply.

risk associated with the actual collections of the receivable from the end use customer. For gas volumes that the Debtor bills directly to the end use customer, the Debtor assumes the customer credit risk and the customer remits payment directly to the Debtor.

19.     Similar to the Debtor's sale of gas volumes, the Debtor bills 100% of its sold power volumes through utility consolidated billing programs. However, unlike the Debtor's gas utilities, the Debtor's power utilities do not provide POR programs for the commodity portion of the monthly bill. Instead, the end use customers remit payment for both power distribution charges and power commodity directly to the power utility, and the power utility (pursuant to published cash application protocols) forwards available cash to the Debtor for the commodity portion of the monthly customer bill. The Debtor assumes full customer credit risk on these receivables.

**E.     The Debtor's Suppliers**

20.     As a retail energy provider, the Debtor relies on a complex Federal Energy Regulatory Commission ("FERC")-regulated network of Independent System Operators ("ISOs"), pipelines, and transmission entities, as well as state-regulated utilities and Wholesale Energy Suppliers (as defined below) to purchase, transmit, and deliver natural gas and electricity to its customers.

21.     Specifically, the Debtor enters into contractual arrangements with Wholesale Energy Suppliers[3] to meet its retail customers' varying consumption requirements, or "load." The overall load that the Debtor is obligated to supply fluctuates frequently depending on customer usage, which constantly changes based on a number of factors, including weather and other factors affecting customers' businesses.

---

[3]     "Wholesale Energy Suppliers" include, without limitation (i) gas marketing companies, (ii) utilities, (iii) ISOs, and (iv) local producers.

22.    There are two primary consequences if the Debtor does not receive energy from Wholesale Energy Suppliers and thus cannot provide energy to the Debtor's customers. First, the unserviced customers will be transferred to default utility service or an alternative energy provider. Second, until the unserviced customers are successfully transferred, the Debtor will be subject to daily noncompliance charges against the Debtor based upon the quantity difference between the energy delivery requirement that the Debtor was supposed to provide and the actual amount delivered. These daily penalties can be severe—in some circumstances $1.5 million or more per day depending on the Debtor's load delivery obligations to the utilities.

## II.    CAPITAL STRUCTURE

### A.    Amended and Restated Revolving Credit and Security Agreement

23.    VESI, as borrower, PNC Bank, N.A. ("PNC Bank"), as Lender, Administrative Agent, Collateral Agent, and Issuer, and PNC Capital Markets LLC ("PNC Capital" and, together with PNC Bank, "PNC"), as Lead Arranger are parties to that certain *Amended and Restated Revolving Credit and Security Agreement* (as amended, supplemented, or otherwise modified from time to time, the "Credit Agreement"), dated June 30, 2016, pursuant to which PNC agreed to make available to VESI a revolving credit line in the maximum principal amount of $42 million. VESI pledged substantially all of its assets to PNC as collateral security for VESI's obligations to PNC under the Credit Agreement.

24.    As of the Petition Date, approximately $30 million is outstanding under the Credit Agreement.

### B.      POR Agreements

25.      As discussed above, VESI is party to various POR agreements with local gas distribution companies ("LDCs").[4] Pursuant to the Credit Agreement, VESI is permitted to sell receivables to applicable LDCs that participate in the delivery of gas that gives rise to the receivable. VESI is further permitted to grant security interests to the LDC to the extent necessary to effect the transfer of any receivable to the LDC, provided that such security interest relates solely to sales of such receivable and does not secure any other obligation owing to the LDC.

26.      Under the POR agreements, VESI has agreed to sell some or all of its receivables arising out of the supply of gas to customers within the LDC's territory to the applicable LDC. The transactions effectuated under the POR agreements are intended to be true sales. However, certain LDCs—Columbia Gas of Ohio, Inc.; Columbia Gas of Kentucky, Inc.; East Ohio Gas Company d/b/a Dominion East Ohio; and Vectren Energy Delivery of Ohio, Inc.—have filed protective UCC-1 financing statements evidencing a security interest in the applicable subject receivables to the extent that any true sale is recharacterized as a secured financing. In such case, VESI will be deemed to have granted the affected LDC a security interest in the relevant receivables.

### C.      Unsecured Debt

27.      VESI estimates that, as of the Petition Date, approximately $40 million of general unsecured debt is outstanding, which is comprised primarily of Wholesale Energy Suppliers and transportation debt.

---

[4]      The POR programs offered to the Debtor in Michigan are tariff based and not subject to POR agreements.

### III.   THE DEBTOR'S HISTORY AND
### EVENTS LEADING TO THIS CHAPTER 11 CASE

28.     VESI was founded in 2001 by Richard A. Curnutte, Sr., who has been the sole

owner and Chief Executive Officer of VESI since that time.

29.     In late 2014, VESI entered into a $150 million syndicated credit facility (the

"Syndicated Facility") led by PNC Bank and five additional lenders (collectively, the

"Syndicated Lenders"). Less than one year into the Syndicated Facility, the Syndicated Lenders

expressed concerns about VESI's financial performance and the Syndicated Facility. To address

these concerns, in July 2015, VESI retained me as a consultant.

