## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOLUNTEER ENERGY SERVICES, INC., | ) | Case No. 22-50804 |
|  | ) |  |
| Debtor.[1] | ) | Judge C. Kathryn Preston |
|  | ) |  |

### DEBTOR'S EXPEDITED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING A PRIVATE SALE OF CERTAIN OF THE DEBTOR'S CUSTOMER CONTRACTS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S CUSTOMER CONTRACTS; (III) WAIVING THE 14-DAY STAYS IMPOSED UNDER BANKRUPTCY RULES 6004(h) AND 6006(d); AND (IV) GRANTING RELATED RELIEF

Volunteer Energy Services, Inc., as debtor and debtor in possession (the "Debtor") in the

above-captioned chapter 11 case (the "Chapter 11 Case"), hereby submits this expedited motion

(the "Motion") for entry of an order substantially in the form attached hereto as **Exhibit A** (the

"Sale Order") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6003, 6004, 6006, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1 and 9013-1 of the Local

Rules of the United States Bankruptcy Court for the Southern District of Ohio (the "Local

Rules"), authorizing and approving (i) the private sale (the "Sale") of certain of the Debtor's

customer contracts (the "Customer Contracts")[2] to NRG Retail LLC or its designee(s)

---

[1]   The last four digits of the Debtor's federal tax identification are (2693), and the address of the Debtor's corporate headquarters is 790 Windmiller Drive, Pickerington, Ohio 43147.

[2]   The Customer Contracts shall not include any Customer Contract in which the counterparty thereto (the "Customers") has voluntarily terminated such contract prior to the transfer of such Customer to the Purchaser.

(collectively, the "Purchaser")[3] free and clear of all liens, claims (as defined in Bankruptcy Code

section 101(5)), encumbrances, obligations, liabilities, contractual commitments or interests of

any kind or nature whatsoever as contemplated by the Asset Purchase Agreement (the "APA"),

between the Debtor and the Purchaser, attached to the Sale Order as **Exhibit 1**, (ii) authorizing

the assumption and assignment of the Customer Contracts, (iii) waiving the 14-day stay with

respect to the Sale Order imposed under Bankruptcy Rules 6004(h) and 6006(d), and (iv)

granting related relief.

In support of this Motion, the Debtor relies upon and incorporates by reference the

*Declaration of David Warner in Support of the Debtor's Chapter 11 Petition and First Day

Pleadings* (Doc. 26) (the "First Day Declaration")[4] and the *Declaration of Tom Buck in Support

of the Debtor's Sale Motion*, attached hereto as **Exhibit B** (the "Buck Declaration"), and

respectfully represents as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Southern District of Ohio (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of

Reference entered in this District.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are Bankruptcy Code sections

105, 363, 365, and 507, Bankruptcy Rules 2002, 6003, 6004, 6006 and 9014, and Local Rules

6004-1 and 9013-1.

---

[3]    NRG Retail LLC is a subsidiary of NRG Energy, Inc., which is a publicly traded fortune 500 company that produces and sells energy and related products. NRG Energy, Inc. serves millions of retail energy customers throughout the United States.

[4]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the First Day Declaration.

2

## BACKGROUND

### I.      The Chapter 11 Case

4.      On March 25, 2022 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtor continues to operate its businesses and manage its properties as Debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6.      The Office of the United States Trustee appointed a creditors' committee on April 1, 2022 (Doc. No. 83). No other official committee, trustee, or examiner has been appointed in the Chapter 11 Case.

7.      A description of the Debtor's business operations, capital structure, and circumstances leading to the chapter 11 filing is set forth in the First Day Declaration, which is incorporated herein by reference.

### II.      The Debtor's Assets

8.      The Debtor is a family-owned retail energy provider headquartered in Pickerington, Ohio. Since 2001, the Debtor has supplied retail electricity and natural gas to its various commercial, industrial, and residential customers across Ohio, Michigan, Pennsylvania, and Kentucky. The Debtor also manages interstate transportation contracts, gas storage, and gas supplies via interstate and intrastate pipelines, and administers energy purchases, monitors energy deliveries, and reconciles all deliveries and imbalances with local distribution companies ("LDCs").

9.      As of the Petition Date, the Debtor serves gas customers in eleven utility regions throughout Ohio, Michigan, Kentucky, and Pennsylvania, and power customers in three utility regions throughout Ohio. As of the Petition Date, the Debtor had approximately 212,000

customers that consume approximately 25 billion cubic feet of annualized gas and approximately 500,000 megawatt hours of annualized power.

10.     The Debtor offers its customers "energy choice"—the ability to receive electricity and natural gas commodity needs from a source other than the local utility in certain markets that have been restructured to permit retail competition, which allows customers to tailor energy supply to their specific needs.

11.     Aside from prepetition receivables, the Debtor's only likely realizable asset is its customer contracts, a portion of which the Debtor will assume and assign to the Purchaser.

### III.     Prepetition Marketing Efforts

12.     As described in greater detail in the First Day Declaration, in or around April 2021, the Debtor commenced a dual path restructuring effort, which included a potential refinancing of its debts and a marketing process for the sale of the Debtor as a going concern or an asset sale. In connection with the Debtor's sale efforts, the Debtor hired a broker (the "Broker") to market its assets to prospective purchasers that had the capabilities to acquire the business as a going concern (or acquire the Debtor's assets) and take assignment of the Debtor's licenses in the states the Debtor operates. In total, the Broker contacted 24 parties that are active buyers in the retail energy market, and approximately 13 parties executed confidentiality agreements ("NDAs") with the Debtor to gain access to the Debtor's virtual data room to conduct preliminary due diligence.

13.     As a result of these efforts, in fall 2021, the Debtor entered into extensive negotiations with a prospective purchaser interested in acquiring the Debtor's ownership interests with a target outside closing date of January 31, 2022. To close the sale, the prospective purchaser requested that PNC provide post-closing working capital financing for 12–18 months.

4

After extensive discussions, however, the parties (PNC and the prospective purchaser) were unable to agree to post-closing working capital financing terms, which prevented the sale from going forward.

14.     In January 2022, the Debtor retained GlassRatner Advisory & Capital Group, LLC dba B. Riley Advisory Services ("B. Riley") as its financial advisor to advise on strategic options. In February 2022, the Debtor terminated the Broker, and with the assistance of B. Riley, resurrected its marketing efforts for a potential asset sale, which was expected to be conducted in connection with this Chapter 11 Case. The Debtor, however, faced significant time constraints that created two notable obstacles in the Debtor's marketing process.

15.     First, any prospective purchaser must be a qualified competitive energy supplier in each jurisdiction in which the Debtor operates in order to continue servicing the Debtor's customer contracts upon the closing of any sale. Second, unlike many retail energy providers, the Debtor's prepetition lender does not also serve as the Debtor's energy supplier. Accordingly, the Debtor was forced to conduct strategic marketing efforts without alarming its current electricity and natural gas suppliers (the "Wholesale Energy Suppliers"), which may have resulted in suppliers refusing to provide energy necessary to continue the Debtor's business given that they are not contractually obligated to do so.

16.     The Debtor prepared marketing materials, updated its virtual data room, and compiled a list of potentially interested parties, relying heavily on the interested parties from its first round of marketing efforts. Given the extremely short runway that the Debtor had under its prepetition credit agreement to effect a sale and orderly wind-down, a discrete set of parties were contacted who, based on prior conversations and experience with similar transactions, would be able to transact on the necessary timeline.

17.    In total, the Debtor contacted six parties. Each party was invited to execute an NDA with the Debtor in order to receive the marketing materials and access a virtual data room. Each of the six parties either executed an NDA or confirmed that they were subject to a previously executed NDA.

18.    Following these efforts, the Debtor received two indicative, non-binding offers for the purchase of certain customer contracts, including the Purchaser's offer contemplated by the APA, which the Debtor received hours before commencing this Chapter 11 Case and was the highest and best offer. The Debtor, however, did not have sufficient liquidity to pursue a lengthy sale process and, as discussed below, was forced to commence this Chapter 11 Case in the midst of defaults to its Wholesale Energy Suppliers.

## IV.    **Wholesale Energy Supplier Defaults**

19.    The Debtor's business relies on the purchase of energy from Wholesale Energy Suppliers in order to service customers. The Debtor's contracts with Wholesale Energy Suppliers are short-term commitment contracts that the Debtor pays in arrears. On the Petition Date, the Debtor defaulted on approximately $12.6 million in payments due to its Wholesale Energy Suppliers. These defaults created a domino effect that resulted in the need for chapter 11 relief.

a.    First, Wholesale Energy Suppliers will cease supplying energy to the Debtor;

b.    Second, the Debtor had no other means to procure sufficient energy to service its customers;

c.    Third, the process began for the transition of customers to default service (however defined under applicable state law or by the applicable electric utility or natural gas LDCs) at the applicable electric utility, natural gas LDC, or, to the extent required by state law, such other electric or gas company providing such service (the "Default Transition");[5] and

---

[5]    Each state has a Default Transition process to protect consumers from losing energy services.

      d.      Fourth, until the Debtor's customers are successfully transitioned, the Debtor will likely incur severe daily penalties for the energy that LDCs are providing to customers on the Debtor's behalf given that the Debtor is no longer able to do so.

20.     As of the Petition Date, the Debtor was in most instances between the second and third steps and in some instances already facing the likelihood of such penalties in the fourth step. Thus, the Debtor's initial goal in this Chapter 11 Case was narrowly focused on expediting the Default Transition to stop the unnecessary imposition of significant penalties against the Debtor in order to allow the Debtor to conduct an orderly winddown for the benefit of all stakeholders.

**V.**     **The Transition Motion**

21.     To that end, on March 28, 2022, the Debtor filed an expedited motion (Doc. 44) (the "Transition Motion") to cause the Default Transition. In addition to filing the Transition Motion, the Debtor sent letters (the "LDC Letters") to each of the Debtor's LDCs expressing the need to expeditiously complete the Default Transition in light of the potential fines, penalties, or costs.

22.     The Debtor's decision to commence this Chapter 11 Case on the Petition Date (the last Friday in March) provided two timing benefits with respect to the Default Transition. First, because the natural gas yearly cycle runs from April 1 to March 31, the timing of the Default Transition would allow many of the LDCs to cleanly transfer gas supply for the Debtor's Customers at the beginning of the next gas year. Second, because the bankruptcy filing occurred only days before the next monthly billing cycle for most of the LDC's, the LDCs would be able to roll Customers to default utility throughout April and assume responsibility for gas supply as

of April 1.[6] Put simply, the timing of the bankruptcy filing would allow LDCs to coordinate the next yearly and monthly cycles for the Debtor's Customers in an orderly manner.

23.     After serving the LDC Letters, the Debtor engaged in numerous phone calls and correspondence with the LDCs to discuss the Default Transition process.[7] Prior to the hearing on the Transition Motion,[8] certain of the LDCs informed the Debtor that in order to commence the Default Transition for the April billing cycle and attempt to avoid further fines and penalties, it was critical that, before 3:00 p.m. (ET) on March 30, 2022, the Debtor obtain a Court order granting it authority to take all necessary actions to transfer and transition customers to the applicable LDC. The Debtor contacted the Court to discuss the possible issuance of an emergency order permitting the Debtor to transition its customers, and, given the circumstances, the Court permitted the Debtor to make an oral motion (the "Oral Motion") requesting the necessary relief. The Court conducted an emergency telephonic hearing on the Oral Motion on March 30, 2022. After considering the testimony presented and other statements in support of the Oral Motion, the Court granted the Debtor its requested relief (*see* Doc. 61) (the "Transition Order").

**VI.    Need for an Expedited Sale Process**

24.     Although the Debtor's primary focus in this Chapter 11 Case was facilitating an accelerated Default Transition, the Debtor did not shut the door on a potential sale. The Debtor, however, had to carefully balance the feasibility of bringing value into the estate (through a sale) against the need to preserve the value of the estate (through avoiding fines and penalties).