30.     Upon my review of VESI's audited financials from 2010-2014 and year to date

unaudited 2015 financials, it quickly became clear that VESI's gross profit accounting (*i.e.*, gas

accounting) was incorrect, which caused inaccuracies in VESI's profit and loss and balance sheet

reporting.

31.     From July 2015 through the summer of 2016, I worked with additional

consultants, including Tony Digioia (VESI's current Chief Operating Officer), to correct VESI's

gross profit accounting. These efforts resulted in restated audited financials for the period ending

December 31, 2015, which included the elimination of approximately $40 million of previously

reported pre-tax net income and retained earnings.[5]

32.     Shortly thereafter, the Syndicated Facility was terminated and VESI entered into

the Credit Agreement with PNC. In connection with the Credit Agreement, VESI created new

borrowing base certificate reporting mechanisms, which were consistent with the revised gas

accounting processes that supported VESI's monthly balance sheets.

---

[5]     Amended federal and state income tax returns were also filed.

**B.**     **Events Leading to this Chapter 11 Case**

33.     Due to the nature of VESI's business, certain factors (*e.g.*, winter weather issues, price volatility, industry margin trends, and sales trends) can greatly impact gross profit. Specifically, VESI's operating expenses remain relatively fixed each year regardless of weather outcomes or performance. Thus, if gross profits underperform relative to these fixed operating expenditures, then VESI's financial position necessarily weakens. Over the last few years, certain key events have taken their toll on VESI's financial position culminating in the need for this Chapter 11 Case.

### ii.     Winter 2019-2020

34.     One of VESI's fixed operating expenses is its pipeline capacity costs (*i.e.*, the volume of firm transportation and storage capacity assigned to VESI pursuant to various Choice programs). If for any reason VESI's winter throughput volumes are significantly decreased due to warm weather, then the per unit cost of fixed capacity costs increases, resulting in margin reduction. In the winter months of 2019 into 2020, the states in which VESI operates had an extremely warm winter, which, in turn, reduced the demand for natural gas and negatively impacted VESI's gross profit performance.

### iii.     COVID-19 Pandemic

35.     Shortly after the winter of 2019-2020, VESI's financial performance continued to be negatively impacted because of the COVID-19 pandemic. Many of VESI's customers are small businesses, restaurants, and food chains, which were ordered to be closed in the second quarter of 2021. Such closures further reduced actual sales versus expected sales, while VESI remained liable for its fixed pipeline capacity and other operating costs.

### iv.    Winter Storm Uri

36.    It appeared that in fiscal year 2021, VESI would be able to turn a corner, and the Company projected a strong and profitable year. In mid-February 2021, however, a historic blast of arctic weather ("Winter Storm Uri") engulfed much of the United States. Winter Storm Uri caused a number of short-term supply disruptions to the U.S. natural gas industry, including, without limitation, natural gas well head freeze offs, pipeline operational constraints, and redirection of existing gas to alternate markets. As a result, the available gas supply within the market dramatically decreased at a time when there was a significant short term increase in consumer demand for gas in Texas and the entire mid-west. Additionally, as a result of the storm, four of VESI's wholesale gas suppliers were unable to supply gas citing force majeure events. Due to increased demand and other factors, VESI was then forced to purchase incremental gas on the secondary market/cash market or risk non-compliance with utility instructions for energy delivery. Because of the extreme industry wide demand for natural gas at the time, the cost to purchase gas during the storm period in the cash market increased from approximately $3.00/MCF to $300/MCF, $600/MCF, and as high as $1200/MCF. VESI procured and delivered the utility required incremental gas as instructed and fully paid all wholesale suppliers. In so doing, in only a ten-day span, VESI's gross profit for the year was negatively impacted by $7.6 million.

### C.    Prepetition Events of Default

37.    From 2016 to 2021, although VESI's gross profit remained positive, VESI's net income financial performance was inconsistent due to, among other things, warm winters, COVID, and Winter Storm Uri. As a result, VESI triggered various events of default under the Credit Agreement for, among other things, failing to maintain (i) minimum undrawn availability and (ii) average balance of revolving advances, which prompted amendments to the Credit

11

Agreement to remedy such defaults on July 21, 2017, August 2, 2018, July 25, 2019, May 13, 2020, and June 26, 2020.

38.     On June 26, 2020, VESI and PNC entered into a seventh amendment to the Credit Agreement and, at the request of PNC, VESI began efforts to refinance in order to close out PNC's position. In January 2021, however, PNC reconsidered its desire to exit its position and began to work with VESI to procure a subordinated debt facility. Such efforts were ultimately not fruitful, and by May 2021 VESI was forced to pursue parallel paths of refinancing and efforts to sell its book of customers. Since the June 26, 2020 amendment to the Credit Agreement, PNC has been lending to VESI pursuant to a series of weekly or monthly extensions and forbearance agreements.