---

[6]    There are 21 "cycle" days in each gas month. Customers' meter read dates and bill generations occur on each of these "cycle" days.

[7]    Although the Default Transition process is in place to ensure that customers' energy services are not interrupted, the number of customers with respect to which the Debtor defaulted on its obligation to supply natural gas was substantial.

[8]    The hearing on the Transition Motion was initially scheduled for April 5, 2022.

25.     To accomplish this feat, the Debtor needed to engage with the limited pool of buyers that could consummate an expedited sale. The Purchaser, which made the highest and best offer for the Customer Contracts prepetition, was one such buyer. For that reason, the Debtor remained engaged with the Purchaser and conducted calls with the Purchaser and certain LDCs governing Customer Contracts that are subject to the Sale. The Debtor understands that several of the Ohio LDCs have indicated a willingness to recall the Debtor's natural gas capacity, which should avoid the imposition of further fines and penalties against the Debtor, and take responsibility for supplying the Debtor's customers with natural gas. Moreover, several of the Ohio and Michigan LDCs have indicated that they would enroll customers to the Purchaser if the Debtor obtains a Court order authorizing the Sale.

26.     Accordingly, the LDCs have indicated a willingness to cooperate with the Debtor in accomplishing a sale transaction. However, they have no obligation to do so and given their need for Court authorization of the Sale, any delay in seeking approval of the Sale could jeopardize the LDCs willingness to accommodate the Debtor.

27.     Moreover, there is a risk that each day the Sale is not consummated is another day that certain Customers are being permanently transitioned, and the value of the applicable Customer Contracts is likely lost. As stated above, there are 21 cycle days for meter reads upon which customers are billed for natural gas. Each cycle day, the Debtor may be losing Customers whose contracts could otherwise be sold.

28.     The Debtor is not only at risk of losing Customers daily to the Default Transition, but also due to customer attrition (Customers are generally entitled to voluntarily switch providers under the Customer Contracts) and enrollment with alternative energy suppliers ("Alternative Suppliers"). The Debtor has been made aware that Alternative Suppliers may be

9

attempting to enroll the Debtor's Customers.[9] Certain of the LDCs have informed the Debtor that

they will not prevent Customers from being enrolled with Alternative Suppliers, including

through a mass enrollment to standard choice offer (SCO) providers or providers of last resort. If

such enrollments occur, the process is irreversible.

29.     For these reasons, an expedited sale is critical to the Debtor maximizing value for

the benefit of stakeholders.

## THE PROPOSED SALE

30.     As discussed above, there are a number of moving targets in this case. In order to

maximize the value of its estate, the Debtor: (i) must continue working to expeditiously complete

the Default Transition to avoid penalties and fines; while (ii) pursuing a sale to recover the value

of its Customer Contracts before the Default Transition is completed; by (iii) working with a

limited pool of buyers that have the capabilities to accomplish a sale in that timeframe. Because

of these circumstances, the Debtor submits that conducting a private sale as described herein is

not only the more efficient way to realize value from these assets but in fact the *only* way to

maximize value for stakeholders. Put simply, if the APA is not approved, the Debtor's

Customers will either be permanently transferred to the default utility or transferred to

Alternative Suppliers and the Debtor will receive no value for these Customers.

31.     Thus, entering into the APA represents a prudent and proper exercise of the

Debtor's business judgment, is supported by concrete business reasons, and is in the best

interests of the Debtor's estate. Moreover, the terms of the Sale are reasonable, and the result of

---

[9]     It is unclear how Alternative Suppliers are identifying the Debtor's Customers. To the extent that the Debtor's
brokers are "shopping" the Debtor's Customers in violation of their broker agreements with the Debtor, the
Debtor intends to pursue such brokers for automatic stay violations.

good faith, arms'-length negotiations between the Debtor and the Purchaser, and the purchase

price and assumed liabilities represent a positive recovery for the Debtor's estate.

**I.    Summary of Key Terms**

32.    In accordance with Local Rule 6004-1(b), the pertinent terms of the Sale are

summarized in the following table:[10]

| Parties | Seller: Volunteer Energy Services, Inc.<br>Purchaser: NRG Retail LLC |
|---|---|
| **Sale to Insider** | NRG Retail LLC is not an insider of the Debtor within the meaning of Bankruptcy Code section 101(31). |
| **Purchase Price** | Purchase Price: The purchase price for the Assigned Contracts and the assumption of the Assumed Liabilities shall be equal to the sum of the Account Values for each Customer account corresponding to an Assigned Contract for which there is an Assignment Date, *provided that*, in no event shall the Purchase Price be less than Two Hundred Fifty Thousand Dollars ($250,000) *plus* the following Assumed Liabilities:<br><br>a.  any performance obligations of Seller (as provider under the Assigned Contracts) first arising on or after the applicable Assignment Date under the Assigned Contracts, to the extent relating to the period on or after the applicable Assignment Date;<br><br>b.  all Cure Costs obligations, as set forth in Section 5.08 of the APA; and<br><br>c.  all Liabilities for Taxes attributable to the ownership or use of any of the Assigned Contracts on or after the applicable Assignment Date. |
| **Good Faith Deposit** | A deposit in the amount of four hundred thousand Dollars ($400,000). |
| **Purchased Assets** | All Contracts with Customers of the Business that correspond to the Customer accounts identified on Schedule 2.07(b) to the APA, as may be revised from time to time pursuant to Section 2.07(b) of the APA. |
| **Excluded Assets** | All assets except for the Purchased Assets. |

---

[10]    This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the APA, the APA governs in all respects. Capitalized terms used but not otherwise defined in this summary shall have the meanings set forth in the APA.

| | |
|---|---|
| **Private Sale/No Competitive Bidding** | The Sale is a private sale. No auction is contemplated. To the extent the Debtor receives an additional proposal in writing on or before the objection deadline, the Debtor will consider the terms of any such competing offer in order to determine whether such offer represents a viable option that is a higher and better bid for the assets. In the event that such an alternative offer is received, the Purchaser has retained the right to offer a further, competitive bid. |
| **Sale Free and Clear** | The Purchased Assets are being sold free and clear of any mortgage, lien, encumbrance, pledge, charge, security interest, warrant, claim, equitable interest, option, restriction, conditional sale or other title retention device or arrangement, except for Permitted Liens. |

## II.  Assumption and Assignment Procedures

33.     The assumption and assignment procedures will, among other things, govern the process of providing notice to Customers that such contracts will be assumed and assigned to the Purchaser and of the cure amounts the Debtor believes are necessary for the Debtor to properly assume and assign such contracts pursuant to Bankruptcy Code section 365. The proposed assumption and assignment procedures are as follows (collectively, the "Assumption and Assignment Procedures"):

a.     **The Customer Contract List**.

i.     The list of Customer Contracts (the "Customer Contract List") is attached as Schedule 2.07(b) to the APA. If the Customer Contract List is amended at any time prior to April 5, 2022 at 1:30 p.m. (ET) (the "Sale Hearing"),[11] the Debtor shall file an amended Schedule 2.07(b).

b.     **Assumption and Assignment Notice**.

i.     As soon as reasonably practicable after entry of the Sale Order, but in no case more than two (2) Business Days (as defined in the APA) after entry of the Sale Order, the Debtor shall serve on each relevant Customer Contract counterparty the Assumption and Assignment Notice, substantially in the form attached to the Sale

---

[11]   The date of the Sale Hearing is subject to the Court's availability and entry of an order granting expedited relief as to this Motion.

Order as **Exhibit 2**. The Assumption and Assignment Notice shall identify (i) the Customer Contracts to be assumed and assigned, (ii) the proposed cure amount, and (iii) the deadline by which any Customer to such Customer Contracts must file an objection to the assumption and assignment of such Customer Contract, including, without limitation, as to the applicable proposed cure amount. The Assumption and Assignment Notice will also inform Customer that (i) the Sale Order approving the Sale to the Purchaser has been entered and (ii) the date by which Customers must object to the assumption or assignment of its Customer Contract, the proposed cure amounts, if any, or the identity of and ability of the Purchaser to provide adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C).

c.    **Assumption and Assignment Objections**.

i.    <u>Objection Deadline</u>. Any Customer may object to the assumption or assignment of its Customer Contract, the proposed cure amounts, if any, or the identity of and ability of the Purchaser to provide adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C) (an "<u>Assumption and Assignment Objection</u>"). All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the cure amount the Customer believes is required to cure defaults under the relevant Customer Contract and supporting materials evidencing the same, (D) **be filed no later than ten days after service of the Assumption and Assignment Notice** (the "<u>Assumed Contract Objection Deadline</u>") and (E) be served on (1) proposed counsel to the Debtor, Isaac Wiles & Burkholder LLC, Two Miranova Place, Suite 700, Columbus, OH 43215 (Attn: David M. Whittaker and Philip K. Stovall) and McDermott Will & Emery LLP, One Vanderbilt Ave., New York, NY, 10017 (Attn: Darren Azman); (2) counsel to PNC, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801 (Attn: Regina Stango Kelbon), (3) counsel to any statutory committee appointed in this Chapter 11 Case, (4) counsel to NRG, Baker Botts L.L.P., 700 K Street, N.W., Washington, DC 20001 (Attn: Elaine M. Walsh) and 910 Louisiana Street, Houston, Texas 77002 (Attn: David R. Eastlake), (5) the Office of the United States Trustee for the Southern District of Ohio, and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Objection Notice Parties</u>").

ii.   <u>Assumption and Assignment Objections</u>. Any Customer that properly files an Assumption and Assignment Objection will

13

automatically be deemed removed from the Customer Contract List, and such Customer will be returned to the default utility service.

iii.   <u>Failure to File Timely Assumption and Assignment Objection</u>. If a Customer fails to file with the Court and serve on the Objection Notice Parties a timely Assumption and Assignment Objection, the Customer shall (i) be forever barred from objecting to or otherwise contesting the assumption and assignment of its Customer Contract, (ii) be deemed to have consented to the applicable cure amount, if any, and be bound to such corresponding cure amount, (iii) provided that there is no unpaid balance of any cure amount with respect to the applicable Customer Contract, be deemed to have agreed that all defaults under the applicable Customer Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that neither the Purchaser nor the Debtor have any liability or obligation with respect to any default occurring or continuing prior to the assignment, and that the applicable Customer Contract shall remain in full force and effect for the benefit of the Purchaser (and such Customer) in accordance with the terms of the Customer Contract from and after the date of the assignment of the applicable Customer Contract, and (iv) be deemed to have agreed to the terms of the Sale Order.

## **RELIEF REQUESTED**

34.     By this Motion, the Debtor seeks entry of an order, substantially in the form of the Sale Order, authorizing and approving (i) the Sale of the Customer Contracts to the Purchaser free and clear of all liens, claims (as defined in Bankruptcy Code section 101(5)), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever as contemplated by the APA, (ii) authorizing the assumption and assignment of the Customer Contracts, (iii) waiving the 14-day stay with respect to the Sale Order imposed under Bankruptcy Rules 6004(h) and 6006(d), and (iv) granting related relief.

## BASIS FOR RELIEF

I.    **Approval of the Sale is Warranted under Section 363(b).**

35.    Bankruptcy Code section 363(b)(1) provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "Determining whether a sale should be approved under § 363 falls within the sound discretion of the trial court." *See In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008) (quoting *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 388 (6th Cir. 1986)) (internal quotation marks omitted). Although section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan, courts in this Circuit have wide latitude to approve a sale of a debtor's assets in the exercise of the debtor's discretion where a sound business purpose dictates such action. *See Stephens Indus., Inc.*, 789 F.2d at 390 (adopting the Second Circuit's reasoning in *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) and concluding that "a bankruptcy court can authorize a sale . . . when a sound business purpose dictates such action"); *see also In re Baldwin United Corp.*, 43 B.R. 905 (Bankr. S.D. Ohio 1984) (Bankruptcy Court's power to authorize a sale under section 363(b) of the Code is to be exercised at its discretion utilizing a flexible case-by-case approach).