### D.     First Prepetition Marketing Efforts

39.     In or around April 2021, VESI retained Keystone Consulting Group ("KCG") as a financial advisor to assist with ongoing refinance efforts. In mid-May 2021, VESI launched a process to sell the company's assets (or as a going concern). This sale process was conducted in parallel with the ongoing refinance efforts. In connection with this process, in late May 2021, VESI hired a broker (the "Broker") with M&A experience and connections in retail energy to run the sale process.

40.     The Broker marketed VESI's assets to prospective purchasers that had the capabilities to acquire the assets or the business as a going concern and take assignment of VESI's customer contracts in the states VESI operates. In total, the Broker contacted 24 parties that are active buyers in the retail energy market, and approximately 13 parties executed confidentiality agreements ("NDA") with VESI to gain access to VESI's virtual dataroom to conduct preliminary due diligence.

41.     As a result of these efforts, in fall 2021, VESI entered into extensive negotiations with a prospective purchaser interested in acquiring VESI's ownership interests with a target outside closing date of January 31, 2022. To close the sale, the prospective purchaser requested that PNC provide post-closing working capital financing for a transition period of 12-18 months. After extensive discussions, however, the parties (PNC and the prospective purchaser) were unable to agree to post-closing working capital financing terms, which prevented the sale from going forward.

**E.     Second Prepetition Marketing Efforts**

42.     In January 2022, VESI terminated KCG and retained B. Riley Financial, Inc. ("B. Riley") as its financial advisor to advise on strategic restructuring options. In February 2022, VESI terminated the Broker, and with the assistance of B. Riley, resurrected its marketing efforts for a potential asset sale, which was expected to be conducted in connection with this Chapter 11 Case. VESI, however, faced significant time constraints that created two notable obstacles in VESI's marketing process.

43.     First, any prospective purchaser must be a qualified competitive energy supplier in each jurisdiction in which VESI operates in order to continue servicing VESI's customer contracts upon the closing of any sale. Second, unlike many retail energy providers, VESI's prepetition lender does not also serve as VESI's energy supplier. Accordingly, VESI was forced to conduct strategic marketing efforts without alarming its Wholesale Energy Suppliers, which may have resulted in suppliers refusing to provide energy necessary to continue VESI's business given that they are not contractually obligated to do so.

44.     VESI prepared marketing materials, updated its virtual data room, and compiled a list of potentially interested parties, relying heavily on the interested parties from its first round of marketing efforts. Given the extremely short runway that VESI had under the Credit

13

Agreement to affect a sale and orderly wind-down, a discrete set of parties were contacted who, based on prior conversations and experience with similar transactions, would be able to transact on the necessary timeline.

45.    In total, VESI contacted six parties. Each party was invited to execute an NDA with VESI in order to receive the marketing materials and access a virtual data room. Each of the six parties either executed an NDA or confirmed that they were subject to a previously executed NDA.

46.    Following these efforts, VESI received two indicative, non-binding offers for the purchase of certain customer contracts. However, PNC was unwilling to fund an orderly winddown and transition of customers to a purchaser or the default utility providers.

**F.    The Need for Chapter 11 Relief**

47.    As discussed above, the Debtor's business relies on the purchase of energy from Wholesale Energy Suppliers to service customers. The Debtor's contracts with Wholesale Energy Suppliers are short-term commitment contracts that the Debtor pays in arrears. On March 25, 2022, the Debtor defaulted on approximately $12.6 million in payments due to its Wholesale Energy Suppliers. These defaults create an irreversible domino effect resulting in the need for chapter 11 relief.

    a.    First, Wholesale Energy Suppliers will refuse to enter into new short-term commitments to continue to provide energy to the Debtor;

    b.    Second, the Debtor will have no means to procure sufficient energy to service its customers;

    c.    Third, the process will begin for transitioning the Debtor's customers to default service (however defined under applicable state law or by the applicable electric utility or natural gas local distribution company) at the applicable electric utility, natural gas local distribution company, or, to the extent required by state law, such other electric or gas company providing such service; and

      d.     Fourth, until the Debtor's customers are successfully transitioned, the Debtor will incur severe daily penalties for the energy that local distribution companies will provide to customers on the Debtor's behalf given that the Debtor is no longer able to do so.

48.     As of the Petition Date, the Debtor is in most instances between the second and third steps and in some instances already facing the penalties in the fourth step. The goal of this Chapter 11 Case is to expedite the process of transitioning the Debtor's customers to default service to stop the unnecessary imposition of significant penalties against the Company, which will allow the Company to conduct an orderly winddown for the benefit of all stakeholders.

## IV.    FACTS RELEVANT TO FIRST DAY PLEADINGS

49.     Together with the filing of this Chapter 11 Case, the Debtor has filed a number of First Day Pleadings seeking relief that the Debtor believes is necessary to enable it to efficiently administer its estate with minimal disruption and loss of value during this Chapter 11 Case. I have reviewed each First Day Pleading discussed below, and the facts set forth in each First Day Pleading are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

### A.    Debtor's Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief (the "Case Management Motion")

50.     In the Case Management Motion, the Debtor seeks entry of an order approving and implementing certain notice, case management, and administrative procedures, attached as **Exhibit 1** to the Proposed Order attached to the Case Management Motion (the "Case Management Procedures") and verifying the Chapter 11 Case as a Complex Chapter 11 Case, as defined the *Procedures for Complex Chapter 11 Cases* attached to the *General Order 30-4 from the United States Bankruptcy Court for the Southern District of Ohio*, dated February 24, 2021.