36.    A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale." (*quoting In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under

15

Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'" (internal citations omitted)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (*quoting In re Schipper*); *see also In re Integrated Resources, Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992). Sales outside the ordinary course of business are supported when a valid business justification exists as such justification creates a strong presumption that "the directors of a company acted in good faith and in the best interests of the company." *In re LTV Steel Co., Inc.*, 333 B.R. 397, 410 (Bankr. N.D. Ohio 2005) (citing *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 927–28 (Del. 2003)).

37.     Moreover, Bankruptcy Rule 6004(f) authorizes debtors to sell assets outside the ordinary course of business by private sale. Fed. R. Bankr. P. 6004(f). A debtor is obligated to maximize the return to its estate resulting from an asset sale, whether public or private. *See In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) ("When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate."); *In re Nepsco, Inc.*, 36 B.R. 25, 26 (D. Me. 1983) ("Clearly, the thrust of the statutory scheme is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate."). Accordingly, if a debtor in possession concludes that a particular private purchase offer is the "most advantageous of the estate," a court should defer to the debtor in possession's business judgment. *Bakalis*, 220 B.R. at 532.

38.     Furthermore, completing a sale on an abbreviated timeline is often appropriate— and indeed necessary—to maximize the estate's value. Just as the decision to sell assets is a business judgment, so is the decision to sell those assets quickly. Courts will therefore approve expedited sales where the value of the debtor's assets—like the assets here—are rapidly deteriorating. *In re GSC, Inc.*, 453 B.R. 132, 165 (Bankr. S.D.N.Y. 2011) ("a sale should be

16

approved when the court is faced with the situation of a so-called 'melting ice cube,' a sale that

would prevent 'further, unnecessary losses'" (quoting *In re Lehman Bros. Holdings, Inc.*, 445

B.R. 143, 180 (Bankr. S.D.N.Y. 2011)). The Customer Contracts epitomize the proverbial

"melting ice cube." If value is not realized from the Customer Contracts now, then it is likely

that no value will be realized at all. In addition, the Procedures for Complex Chapter 11 Cases

adopted in this District by General Order 30-4 expressly provide that a "motion to sell

substantially all the debtor's assets may be heard on an expedited basis" (Procedures for

Complex Chapter 11 Cases, page 10).

39.    Accordingly, ample business justification exists to sell the Customer Contracts to

the Purchaser in a private sale.

40.    *First*, time is of the essence with respect to closing the Sale because (i) the

Default Transition is already underway and (ii) the Debtor cannot prevent Customer enrollment

by Alternative Suppliers. These risks were unavoidable. The Debtor was unable to pay its

Wholesale Energy Suppliers and as a result, could not service its Customers. There is a system in

place to ensure that Customers are not at risk of losing power or gas. Specifically, if the Debtor is

unable to supply power or gas, then the LDCs step in to provide this necessity. If this occurs, the

Default Transition begins, and until the Default Transition can be completed, the Debtor is

assessed significant fines and penalties.

41.    The Debtor had no choice but to take action to expedite the Default Transition to

avoid such fines and penalties. As a result of the Debtor's efforts and pursuant to the authority

provided in the Transition Order, certain LDCs have agreed to accelerate the process. The

downside of this process is that the Debtor has only a short window to sell its Customer

Contracts before the customers are permanently transitioned or enrolled with Alternative

Suppliers. The Debtor is hemorrhaging Customer Contracts, and thus if the Sale is delayed at all

(let alone subject to an auction process), then the purchase price will continue to decline until the

Debtor has no Customer Contracts left to sell.

42.      *Second*, there are a limited number of parties with the ability to consummate the

Sale in the truncated timeframe required by these circumstances. As discussed above, only

purchasers that satisfy the licensing and other regulatory requirements are eligible to acquire the

Customer Contracts. While section 363 provides debtors with great flexibility to sell assets,

debtors must still comply with applicable law. *See, e.g.*, *In re Schauer*, 835 F.2d 1222, 1225 (8th

Cir. 1987) (section 363 "do[es] not expressly authorize the trustee to sell property contrary to the

restrictions imposed by state and contract law"). Consequently, there are a limited number of

prospective purchasers eligible to acquire the Customer Contracts. One such party, the

Purchaser, had already submitted the highest and best offer for the Customer Contracts during

the extensive sale process that occurred prior to the Petition Date.

43.      Moreover, at least one LDC has indicated that it can take at least 30 days to set up

an account with the LDC to take the transfer of Customers. Such delay is not at issue here

because the Purchaser already has accounts with each applicable LDC. Additionally, the Ohio

public utilities commission (the "PUC") requires two-weeks' notice of the identity of a purchaser

of customer contracts and on April 1, 2022, the Debtor filed a notice with the PUC notifying the

PUC of the potential Sale. A true and correct copy of such notice is attached hereto as **Exhibit C**.

If the Debtor is required to conduct an auction process and a there is a new purchaser, the Debtor

will be required to file a new notice with the PUC, which will require an additional two-week

notice period.

44.     For the foregoing reasons, the relief sought herein is not only reasonable, but necessary to maximize the value of the Debtor's estate, and rooted in the Debtor's sound business judgment.

45.     It is not uncommon for bankruptcy courts to authorize a private sale pursuant to Bankruptcy Code section 363, without bidding procedures or an auction, when it is necessary or justified under on the circumstances. *See, e.g.*, *In re FirstEnergy Solutions Corp.*, No. 18-50757 (AMK) (Bankr. N.D. Ohio June 12, 2018) (authorizing a private sale of certain of the debtors' assets without bidding procedures or an auction); *In re Toys "R" Us Property Company I, LLC*, No. 18-31429 (KLP) (Bankr. E.D. Va. May 22, 2019) (same); *In re Vanguard Natural Resources, LLC*, Case No. 17-30560 (MI) (Bankr. S.D. Tex. July 12, 2017) (same); *In re International Shipholding Corp.*, Case No. 16-12220 (SMB) (Bankr. S.D.N.Y. May 2, 2017) (same); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Aug. 16, 2016) (same).

## II.     The Customer Contracts Should be Sold Free and Clear of Liens, Claims, Encumbrances, and Interests.

46.     Pursuant to Bankruptcy Code section 363(f), a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable non-bankruptcy law permits the sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f)(1)–(5). Because these requirements are listed in the disjunctive, the Debtors only need to satisfy one of the five requirements to permit the Customer Contracts to be sold "free and clear" of liens and interests. *In re Wolverine*

19

*Radio Co*., 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that section 363(f) of the

Bankruptcy Code is written in the disjunctive; holding that the court may approve the sale "free

and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is

met). The Debtor's prepetition and DIP lender, PNC, has consented to the Sale free and clear of

all liens, claims, encumbrances, and interests. As PNC is the only entity with a lien, claim, or

other encumbrance on or against the Customer Contracts, section 363(f) is satisfied.

### III.    The Sale of the Customer Contracts is Proposed in Good Faith.

47.    Bankruptcy Code section 363(m) protects a good faith purchaser's interest in

property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is

later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale . . . to an
> entity that purchased . . . such property in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) fosters the "'policy of not only affording finality to the

judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and

judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.)*,

No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In

re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); s*ee also Allstate Ins. Co. v.

Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith

transfers of property will not be affected by the reversal or modification on appeal of an unstayed

order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day,

Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith

20

purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

48.     The Debtor submits that the Sale has been proposed in good faith and is the product of arms'-length negotiations between the Debtor and the Purchaser to sell the Customer Contracts on mutually agreeable terms. Moreover, the terms of the Sale Transaction were negotiated with the active involvement of the Debtor's and Purchaser's management teams and respective professionals. To the best of the Debtor's knowledge, the purchase of the Customer Contracts by the Purchaser is not the product of collusion or bad faith. Accordingly, the Debtor requests that the Court determine that the Purchaser is entitled to the full protections of good faith purchasers under Bankruptcy Code section 363(m).

## IV.    **Assumption and Assignment of Customer Contracts**

49.     In connection with the Sale, the Debtor will assume and assign the Customer Contracts to the Purchaser. Bankruptcy Code section 365(a) provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under Bankruptcy Code Section 365(a). *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) ("The bankruptcy court will generally approve [the] choice [to assume or reject an executory contract] under the deferential 'business judgment' rule.").

50.     The business judgment standard is a deferential one "21equire[ing] only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987). Thus, courts generally will

not second-guess a debtor's business judgment concerning an executory contract absent a showing of bad faith or gross abuse of discretion. *See Allied Tech., Inc. v. R.B. Brunemann & Sons, Inc.*, 25 B.R. 484, 495 (Bankr. S.D. Ohio 1982) (the court should approve the debtor's decision unless it "is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code . . . ."). More exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, to assume an executory contract, a debtor must "cure, or provide adequate assurance that the debtor will promptly cure," any default. 11 U.S.C. § 365(b)(1).

51.    A debtor may assign a contract it has assumed. 11 U.S.C. § 365(f)(2) (providing that the "trustee may assign an executory contract… only if the trustee assumes such contract… and adequate assurance of future performance is provided."). "Adequate assurance of future performance" is fact and circumstance dependent. Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance is present when prospective assignee has financial resources and is willing to devote sufficient funding to business to give it strong likelihood of success). Pursuant to the terms of the APA, to the extent any defaults exist under any Customer Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.

52.    Notwithstanding the foregoing, the Debtor's sale process is unusual due to the severe time constraints and the necessity that the Sale be consummated before the Default

Transition. Thus, the Debtor seeks approval of the Assumption and Assignment Procedures, which provide for the Assumption and Assignment Objection Deadline occurring *after* the Sale Order is entered, and after the Sale has been consummated. Meaning, unless a Customer is actively following this Chapter 11 Case, such counterparty will not have notice of the Sale and the opportunity to be heard at the Sale Hearing.

53.     Notwithstanding the foregoing, the Debtor's customers will not be prejudiced by this limited notice and post-closing objection deadline. If a Customer properly files an Assumption and Assignment Objection, the Debtor and Purchaser have agreed to automatically remove the Customer Contract related to such objection from the Customer Contract List and transition such customer to default utility service. As a result, no Customer Contract counterparty will be prejudiced by this procedure because in either scenario (*i.e.*, the Customer Contract not being included in the Sale or the Customer Contract being removed from the Sale after closing), the Customer will be transitioned to default utility. Thus, the end result for any objecting Customer will be the same—the Customer will be returned to the default utility.

54.     The Debtor submits that it is an exercise of its sound business judgment to assume and assign the Customer Contracts because the Customer Contracts are the entirety of the assets being sold pursuant to the APA.

**V.      <u>Assumption and Assignment Procedures.</u>**

55.     As a procedural matter, "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease . . . is governed by Rule 9014." Fed. R. Bankr. P. 6006(a). Bankruptcy Rule 9014 provides that "[i]n a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought." The notice and hearing requirements for

contested matters under Bankruptcy Rule 9014 are satisfied if appropriate notice and an opportunity for hearing are given in light of the particular circumstances. *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" or a similar phrase to mean such notice and opportunity for hearing "as [are] appropriate in the particular circumstances.").

56.    The Debtor respectfully submits that the Assumption and Assignment Procedures are appropriate and reasonably tailored given the circumstances. Pursuant to these procedures, the Debtor will serve the Assumption and Assignment Notice attached as **Exhibit 2** to the Sale Order upon each Customer Contract party. Upon receipt of the Assumption and Assignment Notice, the Customer Contract counterparties will be given the opportunity to object to the assumption and assignment of their respective contracts. The Debtor is requesting that it be permitted to send Customer Contract counterparties the Assumption and Assignment Notice attached as **Exhibit 2** to the Sale Order. The Assumption and Assignment Notice will identify (i) the Customer Contracts to be assumed and assigned, (ii) the cure amount, and (iii) the deadline by which any Customer Contract counterparty to such Customer Contracts must file an objection to the assumption and assignment of such Customer Contract, including, without limitation, as to the applicable cure amount. The Assumption and Assignment Notice will also inform Customer Contract counterparties (i) that the Sale Order approving the Sale to the Purchaser has been entered and (ii) of the date by which Customer Contract counterparties must object to the ability of the Purchaser to provide adequate assurance of future performance under the applicable Customer Contract. The Debtor submits that service of the Assumption and Assignment Notice in accordance with the Assumption and Assignment Procedures will provide the Customers with adequate notice of and opportunity to object to the Debtor's proposed assumption and assignment of their particular Customer Contract.