51.     The Case Management Procedures, among other things, (a) establish requirements

for filing and serving Court Filings (as defined in the Case Management Procedures), (b)

delineate standards for notices of hearings and hearing agendas, (c) fix periodic omnibus hearing

dates and articulate mandatory guidelines for the scheduling of hearings and objection deadlines,

(d) limit matters that are required to be heard by the Court, and (e) set forth procedures for

professional compensation and reimbursement of expenses. To ensure that parties in interest in

this Chapter 11 Case are made aware of the Case Management Procedures, the Debtor proposes

to (a) serve the Case Management Procedures on the Master Service List (as defined in the Case

Management Procedures), (b) publish the Case Management Procedures on the Debtor's

restructuring website, and (c) make the Case Management Procedures readily available on

request to the Debtor's proposed claims and noticing agent, Epiq Corporate Restructuring LLC

("Epiq").

52.     Given the size and complexity of this Chapter 11 Case, implementing the Case

Management Procedures will facilitate the fair and efficient administration of this case and

promote judicial economy. Therefore, I believe that the relief requested in the Case Management

Motion is necessary and appropriate and is in the best interests of the Debtor, its estate, and all

parties in interest.

### B.     Debtor's Motion for Entry of an Order Extending the Deadline to File Schedules and Statement of Financial Affairs (the "Schedules Motion")

53.     In the Schedules Motion, the Debtor seeks an order extending the time period for

the Debtor to file its schedules of assets and liabilities, schedules of current income and

expenditures, schedules of executory contracts and unexpired leases, and statements of financial

affairs (collectively, the "Schedules") by 16 days, for a total of 30 days from the Petition Date,

without prejudice to the Debtor's right to apply to this Court, upon appropriate notice, for further

extension(s) of the time to file the Schedules or to seek a waiver of the requirement for filing

certain Schedules.

54.     Given the size and complexity of the Debtor's business, a significant amount of

time and effort on the part of the Debtor and its advisors is required to collect, review, and

assemble voluminous amounts of data. The Debtor recognizes the importance of the Schedules in

this Chapter 11 Case and intends to complete the Schedules as quickly and as accurately as

possible.

55.     Based on the foregoing, I believe that the relief requested in the Schedules Motion

is in the best interests of the Debtor, its estate, and all parties in interest and should be approved.

**C.     Debtor's Application for Entry of Order Authorizing the Employment and
Retention of Epiq Corporate Restructuring LLC as Claims and Noticing
Agent Effective as of the Petition Date (the "<u>Claims Agent Application</u>")**

56.     In the Claims Agent Application, the Debtor seeks entry of an order appointing

Epiq as claims and noticing agent (the "<u>Claims and Noticing Agent</u>") for the Debtor in this

Chapter 11 Case effective as of the Petition Date, including assuming full responsibility for the

distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in

this Chapter 11 Case.

57.     Based on my discussions with the Debtor's advisors, I believe that the Debtor's

selection of Epiq to act as the Claims and Noticing Agent is appropriate under the circumstances

and in the best interest of the estate. Moreover, it is my understanding that based on all

engagement proposals obtained and reviewed that Epiq's rates are competitive and comparable

to the rates charged by their competitors for similar services. The Debtor anticipates that there

will be thousands of persons and entities to be noticed in this Chapter 11 Case. In light of the

number of parties in interest and the complexity of the Debtor's business, the Debtor submits that

the appointment of a claims and noticing agent will provide the most effective and efficient

means of, and relieve the Debtor and/or the Clerk's office of the administrative burden of,

noticing and processing proofs of claim and is in the best interests of the Debtor, its estate, and

all parties in interest. Further, I understand that the Procedures for Complex Chapter 11 Cases

adopted in this District require the retention of a claims and noticing agent in complex cases like

this one. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should

approve the Claims Agent Application.

**D.     Debtor's Emergency Motion for Entry of an Order (I) Authorizing the
        Debtor to Implement Procedures for Notifying Customers of the
        Commencement of the Debtor's Case and (II) Granting Related Relief (the
        "Customer Notice Motion")**

58.     In the Customer Notice Motion, the Debtor seeks entry of an order authorizing the

Debtor to implement certain notice procedures with respect to the Debtor's customers (the

"Procedures"). Specifically, pursuant to the Procedures, the Debtor proposes to notify customers

of the commencement of the Chapter 11 Case and meeting of creditors held pursuant to

Bankruptcy Code section 341 (the "Notice of Commencement") by (i) publishing the Notice of

Commencement in local newspapers in states where the Debtor operates, (ii) sending customers

an actual notice informing them that their electricity or natural gas service will be transferred to

the default utility provider or, if applicable, another retail energy provider in their state, and

(iii) establishing a public website for the Chapter 11 Case through which parties will be able to

view, at no cost, filings in and other relevant information about the Chapter 11 Case.