24

57.     The Assumption and Assignment Procedures provide that any Customer that fails to object to the proposed assumption and assignment of any Customer Contract will, *inter alia*, be deemed to consent to the assumption and assignment of the applicable Customer Contract pursuant to Bankruptcy Code section 365, notwithstanding any anti-assignment provision or other restriction on assignment contained in the applicable contract. Courts have routinely granted such relief. *See, e.g.*, *In re Empire Generating Co, LLC*, Case No. 19-23007 (RDD) (Bankr. S.D.N.Y. May 19, 2019) [Docket No. 99] (ordering that failure to object to the assignment and assumption procedures forever bars contract counterparties from objecting to the assumption and assignment of their contract to the successful bidder); *In re Angelica Corporation*, Case No. 17-10870 (JLG) (Bankr. S.D.N.Y. Apr. 3, 2017) [Docket No. 137] (same); *see also Hargrave v. Twp. Of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (finding that by not objecting to the sale motion, a creditor was deemed to consent); *Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

58.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the petition date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. For the reasons discussed above, granting the relief requested herein is integral to the Debtor's ability to recover value for the Customer Contracts before the Default Transition. If the Debtor does not receive such authorization and relief during the first 21 days of this Chapter 11 Case the value of the Customer Contracts will likely be lost and no sale process could be completed. For the reasons discussed herein, the relief requested is necessary in order for the Debtor to maximize the value of its estate for the benefit of all stakeholders.

Accordingly, the Debtor submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested in this Motion.

### WAIVER OF BANKRUPTCY RULES 6004(a), 6004(h) and 6006(d)

59.      The Debtor requests that the Court (a) find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the fourteen-day stay requirements under Bankruptcy Rules 6004(h) and 6006(d). In light of the Debtor's current financial condition and potential depletion of assets, the proposed Sale contemplated herein should be consummated as soon as practicable to allow the Debtor to maximize value for its estate and stakeholders. Accordingly, the Debtor requests that the Sale Order be effective immediately upon entry and that the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) be waived.

### MOTION PRACTICE

60.      This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this Motion. Accordingly, the Debtor submits that this Motion satisfies Local Rule 9013-1(a).

### NOTICE

61.      The Debtor will provide notice of this Motion to: (a) the United States Trustee; (b) counsel to PNC Bank, National Association; (c) the holders of the 20 largest unsecured claims against the Debtor; (d) all official committees appointed, as of the filing of this Motion, in the Chapter 11 Case and their counsel; I the offices of the attorneys general for Ohio, Pennsylvania, Michigan, Kentucky, and West Virginia; (f) the United States Attorney's Office for the Southern District of Ohio; (g) the Internal Revenue Service; (h) the Debtor's state and taxing authorities in Ohio, Pennsylvania, Michigan, Kentucky, and West Virginia; (i) the Public Utilities Commission of Ohio, Pennsylvania Public Utilities Commission, Kentucky Public

Service Commission, and Michigan Public Service Commission; (j) the U.S. Environmental

Protection Agency; (k) the Federal Energy Regulatory Commission; and (l) any party that has

requested notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the

nature of the relief requested, no other or further notice is required.

### NO PRIOR REQUEST

62.     No prior motion for the relief requested herein has been made to this or any other

court.

WHEREFORE, the Debtor respectfully requests that this Court enter the Sale Order

granting the relief requested herein and such other and further relief as the Court may deem just

and appropriate.

Dated:  April 4, 2022                          Respectfully submitted,
       Columbus, Ohio

                                       */s/ David M. Whittaker*
                                       David M. Whittaker (0019307)
                                       Philip K. Stovall (0090916)
                                       **ISAAC WILES & BURKHOLDER, LLC**
                                       Two Miranova Place, Suite 700
                                       Columbus, Ohio 43215-5098
                                       Tel:    (614) 221-2121
                                       Fax:    (614) 365-9516
                                       Email: dwhittaker@isaacwiles.com
                                                pstovall@isaacwiles.com

                                       *- and –*

                                       Darren Azman (admitted *pro hac vice*)
                                       Natalie Rowles (admitted *pro hac vice*)
                                       **MCDERMOTT WILL & EMERY LLP**
                                       One Vanderbilt Avenue
                                       New York, New York 10017-3852
                                       Tel:    (212) 547-5400
                                       Fax:    (212) 547-5444
                                       Email  dazman@mwe.com
                                                nrowles@mwe.com

                                       *Proposed Counsel to the Debtor*

## Exhibit A

**Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOLUNTEER ENERGY SERVICES, INC., | ) | Case No. 22-50804 |
| | ) | |
| Debtor.[1] | ) | Judge C. Kathryn Preston |
| | ) | |

**ORDER (I) AUTHORIZING AND APPROVING A PRIVATE SALE OF
CERTAIN OF THE DEBTOR'S CUSTOMER CONTRACTS FREE AND
CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES;
(II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
OF THE DEBTOR'S CUSTOMER CONTRACTS; (III) WAIVING THE 14-
DAY STAYS IMPOSED UNDER BANKRUPTCY RULES 6004(h) AND
6006(d); AND (IV) GRANTING RELATED RELIEF
[RELATED TO DOCKET NO. [__]**

Upon the motion (Doc. __) (the "Motion")[2] of the Debtor pursuant to Bankruptcy Code

sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules

6004-1 and 9013-1, for an order authorizing and approving, (i) the private sale (the "Sale") of

certain of the Debtor's customer contracts (the "Customer Contracts")[3] to NRG Retail LLC or its

designee(s) (collectively, the "Purchaser") free and clear of all liens, claims (as defined in

Bankruptcy Code Section 101(5)), encumbrances, obligations, liabilities, contractual

commitments or interests of any kind or nature whatsoever as contemplated by the Asset Purchase

Agreement (the "APA"), between the Debtor and the Purchaser, attached to the Sale Order as

Exhibit 1, (ii) authorizing the assumption and assignment of the Customer Contracts, and (iii)

---

[1]    The last four digits of the Debtor's federal tax identification are (2693), and the address of the Debtor's corporate headquarters is 790 Windmiller Drive, Pickerington, Ohio 43147.

[2]    Capitalized terms utilized but not defined herein shall have the meanings given them in the Motion or the APA, as applicable.

[3]    The Customer Contracts shall not include any Customer Contract in which the counterparty thereto (the "Customers") has voluntarily terminated such contract prior to the transfer of such Customer to the Purchaser.

granting related relief, all as more fully set forth in the Motion; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court; and upon consideration of the First Day Declaration, the Buck Declaration, and the Sandford Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference entered in this District; and the matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice is necessary; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, creditors, and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor; it is hereby

**FOUND AND DETERMINED that**:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, and to the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    The Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. § 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). Venue of this Chapter 11 Case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The statutory predicates for the relief sought in the Motion are Bankruptcy Code

sections 105(a), 363, and 365 of the Bankruptcy Code, as complemented by Bankruptcy Rules

2002, 6004, 6006, 9007, 9008 and 9014.

D.      The Debtor's proposed notice of the Motion and the proposed entry of this Sale

Order are (i) appropriate and reasonably calculated given the circumstances to provide all

interested parties with timely and proper notice, (ii) in compliance with all applicable requirements

of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and (iii) adequate

and sufficient under the circumstances of this Chapter 11 Case, and no other or further notice is

required. A reasonable opportunity to object or be heard regarding the relief requested in the

Motion has been afforded to all interested persons and entities, including, but not limited to, the

Objection Notice Parties (as defined below).

E.      The Purchaser (i) is purchasing the Customer Contracts in good faith and (ii) is a

good faith purchaser for value within the meaning of Bankruptcy Code section 363(m) and

therefore is entitled to the full protections of that provision and any other applicable or similar

bankruptcy or non-bankruptcy law. The Purchaser otherwise has proceeded in good faith in all

respects in connection with this proceeding in that, among other things: (a) the Purchaser

recognized that the Debtor was free to deal with any other party interested in acquiring the

Customer Contracts and to solicit competing offers for the Customer Contracts, (b) all payments

to be made by the Purchaser in connection with the APA have been disclosed, (c) the Purchaser

has not violated Bankruptcy Code section 363(n) by any action or inaction, and (d) the APA was

negotiated, proposed, and entered into in good faith and from arms'-length bargaining positions

with the parties represented by competent counsel of their choosing.  Neither the Purchaser nor

any of its affiliates or representatives are "insiders" of the Debtor, as that term is defined in

Bankruptcy Code section 101(31), and no common identity of incorporators, directors or stockholders exists between the Purchaser and the Debtor. Therefore, the Sale and the Debtor's entry into the APA, may not be avoided, and costs may not be recovered or punitive damages awarded, pursuant to Bankruptcy Code section 363(n).

F.      The Purchaser will be acting in good faith within the meaning of Bankruptcy Code section 363(m) in closing the Sale as contemplated by the APA at any time after the entry of this Sale Order and, accordingly, such closing in the face of an appeal, if one should arise, will not deprive the Purchaser of its status as a good faith purchaser.

G.      The consideration provided by the Purchaser pursuant to the APA, including the Purchase Price and Assumed Liabilities, is fair and adequate, is the highest or otherwise best offer therefor and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia (including the Uniform Fraudulent Transfer Act, Uniform Voidable Transactions Act, and the Uniform Fraudulent Conveyance Act).  The APA was not entered into, and neither the Debtor nor the Purchaser have entered into the APA or propose to consummate the Sale, for the purpose of hindering, delaying or defrauding the Debtor's present or future creditors. The Debtor's determination that the APA constitutes the highest or otherwise best offer for the Customer Contracts constitutes a reasonable, valid, and sound exercise of the Debtor's business judgment, and is in the best interests of the Debtor, its estate, and its creditors.

H.      Subject to the entry of this Sale Order, the Debtor has full power and authority to execute the APA and all other documents contemplated thereby, and the Sale has been duly and validly authorized.

I.      The Customer Contracts constitute property of the Debtor's bankruptcy estate and title thereto is vested in the Debtor's estate, within the meaning of Bankruptcy Code section 541. Accordingly, the Debtor has or will have as of the date of Closing all right, title, and interest to and in the Customer Contracts that may be required to implement and effectuate the Sale in the manner contemplated by the APA.

J.      The Debtor (i) has full corporate power and authority to execute the APA, and the Sale has been duly and validly authorized by all necessary corporate action, (ii) has all of the corporate power and authority necessary to consummate the Sale and all transactions contemplated by the APA, (iii) has taken all corporate action necessary to authorize and approve the APA and the consummation by the Debtor of the Sale and all transactions contemplated thereby, and (iv) does not require any consents or approvals that have not been obtained, other than the Court's entry of this Sale Order and those expressly provided for in the APA to consummate such transactions.

K.      The transfer of the Customer Contracts to the Purchaser will be a legal, valid, and effective transfer of the Customer Contracts and will vest the Purchaser at Closing with all right, title, and interest of the Debtor in and to the Customer Contracts, free and clear of all claims (as defined in Bankruptcy Code section 101(5), "Claims"), Liens (as defined in Bankruptcy Code section 101(37)) and encumbrances (together, "Liens") and all other interests (collectively, with Claims and Liens, "Interests"), except for the liabilities assumed by the Purchaser under the APA ("Assumed Liabilities").  Other than the Assumed Liabilities, the Purchaser (and its successors and assigns) shall have no obligations with respect to any liabilities of the Debtor.