59.     The Debtor commenced this Chapter 11 Case with minimal liquidity and an

upside-down balance sheet. Given the reality of the Debtor's financial situation, it is doubtful

whether the Debtor's obligations to its senior secured lender will be fully repaid, leaving little to

no value for residual claimants. Consequently, I believe it is imperative that the Debtor make

every effort to minimize the administrative expenses incurred in this case. A single mailing to

approximately 212,000 customers will cost the estate over one hundred thousand dollars in

postage alone, plus the additional costs associated with photocopying the notice and paying for

the services of the Claims and Noticing Agent.

60.     In light of the high cost of completing mailings to over 212,000 customers and the

estate's limited resources, I believe the implementation of the Procedures is in the best interests

of the Debtor's estate and should be approved.

**E.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing
Debtor to (A) Maintain and Operate Its Existing Cash Management System,
(B) Honor Certain Prepetition Obligations, and (C) Maintain Existing
Business Forms; and (II) Granting Related Relief (the "Cash Management
Motion")**

61.     In the Cash Management Motion, the Debtor seeks orders on an interim and final

basis allowing the continued use of its existing cash management system. The Debtor uses a

centralized cash management system to collect funds from, and to pay expenses incurred by, its

operations (the "Cash Management System") in the ordinary course of business. The Cash

Management System includes three Debtor bank accounts (the "Bank Accounts"), one loan

account (the "Loan Account") controlled by PNC Bank, National Association ("PNC"), and nine

brokerage accounts (the "Brokerage Accounts" and, together with the Bank Accounts and Loan

Account, the "Accounts"). A list of the Accounts is attached to the Cash Management Motion as

**Exhibit D**. The principal components of the Cash Management System are the following

accounts (collectively, the "Accounts"):

(a)     **Collection Account**: The Debtor receives payments for goods and
services in the ordinary course of business, and all collections flow into a
collection account (Account No. xxxxxx9114) (the "Collection Account").
Amounts related to return of third-party collateral postings, hedge
settlements, and miscellaneous refunds are also deposited into the
Collection Account. Each day, amounts held in the Collection Account are
swept into the Loan Account, over which PNC has control.

(b)    **Loan Account**. The funds received in the Loan Account are used to pay down certain amounts owed to PNC under that certain Amended and Restated Revolving Credit and Security Agreement dated as of June 30, 2016 by and among PNC, as Lender, Administrative Agent, Collateral Agent, and Issuer, PNC Capital Markets LLC, as Lead Arranger, and the Debtor, as a Borrower (as amended, supplemented, or otherwise modified from time to time).

(c)    **Operating Account**: In order to facilitate the Debtor's business operations related to, among other things, payroll, wholesale energy and hedging costs, pipeline and transmission payments, capacity costs, and broker payments, the Debtor maintains an operating account (Account No. xxxxxx7644) (the "Operating Account"). Each day, PNC approves and releases draw request amounts from the Loan Account to the Operating Account. The Debtor also uses the Operating Account to fund the Checking Account (as defined below) and Secondary Checking Account (as defined below).

(d)    **Checking Account**: The Debtor maintains a checking account (Account No. xxxxxx9791) (the "Checking Account") for the purpose of making broker payments, payments to local energy suppliers and producers, surety bond premium payments, and certain other operating expense payments. The Checking Account is a zero-balance account, funded based on the aggregate payments to be made via physical checks.

62.    In addition to the Debtor's Loan Account and Bank Accounts that comprise the Debtor's central Cash Management System, the Debtor also utilizes nine Brokerage Accounts to hedge against potential changes in wholesale natural gas and electricity costs to service its retail customers. The Brokerage Accounts are split into two categories.

63.    The first category are the Debtor's International Swaps and Derivatives Association Financial Swap Agreements ("ISDAs") with Merrill Lynch Commodities, Inc., Nextera Energy Capital Holdings, Inc., and INTL FCStone Markets, LLC d/b/a StoneX Markets LLC (collectively, the "ISDA Counterparties"). The ISDAs allow the Debtor to enter into "financially settled" transactions (*i.e.*, transactions that result only in payment obligations between the parties derived from the value of an underlying commodity) with the ISDA counterparties in order to hedge price risks associated with the physical natural gas and power

products that Debtor sells to its retail customers. To close out any financial hedges the Debtor currently has in place requires that the Debtor negotiate with the counterparty as to the purported close-out value of the trades. To the extent the trade falls into a negative value, in accordance with the terms of the ISDAs, the Debtor could be required to provide the counterparty with cash collateral.

64.     The second category are the Debtor's traditional Brokerage Accounts (collectively, the "Clearing Brokers" and, together with PNC and the ISDA Counterparties, the "Banks") wherein the Debtor purchases NYMEX Natural Gas Futures Contracts through a broker. The broker acts as a clearing broker, meaning that the broker purchases and sells the natural gas futures directly from and to the exchanges. Per Commodity Futures Trading Commission regulations, the Debtor is required to post cash collateral to meet initial and maintenance margin requirements to hold the futures contracts in the accounts. Moreover, to the extent that the Debtor's natural gas futures fall into a negative value, the Debtor is required to provide additional cash collateral to the brokers. Such accounts are held at Interactive Brokers LLC. Additionally, the Debtor has an online trading account on ICE US OTC Commodity Mkts LLC and a money market account at BlackRock, Inc.