L.      Effective upon the Closing, this Sale Order (i) is and shall be effective as a determination that all Interests (other than Assumed Liabilities) of any kind or nature whatsoever existing as to the Customer Contracts prior to the Closing have been unconditionally released,

discharged, and terminated, and that the conveyances described herein have been effected, (ii) is and shall be binding upon and shall govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Customer Contracts conveyed to the Purchaser, and all recorded Interests (other than Assumed Liabilities) against the Customer Contracts shall be deemed stricken from such entities' records, official and otherwise.

      M.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing Interests against or on the Customer Contracts shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests (other than Assumed Liabilities) that the person or entity has or may assert with respect to the Customer Contracts, the Debtor and the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Customer Contracts. The Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Interests against the Customer Contracts (other than the Assumed Liabilities). This Sale Order is deemed to be in recordable form

sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

N.      PNC Bank, N.A., as the Debtor's prepetition secured lender and debtor-in-possession financier permits the Debtor to implement the Sale.

O.      The Purchaser is not, and will not become by virtue of the Sale, a successor to the Debtor, the Debtor's business or the Debtor's estate by reason of any theory of law or equity and the Purchaser shall not assume or in any way be responsible for any liability, obligation, duty, or responsibility of the Debtor or its estate, except as otherwise expressly provided in the APA or this Sale Order.  The Purchaser is not a continuation or substantial continuation of the Debtor, its business or its estate, and there is no continuity between the Purchaser and the Debtor or its estate, business or operations.  The Purchaser does not have a common identity of incorporators, directors or equity holders with the Debtor.  The Purchaser is not holding itself out to the public as a continuation of the Debtor or its estate, and the Sale does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtor.

P.      A sale of the Customer Contracts other than one free and clear of all Interests on the terms set forth herein would be of substantially less benefit to and would adversely affect the Debtor's bankruptcy estate.  The Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby if the transfer and sale of the Customer Contracts as provided therein were not free and clear of all Interests, or if the Purchaser would, or in the future could, be liable in respect of any such Interests.

Q.      The Sale neither impermissibly restructures the rights of the Debtor's creditors or holders of the Debtor's equity securities nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtor.  The Sale does not constitute a *sub rosa* plan.

R.      The Debtor will, including by way of entering into the APA, and the provisions

relating to the Customer Contracts therein, (i) cure, or provide adequate assurance of cure, of any

default existing prior to the date hereof under any of the Customer Contracts, within the meaning

of Bankruptcy Code section 365(b)(l)(A), and (ii) provide compensation or adequate assurance of

compensation to any party for any actual pecuniary loss to such party resulting from a default prior

to the date hereof under any of the Customer Contracts, within the meaning of Bankruptcy Code

section 365(b)(1)(B).  The Purchaser's promises to perform the obligations under the Customer

Contracts after the Assignment Date shall constitute adequate assurance of future performance

under the Customer Contracts being assigned to it within the meanings of Bankruptcy Code

sections 365(b)(1)(C) and (f)(2)(B).

S.      The Notice of Assumption and Assignment of Contracts identifying the

Customer Contracts plus the corresponding Cure Amount shall be served upon all Customer

Contract counterparties. Such notice is deemed good, sufficient, and appropriate under the

circumstances, and no other or further notice need be provided in connection with the assumption

and assignment of the Customer Contracts and fixing of cure amounts related thereto.  All

Customer Contract counterparties shall have an adequate opportunity to object to the assumption

and assignment of the Customer Contracts, the cure amounts, and adequate assurance of future

performance, and service of the Notice of Assumption and Assignment of Contracts is reasonably

calculated to provide Customer Contract counterparties with, among other things, notice of the

deadline to object to the assumption and assignment of such Customer Contract to the Purchaser.

T.      Subject to a timely and properly filed Assumption and Assignment Objection,

the Customer Contracts are assignable notwithstanding any provisions contained therein to the

contrary.  Failure of a Customer to timely and properly file an Assumption and Assignment

Objection shall be deemed consent by the Customer to the proposed cure amounts and the assumption and assignment of such Customer Contract to the Purchaser. If an Assumption and Assignment Objection is timely and properly filed, the Customer Contract subject to such objection shall not be assumed and assigned and such Customer shall be transitioned to default utility service by either the Debtor or the Purchaser, as applicable.

U.    The Debtor has articulated good and sufficient business reasons for this Court to approve the Notice of Assumption and Assignment, attached hereto as **<u>Exhibit 2</u>**, and service thereof on Customer Contract counterparties.

V.    The Assumption and Assignment Procedures are reasonable and appropriate and consistent with Bankruptcy Code section 365 and Bankruptcy Rule 6006.

W.    Each Customer Contract is a valid and binding agreement between the Debtor and such Customer as of the date hereof. The temporary transfer of a Customer to default service shall in no way impact the validity and binding nature of such Customers Customer Contract or the Debtor's ability to assume and assign such Customer Contract to the Purchaser.

X.    The Debtor may sell the Customer Contracts to the Purchaser free and clear of all Interests (except the Assumed Liabilities) in accordance with, and to the extent permitted by, Bankruptcy Code section 363(f) because, in each case, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

Y.    It is a reasonable exercise of the Debtor's business judgment to consummate the Sale contemplated by the APA, and such actions are in the best interests of the Debtor's estate and its creditors. The Court finds the Debtor has articulated good, sufficient, and sound business purposes and justifications for the Sale, and compelling circumstances for this Court to approve the APA and the consummation of the Sale pursuant to Bankruptcy Code section 363(b) to the Purchaser,

including but not limited to, the following: (i) the APA constitutes the highest or otherwise best offer for the Customer Contracts and will provide a greater recovery for the Debtor's estate than would be provided by any available alternative, (ii) the APA represents a fair and reasonable offer to purchase the Customer Contracts and no other person or entity or group of entities has offered to purchase the Customer Contracts for greater economic value to the Debtor's estate than the Purchaser, (iii) the Debtor and the Purchaser engaged in good-faith, arms'-length negotiations with respect to all aspects of the Sale and the APA.

Z.      The consummation of the Sale is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

AA.     The APA is a valid and binding contract between the Debtor and the Purchaser, which is and shall be enforceable against the Purchaser and the Debtor according to its terms.

BB.     The Debtor has articulated good and sound business reasons for waiving the stay otherwise imposed by Bankruptcy Rules 6004(h), and 6006(d).

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that:**

1.      The Motion is granted as set forth herein.

2.      All objections to the entry of this Sale Order and the relief requested in the Motion and granted herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, hereby are denied and overruled.

3.      The APA and the transactions contemplated thereunder are hereby approved in all respects.

4.      The Purchaser's offer for the Customer Contracts, as embodied in the APA, is

the highest and best offer for the Customer Contracts and is hereby approved.

5.      The Debtor is authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the APA together with all additional instruments and documents that the Purchaser reasonably deems necessary or appropriate to implement the APA and effectuate the Sale, and to take all other and further actions as may be reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to Purchaser the Customer Contracts, or as may be necessary or appropriate to the performance of the obligations of the Purchaser and the Debtor as contemplated by the APA. The Debtor shall not transfer any Customers in Ohio to the Purchaser earlier than April 15, 2022. Each applicable LDC is: (i) with respect to Customers in Ohio, hereby authorized and directed to cause the applicable Customers to be transferred to Purchaser no earlier than April 15, 2022 and no later than June 30, 2022; and (ii) with respect to Customers in Michigan, hereby authorized and directed to cause the applicable Customers to be transferred to Purchaser as soon as reasonably practicable, but in any event no later than June 30, 2022.

6.      The transfer of the Customer Contracts to the Purchaser upon the Closing pursuant to the APA shall constitute a legal, valid, and effective transfer of the Customer Contracts, notwithstanding anything to the contrary under applicable tariffs or otherwise, and shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Customer Contracts, free and clear of all Interests of any kind or nature whatsoever, including, without limitation, any rebate, refund, or similar obligation that may now or in the future be owed to Customers, other than the Assumed Liabilities, with all such Interests attaching to the net cash proceeds of the Sale in the order of their priority, with the same validity, force, and effect that they now have as against the Customer Contracts, subject to any claims and defenses the Debtor's estate may possess with respect

thereto.  All holders of Interests fall within one or more subsections of Bankruptcy Code section 363(f) and are adequately protected by having their Interests attach to the net proceeds received by the Debtor.

7.      The temporary transfer of a Customer to default service shall in no way impact the validity and binding nature of such Customer's Customer Contract or the Debtor's ability to assume and assign such Customer Contract to the Purchaser.

8.      At or prior to Closing of the Sale, each of the Debtor's creditors and any other holder of an Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Customer Contracts, if any, as such Interests may have been recorded or may otherwise exist.

9.      If any person or entity that has filed financing statements, mortgages, *lis pendens* or other documents or agreements evidencing Interests in the Customer Contracts (except for the Assumed Liabilities) has not delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction or releases of all Interests that the person or entity has with respect to the Customer Contracts, then: (a) the Purchaser is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Customer Contracts, and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which shall constitute conclusive evidence of the release of all Interests in the Customer Contracts of any kind or nature whatsoever.  Each and every federal, state and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale.  Notwithstanding the foregoing, the provisions of this Sale Order authorizing the Sale free and

clear of Interests shall be self-executing, notwithstanding any failure of the Debtor, the Purchaser

or any other party to execute, file or obtain termination statements, instruments of satisfaction,

releases, assignments, consents or other documents to effectuate, consummate and/or implement

the provisions hereof or of the APA with respect to the Sale of the Customer Contracts, and all

Interests in, on or against the Customer Contracts, except for the Assumed Liabilities, shall be

deemed unconditionally released, discharged, terminated, void and unenforceable with respect to

the Customer Contracts upon the occurrence of the Closing.

10.     This Sale Order: (a) shall be effective as a determination that, except for the

Assumed Liabilities, at Closing, all Interests of any kind or nature whatsoever in or to the

Customer Contracts prior to the Closing have been unconditionally released, discharged and

terminated with respect to the Customer Contracts being sold (but not, for the avoidance of doubt,

released, discharged or terminated with respect to the proceeds of those Customer Contracts), and

that the conveyances described herein have been effected, and (b) shall be binding upon and shall

govern the acts of all entities, including, without limitation, all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and local

officials, and all other persons and entities who may be required by operation of law, the duties of

their office or contract to accept, file, register or otherwise record or release any documents or

instruments, or who may be required to report or insure any title or state of title in or to any of the

Customer Contracts.

11.     Except for the Assumed Liabilities, all persons, including, but not limited to, all

debt security holders, equity security holders, federal, state or local governmental, tax,

environmental and regulatory authorities or agencies, lenders, trade and other creditors, holding

Interests of any kind or nature whatsoever against, in connection with or in any way relating to the

Debtor or in the Customer Contracts hereby are forever barred, estopped and permanently enjoined

from asserting, prosecuting or otherwise pursuing such Interests of any kind or nature whatsoever

against the Purchaser or its officers, directors, shareholders or partners, its property or its

successors and assigns or the Customer Contracts, as an alleged successor or otherwise, with

respect to any Interest of any kind or nature whatsoever such person or entity had, has or may have

against or in the Debtor, its estate, its respective officers, directors or shareholders or the Customer

Contracts. No such person shall assert against the Purchaser or any of its successors in interest any

liability, debt, Claim or obligation relating to or arising from Interests in the Customer Contracts

or any liabilities calculable by reference to the Debtor.

12.     Any person or entity that is currently, or on the Closing Date may be, in

possession of some or all of the Customer Contracts, including, without limitation, the LDCs, is

hereby directed to surrender possession of such Customer Contracts either to (a) the Debtor before

the Closing or (b) to the Purchaser upon the Closing.

13.     The Debtor is hereby authorized and directed in accordance with Bankruptcy

Code sections 105(a) and 365 to (a) assume, assign and sell to the Purchaser, effective and

conditioned upon the Closing, the Customer Contracts free and clear of all Interests of any kind

or nature whatsoever, and (b) execute and deliver to the Purchaser such documents or other

instruments as the Purchaser deems is necessary or appropriate to assign and transfer the Customer

Contracts to the Purchaser.