65.     The Debtor seeks the authorization to continue using the existing Cash Management System, as well as a waiver of the *Operating Instructions and Reporting Requirements* issued by the United States Trustee Office for Region 9 (the "U.S. Trustee"), as such requirements would disrupt the Debtor's business, causing delays in payments to vendors, suppliers, subcontractors, administrative creditors, employees, and others, thereby impeding the Debtor's efforts to maximize the value of its estate.

66.    The Debtor also requests the authority to continue to use the Accounts with the same account numbers, styles, and business forms as the Debtor used prepetition. Further, with respect to the Brokerage Account Banks, the Debtor requests a waiver of the requirement set forth in Bankruptcy Code section 345(b) for the posting of a bond or other security by any entity with which money of the estate is deposited or invested.

67.    Further, the Debtor requests that it be authorized to pay and the Banks be authorized to deduct from the appropriate Accounts certain service charges, lockbox fees, and other fees, costs, and expenses owed to the Banks (collectively, the "Bank Charges") as set forth in any deposit agreements between the Debtor and the Banks and to the extent that the Banks have valid setoff claims pursuant to Bankruptcy Code section 553, and further, to charge back to the appropriate Accounts of the Debtor any Bank Charges resulting from returned checks or other returned items, including, without limitation, returned items that result from automated clearing house transactions, wire transfers, or other electronic transfers of any kind (collectively, the "Returned Items") regardless of whether such items were deposited or transferred prepetition or postpetition and regardless of whether the Returned Items relate to prepetition or postpetition items or transfers.

68.    The Debtor also seeks authority to close existing accounts or open new accounts whenever needed, provided that the Debtor gives the U.S. Trustee adequate notice of any newly-opened accounts.

69.    To minimize expenses to its estate, the Debtor also requests authorization to continue using all correspondence and business forms (including, without limitation, letterheads, checks, purchase orders, invoices, and envelopes) (collectively, the "Business Forms") existing

immediately prior to the Petition Date without reference to the Debtor's status as debtor in possession.

70.     The Cash Management System is integral to the operation and administration of the Debtor's business. In short, the Cash Management System is essential to cash inflows and outflows and the efficient execution and achievement of the Debtor's strategic business objectives and, ultimately, to maximizing the value of the Debtor's estate. Thus, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor, its estate, and all parties in interest, and is essential to enable the Debtor to continue to operate its business during this Chapter 11 Case without disruption.

**F.      Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to (A) Pay Its Obligations Under Prepetition Insurance Policies and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage in the Ordinary Course; (II) Authorizing Banks and Other Financial Institutions to Honor Checks and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief (the "<u>Insurance Motion</u>")**

71.     In the Insurance Motion, the Debtor seeks orders on an interim and final basis authorizing the Debtor to (a) pay its obligations under prepetition insurance policies and (b) renew, supplement, modify, or purchase insurance coverage in the ordinary course.

72.     In the ordinary course of business, the Debtor maintains and is covered by several insurance policies (collectively, the "<u>Insurance Policies</u>") that are provided or administered by multiple third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>"). The Insurance Policies include, among other things, general liability insurance, commercial property insurance, and directors' and officers' liability insurance.

73.     In general terms, the Debtor's coverage can be described as follows

(a)     **General and Property Policy**. The Debtor maintains a general liability and property insurance policy with Westfield Insurance Company (the "<u>General and Property Policy</u>"). The General and Property Insurance

23

Policy has a term of May 31, 2021 through May 31, 2022, with an annual premium of $5,678.00, plus a $6.00 installment fee.

(b)   **Auto, Crime, and Umbrella Insurance**. The Debtor maintains an auto, crime, and umbrella insurance policy with Westfield Insurance Company (the "Auto, Crime, and Umbrella Policy"). The Auto, Crime, and Umbrella Policy has a term of May 31, 2021 through May 31, 2022, with an annual premium of $7,956.00, plus a $6.00 installment fee.

(c)   **D&O Insurance**. The Debtor maintains a directors' and officers' liability insurance policy with Everest Indemnity Insurance Company (the "D&O Policy"). The D&O Policy has a term of March 11, 2022 through March 11, 2023, with an annual premium of $135,000.00.

74.   The Insurance Policies are critical to the preservation of the Debtor's property and nonpayment of any premiums, deductibles, or similar obligations under any of the Insurance Policies could result in one or more of the Insurance Carriers (a) terminating the existing Insurance Policies, (b) declining to renew the Insurance Policies, or (c) refusing to enter into new insurance agreements with the Debtor in the future. Although the Debtor is current with its obligations under the Insurance Policies, additional insurance premiums will become due and owing, and any interruption in insurance coverage could expose the Debtor to serious risks.