14.     All requirements and conditions under Bankruptcy Code sections 363 and 365

(including without limitation, the satisfaction of the requirements under Bankruptcy Code

sections 365(b)(1) and 365(c)(1)) for the Debtor's assumption, assignment and sale to the

Purchaser of each of the Customer Contracts have been satisfied, and the Debtor may assume, assign and sell to the Purchaser (at the Closing) each of the Customer Contracts in accordance with Bankruptcy Code sections 363 and 365. Any provisions in any Customer Contracts that prohibit or condition the assignment of such Customer Contracts or allow the party to such Customer Contracts to terminate, recapture, set off (if not exercised pre-petition), impose any penalty, condition, renewal or extension or modify any term or condition upon the assignment of such Customer Contracts, constitute unenforceable anti-assignment provisions, which are void and of no force and effect. The Debtor shall be relieved from any further liability with respect to Customer Contracts after the Debtor's assumption and assignment to the Purchaser at Closing, except Excluded Liabilities.

15.     Upon the Debtor's assignment of the Customer Contracts under this Sale Order, no default shall exist under any of the Customer Contracts and no Customer thereto shall be permitted to declare or enforce a default by the Debtor thereunder prior to the effective date of assumption. All defaults or other obligations of the Debtor under the Customer Contracts arising prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in Bankruptcy Code section 365(b)(2)), are deemed satisfied by the payment of the cure amounts, if any, with respect to each Customer Contract, which shall be satisfied as soon as practicable by the Purchaser in accordance with the APA or any agreement with a Customer.

16.     The Debtor and the Purchaser are authorized to amend the Customer Contract List attached to the APA as set forth in the APA.

17.     Each Customer to a Customer Contract is hereby forever barred, estopped, and permanently enjoined from asserting against the Purchaser, or the Customer Contracts, any default

arising prior to or existing as of the Closing, any indemnification claims or any counterclaim, setoff (if not exercised pre-petition) or any other Claim asserted or assertable against the Debtor.

18.     To the extent a counterparty to any of the Customer Contracts fails to timely object to a cure amount, such cure amount shall be deemed to be finally determined and any counterparty shall be prohibited and forever barred from challenging, objecting to, or denying the validity and finality of the cure amount at any time.

19.     The failure of the Debtor or the Purchaser to enforce at any time one or more terms or conditions of any of the Customer Contracts shall not be a waiver of such terms or conditions, or of the Debtor's and the Purchaser's rights to enforce every term and condition of the Customer Contracts.

20.     The Purchaser shall have no responsibility for any debt, liability, or other obligation of the Debtor arising under or related to the Customer Contracts other than the Assumed Liabilities.  Without limiting the generality of the foregoing and except as otherwise specifically provided in the APA, the Purchaser shall not be liable for any Claims against the Debtor or any of their predecessors or affiliates arising out of or based on any obligations of the Debtor arising prior to the Closing, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the Customer Contracts or the Debtor prior to the Closing.

21.     The Purchaser is not, and shall not be deemed, as a result of any action taken in connection with, or as a result of the Sale including the transfer and sale of the Customer Contracts, to: (i) be a legal successor (or other such similarly-situated party) to the Debtor, its business and operations or its estate (except as otherwise specified in the APA) by reason of any theory of law or equity; (ii) to be an affiliate of the Debtor, (iii) have, *de facto* or otherwise,

merged with or into the Debtor, or (iv) be an alter ego or continuation or successor of the Debtor in any respect.

22.     <u>Assumption and Assignment Procedures</u>**.** The Assumption and Assignment procedures set forth in the Motion are hereby approved.

23.     The form of Assumption and Assignment Notice, attached hereto as **<u>Exhibit 2</u>** and service thereof on Customer Contract counterparties, is hereby approved in all respects. The Assumption and Assignment Notice (i) contains the type of information required under Bankruptcy Rule 2002 that is currently known to the Debtor and (ii) is reasonably calculated to provide due, adequate, and timely notice to all Customer Contract counterparties of (a) the assumption and assignment of the Customer Contracts and rights thereunder, (b) the proposed cure amounts and (c) the deadline to file objections to such assumption and assignment, the existence of any defaults, the proposed cure amounts or adequate assurance of future performance.

24.     As soon as reasonably practicable, but in no case more than two (2) Business Days after entry of this Sale Order, the Debtor shall serve on each relevant Customer the Assumption and Assignment Notice.

25.     <u>Objection Deadlines</u>. Any Customer may object to the assumption or assignment of its Customer Contract, the proposed cure amounts, if any, or the identity of and ability of the Purchaser to provide adequate assurance of future performance **<u>within the meaning of Bankruptcy Code section 365(b)(l)(C)</u>** (an "<u>Assumption and Assignment Objection</u>"). All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the cure amount the Customer believes is required to cure defaults under the relevant Customer Contract and supporting materials evidencing the

same, (D) **be filed no later than ten days after service of the Assignment and Assumption Notice** and I be served on (1) proposed counsel to the Debtor, Isaac Wiles & Burkholder LLC, Two Miranova Place, Suite 700, Columbus, OH 43215 Attn: David M. Whittaker and Philip K. Stovall, and McDermott Will & Emery LLP, One Vanderbilt Ave., New York, NY, 10017 Attn: Darren Azman; (2) counsel to PNC, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801 Attn: Regina Stango Kelbon, (3) counsel to any statutory committee appointed in this Chapter 11 Case, (4) counsel to NRG, Baker Botts L.L.P., 700 K Street, N.W. Washington, DC 20001 Attn: Elaine M. Walsh and 910 Louisiana Street, Houston, Texas 77002 Attn: David R. Eastlake, (5) the Office of the United States Trustee for the Southern District of Ohio, and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

26.    Assumption and Assignment Objections. Any Customer that files an Assumption and Assignment Objection shall be removed from the Customer Contract List and returned to default utility service.

27.    Failure to File Timely Assumption and Assignment Objection. If a Customer fails to file with the Court and serve on the Objection Notice Parties a timely Assumption and Assignment Objection, the Customer shall (i) be forever barred from objecting to or otherwise contesting the assumption and assignment of its Customer Contract, (ii) be deemed to have consented to the applicable cure amount, if any, and be bound to such corresponding cure amount, (iii) provided that there is no unpaid balance of any cure amount with respect to the applicable Customer Contract, be deemed to have agreed that all defaults under the applicable Customer Contract arising or continuing prior to the effective date of the assignment have been cured as a result or precondition of the assignment, such that neither the Purchaser nor the Debtor have any

liability or obligation with respect to any default occurring or continuing prior to the assignment, and that the applicable Customer Contract shall remain in full force and effect for the benefit of the Purchaser (and such Customer) in accordance with the terms of the Customer Contract from and after the date of the assignment of the applicable Customer Contract, and (iv) be deemed to have agreed to the terms of this Sale Order.

28.     The Debtor's assumption and assignment of the Customer Contracts to the Purchaser is subject to consummation of the Sale. Accordingly, absent the closing of such Sale, the Customer Contracts shall not be deemed assumed or assigned and shall in all respects be subject to further administration under the Bankruptcy Code.

29.     <u>General Provisions</u>. As demonstrated by (i) testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor and its agents have marketed the Customer Contracts and conducted all aspects of the sale process at arms'-length, and in good faith. The marketing process undertaken by the Debtor and its agents with respect to the Customer Contracts has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders.

30.     The consideration provided by the Purchaser for the Customer Contracts under the APA is fair and reasonable and the sale of the Customer Contracts may not be avoided under Bankruptcy Code sections 363(n) or 549(a).

31.     The transactions are undertaken by the Purchaser without collusion and in good faith, in accordance with Bankruptcy Code sections 363(m) and 363(n). The Purchaser is a good-faith purchaser of the Customer Contracts and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m) and other applicable law. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not

affect the validity of the sale of the Customer Contracts to the Purchaser, unless such authorization is duly stayed pending such appeal.

32.     The APA and any related agreements, documents, or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

33.     The Debtor shall cooperate with the Purchaser and the Purchaser will cooperate with the Debtor, as set forth in the APA, in each case to ensure that that transactions contemplated in the APA are consummated, and to provide an orderly transition of the Customer Contracts and Assumed Liabilities from the Debtor to the Purchaser. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Customer Contracts to the Purchaser in accordance with the terms of the APA and this Sale Order. Following the Closing, no holder of an Interest in the Customer Contracts shall interfere with the Purchaser's title to or use and enjoyment of the Customer Contracts based on or related to such Interest, or any actions that the Debtor may take in its chapter 11 case or any successor case.

34.     Promptly upon the Debtor's receipt of cash proceeds under the APA, the Debtor shall pay such proceeds to the Pre-Petition ABL Agent for the benefit of the Pre-Petition ABL Secured Parties in order to reduce the Pre-Petition ABL Obligations.[4]

---

[4]     Capitalized terms not otherwise defined in paragraph 34 shall have the meanings ascribed to them in the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (a) Obtain Postpetition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to the Postpetition Lender, and (C) Utilize Cash Collateral; (II) Providing Adequate Protection to the Prepetition Secured Parties; (III) Modifying the Automatic Stay; And (IV) Granting Related Relief* (Doc. 35).

35.     Any amounts that become payable by the Debtor to the Purchaser pursuant to the APA shall be paid in accordance therewith from the Escrow Account; provided that in the event any amounts are not promptly paid to the Purchaser, such amounts shall (i) be entitled to administrative expense claim status under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code; (ii) not be subordinate to any other administrative expense claim against the Debtor; (iii) not be altered, amended, discharged or affected by any chapter 11 plan proposed, confirmation order entered in the Debtor's chapter 11 case, or any order dismissing the chapter 11 case without the prior written consent of the Purchaser; (iv) be paid by the Debtor in the time and manner provided for in the APA without further order of this Court; and (v) not be subject to any bar date in the Debtor's chapter 11 case or any requirement to file any request for allowance of administrative claim or proof of claim. For the avoidance of doubt, any and all payment obligations by the Debtor to the Purchaser as set forth in this paragraph 35 or in the APA, if any, shall be recourse solely to the Deposit funds in the Escrow Account and payment obligations, if any, shall be limited solely to the application of monies, if any, from such Escrow Account.

36.     The failure to specifically include any particular provisions of the APA in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA is hereby authorized and approved in its entirety, as it may be amended or supplemented in accordance with its terms and this Sale Order.

37.     To the extent of any conflict between the APA and this Sale Order regarding the rights and obligations of the Debtor and the Purchaser with respect to each other, or with respect to the rights and obligations of third parties, this Sale Order shall govern

38.     This Sale Order and the APA shall be binding in all respects upon (i) all creditors of and holders of equity interests in the Debtor (whether  known  or  unknown),  any  holders

of Interests, all Customer Contract counterparties, the Purchaser and all successors and assigns

of the Purchaser, the Debtor, and its estate, and (ii) on any trustee(s) subsequently appointed in the

Debtor's chapter 11 case or in the event of a conversion of the Debtor's chapter 11 case to a case

under chapter 7 under the Bankruptcy Code.

39.     This Sale Order constitutes a final and appealable order within the meaning of 28

U.S.C. § 158(a). The APA and the Sale Order are not subject to rejection under Bankruptcy Code

section 365 or avoidance (whether through any avoidance or recovery, claim, action, or proceeding

arising under chapter 5 of the Bankruptcy Code or under any similar state or federal law or any

other cause of action) by the Debtor, any chapter 7 or chapter 11 trustee of the Debtor's bankruptcy

estate or any other person or entity. The APA, this Sale Order, and the Debtor's obligations therein

and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by

any chapter 11 plan proposed or confirmed in the Debtor's chapter 11 case, any order confirming

any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the

Purchaser. Nothing contained in any chapter 11 plan confirmed in this chapter 11 case, the

confirmation order confirming any such chapter 11 plan, or any order dismissing this chapter 11

case, shall conflict with or derogate from the provisions of the APA or this Sale Order. This Sale

Order and the APA shall inure to the benefit of the Debtor, its estate, its creditors, the Purchaser,

and each of the foregoing respective successors and assigns.