75.   The Debtor's ability to revise, extend, supplement, or change insurance coverage (including obtaining "tail" coverage), as necessary, on a postpetition basis is also critical. As the Insurance Policies are essential to the preservation of the value of the Debtor's business, properties, and assets the Debtor must have the ability to renew, supplement, or purchase insurance coverage on a postpetition basis in the ordinary course of business.

76.   I believe that the relief requested in the Insurance Motion is in the best interests of the Debtor, its estate, and all parties in interest and will enable the Debtor to continue to preserve the value of its business, properties, and assets and protect the Debtor and other parties in interest from losses caused by casualty, natural disaster, fraud, or other unforeseen events without disruption.

**G.    Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Pay Prepetition Reimbursable Expenses, Benefits, and Related Items and (B) Honor and Continue Certain Prepetition Practices; (II) Authorizing Banks and Other Financial Institutions to Honor Checks and Electronic Transfer Requests Related to the Foregoing; and (III) Granting Related Relief (the "Wage Motion")**

77.    To minimize the personal hardships the Debtor's employees (the "Employees") and independent contractors (the "Independent Contractors") will suffer if prepetition employment-related obligations are not paid when due or as expected, as well as to maintain morale during this critical time, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to pay: (a) amounts deducted from the compensation of Employees and Independent Contractors and the employer portion of payroll-related taxes on account of various federal, state, and local income, FICA, Medicare, state disability, workers' compensation, and other taxes for remittance to the appropriate federal, state, or local taxing authority (the "Prepetition Deductions"), (b) unreimbursed or unpaid prepetition business expenses to its Employees and Independent Contractors (collectively, the "Prepetition Business Expenses"), (c) prepetition contributions to, and benefits under, Employee benefits programs (collectively, the "Prepetition Benefits Obligations"), and (d) all costs and expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers (the "Prepetition Processing Costs"); and (ii) authorizing the Debtor to honor and continue the Debtor's prepetition practices related to the Prepetition Deductions, Prepetition Business Expenses, Prepetition Benefits Obligations, and prepetition wages and salaries (the "Prepetition Wages" and, together with the Prepetition Deductions, Prepetition Business Expenses, Prepetition Benefits Obligations, and Prepetition Processing Costs, the "Prepetition Employee Obligations", and the programs giving rise to such Prepetition Employee Obligations, the "Employee Programs") in the ordinary course of business.

78.     The Debtor has approximately 20 Employees, located in two states. All of the

Employees are salaried. The Debtor also periodically retains specialized individuals as

Independent Contractors and currently has one independent contractor. The Debtor has

historically paid Prepetition Wages and Prepetition Deductions on Friday of each week for

amounts that accrued the prior week. However, on Monday, March 21, 2022, the Debtor paid the

Employees and Independent Contractor for Prepetition Wages that accrued from March 12, 2022

through March 18, 2022. And on March 25, 2022, the Debtor paid the Employees and

Independent Contractor for Prepetition Wages that accrued from March 19, 2022 through March

25, 2022. Thus, no Prepetition Wages are due or owing to the Employees or Independent

Contractor as of the Petition Date. However, there are Prepetition Deductions due and payable as

of the Petition Date in the amount of approximately $24,000.00.

79.     The Debtor customarily reimburses its Employees and Independent Contractors

for a variety of business expenses incurred in the ordinary course of its business, including for

travel expenses such as hotels, meals, cell phones, and parking and fuel costs, among other

things. The Debtor estimates that, as of the Petition Date, the total amount of prepetition business

expenses that are and payable is approximately $11,000.00.

80.     The Prepetition Benefits Obligations relate to the Debtor's Employee benefit

programs, including, for eligible Employees: medical, dental, vision, life, and disability

insurance, a 401(k) plan, a health reimbursement account, a flexible spending account, COBRA

medical coverage for former Employees, workers' compensation, and a managed care program,

The Debtor estimates that, as of the Petition Date and before the final hearing on this Motion, the

total amount of Prepetition Benefits Obligations that will be due and payable will be

approximately $59,000.00.

26

81.     The Prepetition Processing Costs include, among other things, processing costs, the employer portion of payroll-related taxes, and accrued but unpaid prepetition charges for administration of the Employee benefits programs, such as payments owed to the Plan Administrators and Paylocity. The Debtor estimates that, as of the Petition Date and before the final hearing on this Motion, the total amount of Prepetition Processing Costs that will be due and payable will be approximately $1,300.

82.     The Debtor's Employees and Independent Contractor will likely be exposed to financial hardships if the Debtor is not permitted to honor obligations for unpaid Prepetition Employee Obligations. Further, honoring and continuing the Debtor's prepetition practices related to the Prepetition Employee Obligations is crucial to helping maintain Employee and Independent Contractor morale and minimizing the adverse effects of the commencement of the Chapter 11 Case on the Debtor's ongoing business operations.