40.     The fourteen-day stay otherwise imposed by Bankruptcy Rules 6004(h), 6006(d)

and 7062 is hereby waived, and this Sale Order shall be effective immediately upon entry. Time

is of the essence in consummating the Sale contemplated by the APA, and it is in the best interests

of the Debtor and its estate to timely consummate such transaction.

41.     The Court shall retain jurisdiction over any matters related to or arising from the implementation or interpretation of the APA or this Sale Order. All matters arising from or related to the implementation of the APA or this Sale Order may be brought before the Court as a contested matter, without the necessity of commencing an adversary proceeding.

**SO ORDERED.**

Copies to: Default List

## Exhibit 1

**APA**

**[To be filed]**

**<u>Exhibit 2</u>**

**Form of Assumption and Assignment Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| VOLUNTEER ENERGY SERVICES, INC., | Case No. 22-50804 |
| Debtor.[1] | Judge C. Kathryn Preston |

**NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNT**

**You are receiving this notice because you are a retail natural gas customer of Volunteer Energy Services, Inc. (the "Debtor"), the debtor in the above captioned chapter 11 case. Please read this notice carefully as your rights may be affected by the transactions described herein.**

If you have questions concerning this notice, please visit https://dm.epiq11.com/volunteerenergy, email volunteerenergyinfo@epiqglobal.com or call the dedicated hotline toll-free at (855) 604-1885 or, for international callers, at +1 (503) 597-5544, between 9am ET and 9pm ET, Monday to Friday. Residential customers with questions about their rights as a consumer of natural gas under state law and regulations may contact their state regulator or residential consumer representative.

On March 25, 2022, the Debtor filed a voluntary petition for chapter 11 relief in the United States Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court"). The Debtor's Bankruptcy Code section 341 meeting of creditors will take place on May 3, 2022 at 11:00 a.m. (ET), which you may (but are not required to) attend by telephone at 866-775-6845 (Access Code 4751660).

As part of its restructuring efforts, the Debtor sought Bankruptcy Court approval of a sale (the "Sale") of certain of its contracts (including any renewals or extensions thereof) with customers of its natural gas business, such as yourself (collectively, the "Customer Contracts"). In particular, the Debtor entered into an asset purchase agreement with NRG Retail LLC ("NRG").[2] On April [__], 2022, the Bankruptcy Court approved the Sale to NRG.

The Debtor has established procedures to transfer its Customer Contracts to NRG, which include a process to ensure that retail customers, such as yourself, receive notice that their Customer Contracts will be transferred and assigned to NRG. **NRG is a qualified competitive**

---

[1]    The last four digits of the Debtor's federal tax identification are (2693), and the address of the Debtor's corporate headquarters is 790 Windmiller Drive, Pickerington, Ohio 43147.

[2]    NRG Retail LLC is a subsidiary of NRG Energy, Inc., which is a publicly traded fortune 500 company that produces and sells energy and related products. NRG Energy, Inc. serves millions of retail energy customers throughout the United States.

27

energy supplier[2] that has agreed to provide your natural gas service on the same rates, terms, and conditions in your current Customer Contract with the Debtor. Other than the change in your retail energy supplier, your natural gas service will NOT be affected by this Sale.

Please be assured that there will be no interruption of service under your Customer Contract as a result of the Sale and you will not need to take any action. To the extent that you receive an invoice directly from the Debtor, you will be advised of a new payment address. Only the provider of your service will change, and you will see NRG's name and/or logo on your bills going forward after assignment.

If you do not wish to object to the transfer of your Customer Contract to NRG, on the same rates, terms and conditions that you have already agreed to with the Debtor, you do not need to take any action in response to this notice.

## Adequate Assurance of Future Performance

To successfully transfer your Customer Contract to NRG, NRG must demonstrate that it can provide adequate assurance of future performance under your Customer Contract (*i.e.*, information that establishes that NRG will be able to deliver uninterrupted natural gas to you following the successful transfer of your Customer Contract).

## Cure Amount

To successfully transfer your Customer Contract to NRG, the Debtor must cure any outstanding defaults under your Customer Contract. The proposed cure amount (the "Cure Amount") under your Customer Contract is as follows:

[CURE AMOUNT]

*Each Cure Amount listed above represents all liabilities of any nature that the Debtor believes it has arising under a Customer Contract prior to the closing of the Sale, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent, or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale. If you believe your Cure Amount is listed with an incorrect amount on the Executory Contract List, you must object in accordance with the procedures described below.*

## Filing Objections

You have a right to file an objection (an "Objection") related to: (i) the identity of and ability of NRG to provide adequate assurance of future performance with respect to your Customer Contract; and (ii) the assignment of your Customer Contract, including any objection relating to the Cure Amount. Objections must (a) **be filed no later than April [__], 2022**, (b) be in writing, (c) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules, (d) state, with specificity, the legal and factual bases thereof, including, if applicable, the

---

[2]    A competitive retail energy supplier sells electricity and natural gas in regulated energy markets to residential, commercial and industrial end-use customers in your applicable state.

Cure Amount(s) that you believe are required to cure defaults under your Customer Contract(s), and I be served on (1) proposed counsel to the Debtor, Isaac Wiles & Burkholder LLC, Two Miranova Place, Suite 700, Columbus, OH 43215 Attn: David M. Whittaker and Philip K. Stovall, and McDermott Will & Emery LLP, One Vanderbilt Ave., New York, NY, 10017 Attn: Darren Azman); (2) counsel to PNC, Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801 Attn: Regina Stango Kelbon, (3) counsel to any statutory committee appointed in this Chapter 11 Case, (4) counsel to NRG, Baker Botts L.L.P., 700 K Street, N.W., Washington, DC 20001 (Attn: Elaine M. Walsh) and 910 Louisiana Street, Houston, Texas 77002 (Attn: David R. Eastlake), (5) the Office of the United States Trustee for the Southern District of Ohio, and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002.

Be aware that, if you do not file an Objection to the assignment of your Customer Contract, including any objection relating to the Cure Amount by **April [\_\_], 2022**, you will not be able to object to the transfer and assignment later in this chapter 11 case.

Dated: April 5, 2022
      Columbus, Ohio

Respectfully submitted,

_____

David M. Whittaker (0019307)
Philip K. Stovall (0090916)
**ISAAC WILES & BURKHOLDER, LLC**
Two Miranova Place, Suite 700
Columbus, Ohio 43215-5098
Tel:    (614) 221-2121
Fax:   (614) 365-9516
Email: dwhittaker@isaacwiles.com
       pstovall@isaacwiles.com

_- and –_

Darren Azman (admitted _pro hac vice_)
Natalie Rowles (admitted _pro hac vice_)
**MCDERMOTT WILL & EMERY LLP**
One Vanderbilt Avenue
New York, New York 10017-3852
Tel:    (212) 547-5400
Fax:   (212) 547-5444
Email: dazman@mwe.com
       nrowles@mwe.com

_Proposed Counsel to the Debtor_

## Exhibit B

**Buck Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOLUNTEER ENERGY SERVICES, INC., | ) | Case No. 22-50804 |
| | ) | |
| Debtor.[1] | ) | Judge C. Kathryn Preston |
| | ) | |

**DECLARATION OF THOMAS BUCK IN SUPPORT OF THE
DEBTOR'S SALE MOTION**

I, Thomas Buck, declare under penalty of perjury as follows.

1.      I am a Senior Managing Director at GlassRatner Advisory & Capital Group, LLC

dba B. Riley Advisory Services, Inc. ("B. Riley"). I have been a Senior Managing Director at B.

Riley since the Fall of 2018. Prior to joining B. Riley, I was a Principal at EisnerAmper from

2009 to 2018. I have over 21 years of experience in the field of rendering financial advisory and

corporate finance related services in bankruptcy, workouts and restructuring transactions. I

received a B.S. from Lehigh University and an M.B.A. from Wake Forest University.

2.      In January 2022, B. Riley was retained to provide financial advisory services to

Volunteer Energy Services, Inc., the debtor and debtor in possession (the "Debtor") in the above-

captioned chapter 11 case (the "Chapter 11 Case"). As such, I am familiar with the Debtor's day-

to-day operations, business, and financial affairs.

3.      I submit this declaration (the "Declaration") in support of the relief requested in

the *Debtor's Expedited Motion for Entry of an Order (I) Authorizing and Approving a Private*

*Sale of Certain of the Debtor's Customer Contracts Free and Clear of All Liens, Claims,*

---

[1]      The last four digits of the Debtor's federal tax identification are (2693), and the address of the Debtor's
corporate headquarters is 790 Windmiller Drive, Pickerington, Ohio 43147.

*Interests, And Encumbrances; (II) Authorizing the Assumption and Assignment of Certain of the Debtor's Customer Contracts; (III) Waiving the 14-Day Stays Imposed Under Bankruptcy Rules 6004(h) and 6006(d); and (IV) Granting Related Relief* (the "Motion"),[2] filed contemporaneously herewith. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's management team and the Debtor's advisors, my review of relevant documents and information concerning the Debtor's operations, financial affairs, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am authorized by the Debtor to submit this Declaration on its behalf.

4.       The Debtor is a family-owned retail energy provider headquartered in Pickerington, Ohio. Since 2001, the Debtor has supplied retail electricity and natural gas to its various commercial, industrial, and residential customers across Ohio, Michigan, Pennsylvania, and Kentucky. The Debtor also manages interstate transportation contracts, gas storage, and gas supplies via interstate and intrastate pipelines, and administers energy purchases, monitors energy deliveries, and reconciles all deliveries and imbalances with local distribution companies ("LDCs").

5.       As of the Petition Date, the Debtor serves gas customers in eleven utility regions throughout Ohio, Michigan, Kentucky, and Pennsylvania, and power customers in three utility regions throughout Ohio. As of the Petition Date, the Debtor had approximately 212,000 customers that consume approximately 25 billion cubic feet of annualized gas and approximately 500,000 megawatt hours of annualized power.

---

[2]       Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

6.      The Debtor offers its customers "energy choice"—the ability to receive electricity and natural gas commodity needs from a source other than the local utility in certain markets that have been restructured to permit retail competition, which allows customers to tailor energy supply to their specific needs.

7.      Aside from prepetition receivables, the Debtor's only likely realizable asset is its customer contracts, a portion of which the Debtor will assume and assign to the Purchaser.

8.      The Debtor's business relies on the purchase of energy from Wholesale Energy Suppliers in order to service customers. The Debtor's contracts with Wholesale Energy Suppliers are short-term commitment contracts that the Debtor pays in arrears. On the Petition Date, the Debtor defaulted on approximately $12.6 million in payments due to its Wholesale Energy Suppliers. These defaults created a domino effect that resulted in the need for chapter 11 relief.

(a)      First, Wholesale Energy Suppliers will cease supplying energy to the Debtor;

(b)      Second, the Debtor had no other means to procure sufficient energy to service its customers;

(c)      Third, the process began for the transition of customers to default service (however defined under applicable state law or by the applicable electric utility or natural gas LDCs) at the applicable electric utility, natural gas LDC, or, to the extent required by state law, such other electric or gas company providing such service (the "Default Transition");[3] and

(d)      Fourth, until the Debtor's customers are successfully transitioned, the Debtor will likely incur severe daily penalties for the energy that LDCs are providing to customers on the Debtor's behalf given that the Debtor is no longer able to do so.

9.      As of the Petition Date, the Debtor was in most instances between the second and third steps and in some instances already facing the likelihood of such penalties in the fourth step. Thus, the Debtor's initial goal in this Chapter 11 Case was narrowly focused on expediting the Default Transition to stop the unnecessary imposition of significant penalties against the

---

[3]      Each state has a Default Transition process to protect consumers from losing energy services.

Debtor in order to allow the Debtor to conduct an orderly winddown for the benefit of all stakeholders.