83.     Moreover, the Employees and Independent Contractors provide the Debtor with services necessary to conduct the Debtor's business, and absent the payment of the Prepetition Employee Obligations owed to, or on account of, the Employees and Independent Contractor, the Debtor may experience Employee and Independent Contractor turnover and instability at this critical time in the Chapter 11 Case. Therefore, I believe that the relief requested in the Wage Motion is necessary and appropriate and is in the best interests of the Debtor, its estate, and all parties in interest.

**H.      Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>")**

84.     In the Taxes Motion, the Debtor seeks the entry of interim and final orders (i) authorizing, but not directing, the Debtor, in its sole discretion, to remit and pay certain accrued and outstanding prepetition taxes, including sales and use taxes, franchise taxes, and

similar taxes and fees in an amount up to $3.4 million on an interim basis and up to $5.3 million

on a final basis, absent further order of the Court and (ii) granting related relief.

85.     The Debtor collects, incurs, and pays sales taxes, use taxes, utility user taxes,

gross receipt taxes, income taxes, and various other governmental taxes, fees, and assessments

(collectively, the "Taxes and Fees").[6] The Debtor remits the Taxes and Fees to various federal,

state, and local governments, including taxing authorities (collectively, the "Governmental

Authorities").

86.     Taxes and Fees are remitted and paid by the Debtor through checks and electronic

transfers that are processed through its banks and other financial institutions. The Debtor

estimates that approximately $5.3 million in Taxes and Fees relating to the prepetition period are

or will become due and owing to the Governmental Authorities after the Petition Date in the

ordinary course. The Debtor further estimates that approximately $3.4 million in Taxes and Fees

relating to the prepetition period are or will become due and owing to the Governmental

Authorities within 30 days after the Petition Date.

87.     The Debtor must continue to pay the Taxes and Fees to avoid potential costly

distractions during this Chapter 11 Case. Specifically, the Debtor's failure to pay the Taxes and

Fees could adversely affect the Debtor's estate because the Governmental Authorities could file

liens or seek to lift the automatic stay. I believe that failing to pay the Taxes and Fees may also

result in increased tax liability for the Debtor if interest and penalties accrue on the claims for

Taxes and Fees, which amounts may also be entitled to priority treatment. Further, many of the

---

[6]     The Debtor does not seek the authority to collect and remit state and federal employee-related withholding taxes
by this motion. Such relief is instead requested in the *Debtor's Motion for Entry of an Order (I) Authorizing,
But Not Directing, the Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and
Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related
Relief*, filed concurrently herewith.

Taxes and Fees are "trust fund" taxes that are collected and held on behalf of the applicable

Governmental Authorities and therefore are not property of the Debtor.

88.     I believe that the relief requested in the Taxes Motion is in the best interests of the

Debtor, its estate, and all parties in interest, and will enable the Debtor to continue to operate its

business in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully

submit that the Taxes Motion should be approved.

**I.      Debtor's Motion for Entry of Interim and Final Orders (I) Approving Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving Proposed Procedures for Resolving Adequate Assurance Requests, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief (the "Utilities Motion")**

89.     In the Utilities Motion, the Debtor seeks entry of interim and final orders

(i) approving the Debtor's proposed adequate assurance of payment for future utility services,

(ii) approving the Debtor's proposed procedures for resolving adequate assurance disputes,

(iii) prohibiting utility companies from altering, refusing, or discontinuing services, and

(iv) granting related relief.

90.     In the aggregate, the Debtor pays approximately $5,600 each month for utility

services, calculated as a historical average payment for the twelve-month period ending February

2022. Accordingly, the Debtor estimates that the cost for utility services during the next 30 days

will be approximately $5,600. The Debtor intends to pay postpetition obligations owed to the

utility companies in a timely manner using cash held by the Debtor, cash generated in the

ordinary course of business, and cash otherwise available to the Debtor under its proposed

debtor-in-possession financing facility. As additional adequate assurance, the Debtor proposes to

deposit $2,800 (the "Adequate Assurance Deposit") into a segregated account, which represents

an amount equal to approximately one-half of the cost of the Debtor's average monthly utility

services. The Adequate Assurance Deposit will be held in the segregated account for the benefit of the utility companies for the duration of the Chapter 11 Case.

91.     I believe that the utility companies are adequately assured against any risk of nonpayment for future services. The Adequate Assurance Deposit and the Debtor's ongoing ability to meet obligations as they come due in the ordinary course provides assurance of the Debtor's payment of their future obligations. The payments thereby minimize the risk of termination of the utility services, which could result in the Debtor's inability to operate its business to the detriment of all stakeholders. Further, the proposed adequate assurance procedures establish a streamlined process for utility companies to address potential concerns with respect to the proposed adequate assurance while allowing the Debtor to continue its operations uninterrupted.

92.     The utility services are essential to the Debtor's business. The refusal of any utility company to continue providing service, even for a brief period, would disrupt the Debtor's business operations and ability to service its customers, which, in turn, could jeopardize the success of this Chapter 11 Case. Accordingly, on behalf of the Debtor, I respectfully submit that the relief requested in the Utilities Motion should be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 26, 2022
Pickerington, Ohio

/s/ David Warner
David Warner
Chief Financial Officer