10.     To that end, on March 28, 2022, the Debtor filed an expedited motion (Doc. 44) (the "Transition Motion") to cause the Default Transition. In addition to filing the Transition Motion, the Debtor sent letters (the "LDC Letters") to each of the Debtor's LDCs expressing the need to expeditiously complete the Default Transition in light of the potential fines, penalties, or costs.

11.     The decision to commence this Chapter 11 Case on the Petition Date (the last Friday in March) provided two timing benefits with respect to the Default Transition. First, because the natural gas yearly cycle runs from April 1 to March 31, the timing of the Default Transition would allow many of the LDCs to cleanly transfer gas supply for the Debtor's Customers at the beginning of the next gas year. Second, because the bankruptcy filing occurred only days before the next monthly billing cycle for most of the LDC's, the LDCs would be able to roll Customers to default utility throughout April and assume responsibility for gas supply as of April 1.[4] Put simply, the timing of the bankruptcy filing would allow LDCs to coordinate the next yearly and monthly cycles for the Debtor's Customers in an orderly manner.

12.     After serving the LDC Letters, the Debtor engaged in numerous phone calls and correspondence with the LDCs to discuss the Default Transition process.[5] Prior to the hearing on the Transition Motion,[6] certain of the LDCs informed the Debtor that in order to commence the Default Transition for the April billing cycle and attempt to avoid further fines and penalties, it

---

[4]     There are 21 "cycle" days in each gas month. Customers' meter read dates and bill generations occur on each of these "cycle" days.

[5]     Although the Default Transition process is in place to ensure that customers' energy services are not interrupted, the number of customers with respect to which the Debtor defaulted on its obligation to supply natural gas was substantial.

[6]     The hearing on the Transition Motion was initially scheduled for April 5, 2022.

was critical that, before 3:00 p.m. (ET) on March 30, 2022, the Debtor obtain a Court order

granting it authority to take all necessary actions to transfer and transition customers to the

applicable LDC. The Debtor contacted the Court to discuss the possible issuance of an

emergency order permitting the Debtor to transition its customers, and, given the circumstances,

the Court permitted the Debtor to make an oral motion (the "Oral Motion") requesting the

necessary relief. The Court conducted an emergency telephonic hearing on the Oral Motion on

March 30, 2022. After considering the testimony presented and other statements in support of the

Oral Motion, the Court granted the Debtor its requested relief (*see* Doc. 61) (the "Transition

Order").

### The Need for an Expedited Sale Process

13.     Although the Debtor's primary focus in this Chapter 11 Case was facilitating an

accelerated Default Transition, the Debtor did not shut the door on a potential sale. The Debtor,

however, had to carefully balance the feasibility of bringing value into the estate (through a sale)

against the need to preserve the value of the estate (through avoiding fines and penalties).

14.     To this feat, the Debtor needed to engage with the limited pool of buyers that

could consummate an expedited sale. The Purchaser, which made the highest and best offer for

the Customer Contracts prepetition, was one such buyer. For that reason, the Debtor remained

engaged with the Purchaser and conducted calls with the Purchaser and certain LDCs governing

Customer Contracts that are subject to the Sale. The Debtor understands that several of the Ohio

LDCs have indicated a willingness to recall the Debtor's natural gas capacity, which should

avoid the imposition of further fines and penalties against the Debtor, and take responsibility for

supplying the Debtor's customers with natural gas. Moreover, several of the Ohio and Michigan

LDCs have indicated that they would enroll customers to the Purchaser if the Debtor obtains a
Court order authorizing the Sale.

15.     Accordingly, the LDCs have indicated a willingness to cooperate with the Debtor
in accomplishing a sale transaction. However, they have no obligation to do so and given their
need for Court authorization of the Sale, any delay in seeking approval of the Sale could
jeopardize the LDCs willingness to accommodate the Debtor.

16.     Moreover, there is a risk that each day the Sale is not consummated is another day
that certain Customers are being permanently transitioned, and the value of the applicable
Customer Contracts is likely lost. As stated above, there are 21 cycle days for meter reads upon
which customers are billed for natural gas. Each cycle day, the Debtor may be losing Customers
whose contracts could otherwise be sold.

17.     The Debtor is not only at risk of losing Customers daily to the Default Transition,
but also due to customer attrition (Customers are generally entitled to voluntarily switch
providers under the Customer Contracts) and enrollment with alternative energy suppliers
("Alternative Suppliers"). The Debtor has been made aware that Alternative Suppliers may be
attempting to enroll the Debtor's Customers.[7] Certain of the LDCs have informed the Debtor that
they will not prevent Customers from being enrolled with Alternative Suppliers, including
through a mass enrollment to standard choice offer (SCO) providers or providers of last resort. If
such enrollments occur, the process is irreversible.

18.     For these reasons, an expedited sale process is critical to the Debtor maximizing
value for the benefit of stakeholders.

---

[7]     It is unclear how Alternative Suppliers are identifying the Debtor's Customers. To the extent that the Debtor's
brokers are "shopping" the Debtor's Customers in violation of their broker agreements with the Debtor, the
Debtor intends to pursue such brokers for automatic stay violations.

## Assumption and Assignment Procedures

19.     The Customer Contract counterparties will not be prejudiced by the Assumption and Assignment Procedures. The Debtor established procedures so that if there are any Assumption and Assignment Objections, the Debtor and the Purchaser have agreed to transition such customer to default utility service without litigating the objection. Customers will not be prejudiced because if the customer is not subject to the sale, then such customer would have been transferred to default utility. Thus, in either situation (*i.e.*, the Customer Contract not being included in the Sale or the Customer Contract being removed from the Sale after closing), the customer will be transitioned to default utility.

## Conclusion

20.     Based on my experience and my personal knowledge of the Debtor's commercial circumstances and marketing process, I believe that expedited approval of the Motion is necessary and entry into the APA is in the best interests of the Debtor, its estate, and all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  April 3, 2022                         By: */s/ Thomas Buck*

Thomas Buck
Senior Managing Director
GlassRatner Advisory & Capital Group LLC dba
B. Riley Advisory Services

**<u>EXHIBIT C</u>**

**PUC Notice**





April 1, 2022

**CONFIDENTIAL**

Robert Fadley, Director
Service Monitoring and Enforcement Division
Public Utilities Commission of Ohio
180 East Broad Street
Columbus, OH 43215-3793

**Re: Notice of Assignment of Gas Supply Service Contracts, #02-1786-EL-CRS**

Dear Mr. Fadley:

The purpose of this joint letter is to advise the Public Utilities Commission of Ohio that Volunteer Energy Services, Inc. ("Volunteer Energy") and NRG Retail, LLC ("NRG") intend to enter into an asset purchase agreement ("the Agreement") for the acquisition by NRG's retail subsidiary, Direct Energy Services, LLC ("Direct Energy"), of certain customer accounts of Volunteer Energy in the State of Ohio. This letter constitutes the notice of such assignment required by OAC Rule 4901:1-29-10(D)(1)(a).

Volunteer Energy currently provides gas supply service within the service territories of Columbia Gas of Ohio, Dominion East Ohio, Duke Energy Ohio, and Vectren Energy Delivery of Ohio. Pursuant to the Agreement, Volunteer Energy will assign to Direct Energy approximately ▮▮▮▮▮ residential and small commercial customer accounts. Volunteer Energy license number is 02-022G; Direct Energy's license number is 02-024G.

The Agreement is contingent upon approval by the United States Bankruptcy Court for the Southern District of Ohio. Upon an Order by Judge C. Kathryn Preston approving the Agreement, the contracts will be assigned effective on or after April 15, 2022.

As required by OAC Rule 4901:1-29-10(D)(1)(a)(vi), a draft of the customer notification that will be sent to customers served are attached hereto. As noted in the proposed notification, no early termination fee will be charged to any customers who wish to cancel their contracts.

For all regulatory inquiries or any other questions, please do not hesitate to contact the following representatives:

**Volunteer Energy Representative:**        **NRG Representative:**

David Warner                              John Holtz
Chief Financial Officer                   Sr. Director, Regulatory Affairs
Volunteer Energy Services, Inc.           NRG Energy, Inc.
790 Windmiller Drive                      804 Carnegie Center
Pickerington, OH 43147                    Princeton, NJ 08540
614-729-2319                              609-280-7701
dwarner@volunteerenergy.com               john.holtz@nrg.com

Respectfully submitted,

Volunteer Energy

By /s/ David Warner_____
David Warner
Chief Financial Officer

NRG ENERGY, INC.

By_____
John Holtz, Senior Director Market
Development & Regulatory Affairs

cc:    Columbia Gas of Ohio
       Dominion East Ohio
       Duke Energy Ohio
       Vectren Energy Delivery of Ohio.

**Exhibit A**

Form Customer Notice

                                    

<Customer_Name>
<Billing_Street_1>
<Billing_Street_2>
<Billing_City>, <Billing_State> <Billing_Zip>
<UTILITY ><MaskedUAN>

**IMPORTANT NOTICE ABOUT YOUR GAS SERVICE PLAN:** Your current plan is not changing.

Dear <Customer_Name>,                                    <MailDate>

At Volunteer Energy Services, Inc. we appreciate your business and have enjoyed serving as your retail natural gas supplier. **This notice is to inform you that <u>your gas supply service will be transferred from Volunteer Energy to Direct Energy Services, LLC on or after <Transfer Date>.</u>**

Direct Energy has a strong record of high-quality customer service, the ability to continue to serve your energy needs, and the resources to provide you with expanded service offerings. Direct Energy is a certified natural gas supplier authorized by the Public Utility Commission of Ohio.[1]

**There are no changes to the material terms and conditions, including price and duration, of your natural gas service plan. The assignment is allowed per your contract. This transfer will not interrupt your natural gas service and there is no action required from you.**

**What is happening?**
- Your natural gas supply service will be transferred from Volunteer Energy to Direct Energy on or after <Transfer Date>.

**What will stay the same?**
- Your <u>terms of service</u> will remain the same — <u>There are no changes to your natural gas service plan.</u>
  - If you are on a fixed price plan, your service will continue with the same fixed price until the end of your contract term.
  - If you are on a variable price, month-to-month plan, your service will continue with Direct Energy's variable natural gas supply price plan.

---

[1] Direct Energy Services, LLC is certified as a Competitive Retail Natural Gas provider by the Public Utility Commission of Ohio; PUCO License No. 02-024G.

- You will continue to receive your natural bill from and will remit payment to <UTILITY>.

**What will change?**

- Direct Energy will be listed as your natural gas supplier on your utility bill.
- Your natural gas supplier contact information — customer service phone numbers, email address, and website address — will change to Direct Energy's contact information listed below.

**What do you need to do?**

- Nothing — your <u>natural gas supply service is assignable and will transfer automatically</u> and there will be no interruption of your service. In the coming weeks, you may receive a notice from <UTILITY> confirming the change to Direct Energy.

- Continue paying your natural gas bill to your utility as normal.

**Who do I contact if I need more information about this change?**

If you have further questions, please contact Volunteer Energy Customer Care or Direct Energy Customer Support as follows:

- <u>Your prior service under Volunteer Energy</u>:
  Email: VolunteerEnergyInfo@epiqglobal.com
  Toll-free Phone: (855) 604-1885

- <u>Starting **<Transfer Date>** all questions and customer support should be directed to Direct Energy</u>:
  Email: csdirectenergy@nrg.com
  Toll-free Phone: 1-866-348-4193 (Mon. – Fri., 8:00 a.m. to 8:00 p.m., Sat. 8:00 a.m. to 5:00 p.m. EST)

Please keep the information in this notice on hand in case you have any questions regarding this transition.

Thank you so much for entrusting your retail natural gas service to Volunteer Energy.  We are confident you will enjoy your continuing service with Direct Energy.

Kind Regards,


[Signature]                                              [Signature]
David Warner                                          Mark Eddings
Chief Financial Officer                            Vice President
Volunteer Energy Services, Inc.              Direct Energy Services, LLC