# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) |
|  | ) |
|  | )  **Chapter 11** |
| **VOLUNTEER ENERGY SERVICES,** | ) |
| **INC.,** | )  **Case No. 22-50804** |
|  | ) |
| **Debtor.** | )  **Judge Nami-Khorrami** |
|  | ) |
|  | ) |
| **THE VOLUNTEER ENERGY** | ) |
| **LIQUIDATING TRUST, THROUGH** | ) |
| **JOHN B. PIDCOCK, AS LIQUIDATING** | )  **Adv. Proc. No. 2:24-ap-_____** |
| **TRUSTEE OF VOLUNTEER ENERGY** | ) |
| **LIQUIDATING TRUST,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | ) |
| **VERTEXONE SOFTWARE, LLC,** | ) |
| **d/b/a, EC INFOSYSTEMS, INC.** | ) |
| **1321 Upland Drive, Suite 8389** | ) |
| **Houston, TX 77043** | ) |
|  | ) |
|  | ) |
| **Serve Also:** | ) |
| Vertexone Software, LLC, | ) |
| dba, EC Infosystems, Inc. | ) |
| c/o Corporation Service Company | ) |
| dba CSC-Lawyers Incorporating Service | ) |
| Company | ) |
| 211 E. 7th Street, Suite 620 | ) |
| Austin, TX 78701-4234 | ) |
|  | ) |
|  | ) |
| **Defendant.** | ) |
|  | ) |

15445654.1

### LIQUIDATING TRUST'S COMPLAINT FOR AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS AND OBJECTION TO CLAIMS

The Volunteer Energy Liquidating Trust (the "**Volunteer Energy Liquidating Trust**" or the "**Plaintiff**"), through its trustee John B. Pidcock, ("**Liquidating Trustee**"), the successor in interest to Volunteer Energy Services, Inc. (the "**Debtor**" or "**VESI**"), files this *Complaint for Avoidance and Recovery of Preferential Transfers and Objection to Claims* (the "**Complaint**") against Vertexone Software, LLC d/b/a EC Infosystems, Inc. (the "**Defendant**") and respectfully alleges as follows:

### NATURE OF THE ACTION

1.     Plaintiff brings this action against Defendant to avoid and recover certain preferential transfers that occurred during the ninety (90) day period (the "**Preference Period**") prior to the commencement of this Bankruptcy Case (defined herein).  Specifically, Plaintiff seeks entry of a judgment against Defendant: (i) avoiding transfers pursuant to section 547 of title 11 of the United States Code (the "**Bankruptcy Code**");  and (ii) directing Defendant to pay an amount to be determined at trial that is not less than the amount of avoidable transfers, plus interest and costs, pursuant to section 550 of the Bankruptcy Code; and (iii) disallowing any claims of the Defendant against the bankruptcy estate unless and until Defendant pays the value of or return the avoidable transfers to the Trustee pursuant to 11 U.S.C. § 502(d).

### PARTIES

2.     The Plaintiff is the duly appointed liquidating trust with the authority and right under sections 108, 323, 502, 541, 542, 547, and 550 of the Bankruptcy Code to enforce and prosecute the causes of action asserted in this Complaint.

15445654.1

3.      Defendant is a foreign business corporation duly incorporated under the laws of the State of Texas with a principal place of business at 1321 Upland Drive, Suite 8389, Houston, Texas, 77043.

4.      Defendant contracted with VESI to provide billing services to VESI's energy companies using an electronic system called "UtiliBill".  A copy of that certain *EX Infosystems Billing System Agreement* (the "**Contract**") is attached hereto as <u>Exhibit A</u>.

5.      Despite conducting business with VESI in the State of Ohio, Defendant is not registered to do business in the State of Ohio.  On or about March 14, 2024, an entity named "EC Infosystems, LLC" ("**LLC**") registered to conduct business in the State of Ohio. On information and belief, LLC's service of process address is: 1160 Dublin Road, Suite 400, Columbus, OH 43215.

6.      VESI scheduled a general unsecured claim in the amount of $24,013.99 on behalf of Defendant (the "**Scheduled Claim**").

## JURISDICTION AND VENUE

7.      This Bankruptcy Court (the "**Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b) and the *Amended General Order No. 05-02 (Amended Standing Order of Reference)* dated September 16, 2016 because this is a civil proceeding arising in or related to a case under Title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

8.      This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  In the alternative, the Court maintains "related to" jurisdiction over this Adversary Proceeding.

15445654.1

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     Plaintiff confirms its consent, pursuant to Bankruptcy Rule 7008 to the entry of a final order by the Court in connection with this Complaint to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

11.     The statutory predicates for the relief sought herein are sections 547 and 550 of the Bankruptcy Code and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## **RELEVANT FACTS**

12.     On March 25, 2022 (the "**Petition Date**"), VESI commenced its chapter 11 bankruptcy case (the "**Bankruptcy Case**") by filing a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio (the "**Bankruptcy Court**").  On July 27, 2023, the Court entered an order [Docket No. 891] (the "**Confirmation Order**") confirming the *Third Amended Chapter 11 Plan of Liquidation of Volunteer Energy Services, Inc.* [Docket No. 655] (as amended, modified, or supplemented, the "**VESI Plan**").

13.     The Effective Date of the VESI Plan occurred on August 17, 2023 [Docket No. 916].

14.     As of the Effective Date and pursuant to the Confirmation Order, the VESI Plan and that certain *Liquidating Trust Agreement* (the "**Trust Agreement**"): (i) VESI's Assets were transferred to the Volunteer Energy Liquidating Trust, which was empowered, among other things, to collect and administer VESI's Assets (including Causes of Action (as defined therein)) and

4

resolve Claims against VESI and its estate and (ii) John B. Pidcock was appointed to act as Liquidating Trustee.

15.     This Cause of Action is an Asset of the Volunteer Energy Liquidating Trust.

16.     Prior to the Petition Date, VESI was a family-owned retail energy provider headquartered in Pickerington, Ohio.  Since 2001, VESI supplied retail electricity and natural gas to its various commercial, industrial, and residential customers across Ohio, Michigan, Pennsylvania, and Kentucky. In conducting its business operations, the Debtor purchased, received, and/or provided good and services.  In the course of providing retail energy, the Debtor also entered into numerous contractual arrangements and engaged various vendors.

17.     Prior to the Petition Date, based on the records available to the Liquidating Trust, Defendant provided software as a service to VESI through its UtiliBill software, which enables clients, including VESI, to bill its end customers and perform other related billing functions.

18.     During the Preference Period, the Debtor continued to operate its business, including the transfer of money, either by checks, cashier checks, wire transfers, ACH transfers, direct deposits, or otherwise, to various entities.

19.     During the Preference Period, the Debtor made payments to or for the benefit of the Defendant, including those identified on Exhibit B (collectively, the "**Transfers**").  Each Transfer was related to an invoice (the "**Invoices**") pursuant to which the Defendant billed the Debtor for the services it had previously delivered to the Debtor for which the Debtor had an obligation to pay.  Exhibit B sets forth the details of each Transfer including the payment clear date, payment amount, transaction number, transaction type, and transferee name.

20.     On information and belief, each Transfer was made on account of an antecedent debt owing by the Debtor to Defendant.

21.    The aggregate amount of the Preference Period Transfers is not less than $122,704.24.

22.    As evidenced by VESI's schedules filed in the underlying bankruptcy case as well as the Scheduled Claim and the records of the Plaintiff, the Debtor's liabilities exceed its assets such that the Debtor's general unsecured creditors will not receive payment of their claims in full from the Debtor's bankruptcy estate.

23.    Plaintiff is seeking to avoid all of the Transfers made by the Debtor to Defendant within the Preference Period.

24.    In connection with Plaintiff's due diligence, earlier this month, Plaintiff, through counsel, sent a demand letter (the "**Demand Letter**") to Defendant, seeking a return of the Transfers.  The Demand Letter indicated that the Transfers may be subject to certain defenses and invited the Defendant to engage in discussions aimed toward resolving the claims arising from the Transfers without the time and expense of litigation.  To date, Defendant has not provided Plaintiff with any evidence related to any affirmative defense that it may assert.

25.    By a review of the Debtor's records, Plaintiff performed its own due diligence evaluation of the known (if any) and reasonably knowable affirmative defenses available to Defendant, including under section 547(c)(2) (ordinary course of business) and section 547(c)(4) (subsequent new value), assessing the data available with respect to the elements of each of the above-referenced defenses.  Based upon this review, Plaintiff has determined that the claims to avoid the Transfers herein are viable and presented in good faith.

26.    During the course of this proceeding, Plaintiff may learn (through discovery or otherwise) of additional funds and other amounts owing to the Debtor.  It is Plaintiff's intention to avoid and recover all avoidable transfers of property made by the Debtor, as well as interests of

6

the Debtor in property, to or for the benefit of Defendant or any other transferee. amounts owing by the Defendant to the Debtor, whether identified in this Complaint or hereafter discovered. Plaintiff reserves the right to amend this Complaint to include: (i) further information regarding the Preferential Transfers; (ii) additional avoidable transfers, whether as preferences or based on other legal theories; (iii) modifications of and/or revision of the Defendant's name or identity; (iv) additional Defendants; and/or (v) additional causes of action (collectively, the "**Amendments**"), that may become known to Plaintiff at any time during the pendency of this Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this Complaint.

27. Based on information and belief, in connection with this Agreement and the goods and/or services provided by Defendant to the Debtor, the Defendant owes to the Debtor and now the Liquidating Trust, the Preferential Transfers in the amount of $122,704.24.

## FIRST CLAIM FOR RELIEF
### (Avoidance of Preferential Transfers Pursuant to 11 U.S.C. § 547)

28. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though set forth fully herein.

29. During the Preference Period, the Debtor made each Transfer to or for the benefit of Defendant in an aggregate amount not less than the amount set forth on Exhibit B hereto.

30. Each Transfer was made from the Debtor, and it constituted transfers of an interest in property of the Debtor.

31. Defendant was a creditor of the Debtor at the time of each Transfer by virtue of supplying services to the Debtor for which the Debtor was obligated to pay in accordance with the Agreement.

15445654.1

32.     Each Transfer was to or for the benefit of a creditor within the meaning of section 547(b)(1) of the Bankruptcy Code because each Transfer either reduced or fully satisfied a debtor or debts then owned by the Debtor to Defendant.

33.     As is evidenced by Exhibit B, each Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor to Defendant before each respective Transfer was made, as asserted by Defendant and memorialized in the underlying transaction documents, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendant prior to being paid by the Debtor.

34.     The Debtor was insolvent when each Preferential Transfer was made.  Plaintiff is entitled to the presumption of insolvency for each Preferential Transfer made during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

35.     Each Preferential Transfer was made within the ninety (90) days prior to the Petition Date.

36.     Each Preferential Transfer enabled Defendant to receive more than Defendant would have received if (a) the case was a case under chapter 7 of the Bankruptcy Code; (b) the Preferential Transfers and/or payments had not been made; and (c) Defendant received payment of its debts to the extent provided by the Bankruptcy Code.

37.     Each Preferential Transfer constitutes an avoidable preference pursuant to section 547(b) of the Bankruptcy Code.

38.     As of the date hereof, the Defendant has not returned any of the Transfers to the Plaintiff.

39.     The Plaintiff is entitled to an order and judgment under section 547 of the Bankruptcy Code avoiding each of the Preferential Transfers.

8

15445654.1

## SECOND CLAIM FOR RELIEF
### (Recovery of Preferential Transfers Pursuant to 11 U.S.C. § 550)

40.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though set forth fully herein.

41.     The Plaintiff is entitled to avoid the Preferential Transfers described above and on **Exhibit B**, attached hereto and incorporated herein by reference herein, pursuant to section 547 of the Bankruptcy Code.

42.     With respect to the Preferential Transfers avoided under section 547(b) of the Bankruptcy Code, the Trustee is entitled to recover the Preferential Transfers or the value of the Preferential Transfers pursuant to Bankruptcy Code Section 550.

43.     Defendant was either (a) the initial transferee of the Preferential Transfers, (b) the entity for whose benefit the Preferential Transfers were made, or (c) an immediate or mediate transferee of the Preferential Transfers.

44.     Plaintiff is entitled to an order and judgment under section 550 of the Bankruptcy Code in an amount to be determined at trial that is not less than the sum of the Preferential Transfers, or $122,704.24.

## THIRD CLAIM FOR RELIEF
### (Objection to Claims Pursuant to 11 U.S.C. § 502(d))

45.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of this Complaint as though set forth fully herein.

46.     As set forth in the First Claim for Relief, the Defendant was the transferee of the Preferential Transfers each of which are avoidable under section 547 of the Bankruptcy Code. As further set forth in the Second Claim for Relief, the Plaintiff is entitled to recover the Preferential Transfers or the value of the Preferential Transfers pursuant to section 550 of the Bankruptcy Code.

47.     Pursuant to Section 502(d) of the Bankruptcy Code, any claims of the Defendant, including, without limitation the Scheduled Claim, must be disallowed until such time as the Defendant have paid the amount of the Preferential Transfers, or turned over any such other property, for which the Defendant is liable to the Plaintiff under section 550 of the Bankruptcy Code.

48.     The Court may determine Defendant's liability and require the Defendant to turn over to the Liquidating Trust the funds represented by Preferential Transfers in an amount of not less than $122,704.24.

## **RESERVATION OF RIGHTS**

49.     Plaintiff reserves the right to bring all other claims or causes of action that it might have or could assert against Defendant, on any and all grounds, as allowed under the law or in equity.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests and prays for judgment as follows:

a.     On Plaintiff's First and Second Claims for Relief, judgment in favor of Plaintiff and against Defendant avoiding all of the Preferential Transfers and directing Defendant to return to Plaintiff the amount of the Preferential Transfers, pursuant to sections 547(b) and 550(a) of the Bankruptcy Code, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action, including without limitation, attorneys' fees;

b.     On Plaintiff's Third Claim for Relief, judgment in favor of Plaintiff and against Defendant disallowing the Scheduled Claim held or filed by Defendant against the Debtor or

15445654.1

Plaintiff (including but not limited to the Scheduled Claim) until Defendant return the Preferential

Transfers to Plaintiff pursuant to section 502(d) and (j) of the Bankruptcy Code; and

    c.  For such other and further relief as the Court may deem just and proper.

Dated: March 23, 2024                            Respectfully submitted,

*/s/ Christopher B. Wick*
Christopher B. Wick (0073126)
Daniel A. DeMarco (0038920)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Phone: (216) 621-0150
Email: cwick@hahnlaw.com
       dademarco@hahnlaw.com

Christopher S. Baxter (0088640)
**HAHN LOESER & PARKS LLP**
65 E. State Street, Suite 2500
Columbus, Ohio 43215
Phone: (614) 233-5119
Fax: (614) 221-5909
cbaxter@hahnlaw.com


*Counsel to Plaintiff Volunteer Energy*
*Liquidating Trust*

# ec infosystems ᴵᴺᶜ

333 Earle Ovington Boulevard, Suite 102   Uniondale   NY 11553   Tel: (516) 874-8000

## EC Infosystems Billing System Agreement

This Contract for Services ("Agreement") is entered into and effective as of **June 28, 2018 (the "Effective Date")**, by and between **EC Infosystems Inc.,** a New York corporation with offices located at 333 Earle Ovington Boulevard, Suite 102, Uniondale, NY 11553 ("EC Infosystems" or "Company") and **Volunteer Energy Services, Inc.** a **Ohio** company, with offices located at **790 Windmiller Drive, Pickerington, OH 43147 ("Volunteer Energy"** or "Client"), collectively referred to as "the parties."

Client desires to engage EC Infosystems to perform services specified in this Agreement and the Services specified in the Proposal (defined below). In consideration of the promises and mutual agreements in this Agreement, and for other good and valuable consideration, Client and EC Infosystems hereby agree as follows:

1. **Services**

1.1 EC Infosystems' Billing System ("UtiliBill") enables its Clients to bill their end customers and perform other related billing functions. The terms set forth herein, together with the terms and conditions set forth in the Proposal for Services attached hereto as Schedule "A", and made a part hereof (the "Proposal") cover the UtiliBill and related services (collectively, the "Services") to be provided to Client by EC Infosystems on an outsourced basis via the Internet.
1.2 This Agreement, the Proposal (Schedule "A"), attached hereto and made a part hereof, form the entire Agreement between the parties. In the event of any conflict between this Agreement and its Schedules, the terms and conditions of this Agreement shall govern and control over the terms and conditions set forth in Schedules "A".
1.3 Client is responsible for having and supporting access to the Internet via a static IP Address.
1.4 Client shall not, and shall not permit others to reverse engineer, disassemble, decompile, decode or adapt Billing Service, or otherwise attempt to derive or gain access to the source code of the Billing Service, in whole or in part.

2. **Term**
2.1 This Agreement is effective on the Effective Date and shall be for an initial term of three (3) years (the "Initial Term") from the Effective Date. Thereafter, this Agreement will renew automatically in one year increments (each, a "Subsequent Term" and together with the Initial Term, the "Term") unless either party provides the other party with at least 90 days' advance notice that it does not desire to continue the Agreement in effect.

2.2   In addition to all other charges and amounts due under this Agreement, Client acknowledges and agrees that it is also responsible for and will pay all setup fees, including customizations and like services, as well as certification fees, as invoiced by EC Infosystems upon the submission by Client of the identity(ies) of the utility(ies) with which Client will be using the Services, systems, support, and related services of EC Infosystems' under this Agreement. Payment of these fees are due immediately upon invoicing by EC Infosystems and before any testing or setup by Company occurs. Client also agrees to provide EC Infosystems with no less than two weeks' prior written notice to add any Utility. Client understands that, after completion of the setups and testing occurs, there may be a two (2) to (8) week time period before Client can utilize the system or Services with respect to each Utility.

2.3   It is understood and agreed by the parties that in the event that the Client should at any time during the term of this Agreement, merge with any other entity, create a third-party entity (i.e. subsidiary, affiliate, doing business as name, etc.) or in any way transfer any and all of Client's corporate assets, contracts, etc., this contract shall remain in full force and effect as to all then-existing customers of Client whose accounts are affected by the merger or asset sale.   For the sake of clarity, the preceding sentence is intended to reflect that this Agreement shall have no bearing on customers not affiliated with Client immediately prior to the merger or asset sale. Client further agrees that it shall notify Company of any changes in the structure of Client at least sixty (60) days prior to such change.

2.4   It is understood that during the Term of this Agreement, EC Infosystems will be the sole provider of Billing Services for the service areas identified by Client in writing (the "EC Territories").   The use of a second provider for such Services in one of the EC Territories during the Term of this agreement shall constitute a breach of the agreement and result in the enforcement of Paragraph 4 Liquidated Damages.

## 3.   Payments

3.1   EC Infosystems will provide Client with a paper or electronic invoice each month for the following month's fees, adjustments, and other charges. Client shall pay the invoiced amount within ten (10) days after receipt by Client in immediately available funds via EFT or check drawn upon a nationally recognized banking institution. EC Infosystems will provide invoices with reasonable amounts of detail in accordance with its current standard practices. If Client questions or disputes any portion of any invoice, Client shall notify EC Infosystems of such dispute within ten 10) business days after Client receives such invoice. Client's notice shall describe in reasonable detail the question or item in dispute and the basis for such question or dispute. EC Infosystems will supply the documentation necessary for Client to audit the disputed amounts. The Parties shall seek to resolve all such disputes expeditiously and in good faith.. Invoices for which no such timely notification is received shall be deemed accepted by the Client as true and correct, and the Client shall pay all amounts due under such invoices within the period set forth in this Section 3.1. Notwithstanding anything to the contrary, each Party shall continue performing its obligations under this Agreement during any such dispute, including, without limitation, payment by the Client of all undisputed amounts due and payable.

3.2  Any fees, payments, or credits owing to either Party pursuant to this Agreement that are not paid when due will bear interest at the rate of one and one-half percent (1.5%) per month, but in no event to exceed the highest lawful rate of interest, calculated from the date such amount was due until the date payment is received by the Party to whom such amount is owed. In the event of a dispute regarding an invoice, the undisputed amount will be paid to EC Infosystems in accordance with Section 3.1 herein. Such disputed payments will not be subject to late fees until resolution of the dispute.  Client shall also reimburse Company for all reasonable costs incurred in collecting any late payments, including, without limitation, attorneys' fees.

3.3  In addition to, and not in lieu of, all other remedies available under this Agreement or at law (which Company does not waive by the exercise of any rights hereunder), Company shall be entitled to suspend the provision of any Billing Services if Client fails to pay any undisputed amounts when due for a period of ten (10) days after payment is due and said suspension will, at Company's sole option, remain effective until such undisputed amounts are paid in full.  Client shall not withhold payment of any amounts due and payable under this Agreement by reason of any setoff of any claim or dispute with Company, whether relating to the Company's breach, bankruptcy or otherwise.

3.4  Company has the right to revise its method of counting the number of meters involved with Client and for which Company invoices to Client are based upon 30 days prior written notice to Client.  Should client disagree with the revised methodology, it shall provide notice to Company within thirty (30) days of its notice. If Company and Client cannot mutually agree on the method for counting the number of meters within thirty (30) days Client's notice of objection, this Agreement will terminate upon written notice by either party to the other and  imposition of the revised meter counting methodology will be implemented ninety (90) days from the date of the original notice to Client.

## 4.  Liquidated Damages

4.1 Client may voluntarily choose to terminate this Agreement at any time by providing EC Infosystems with at least ninety (90) days prior written notice; provided however, that:

    4.1.1 If such termination occurs during the Term of this Agreement, then Client agrees to pay EC Infosystems all amounts due and owing to EC Infosystems as of the effective date of the termination, PLUS the sum of One Hundred Thousand ($100,000) dollars as liquidated damages.  Parties agree that EC Infosystems would be damaged by early termination of this Agreement and such damage would be difficult to calculate and parties agree that $100,000 represents an estimate of the damages that EC Infosystems would suffer.  Parties agree that EC Infosystems could enter an unlimited number of contracts and that EC Infosystems would suffer the loss of

benefits associated with this Agreement and would not be able to mitigate the damages of this breach by entering other contracts.

4.2 Liquidated Damages fee will not apply if Client ceases to operate as a Supplier in the EC Territories for the commodity being serviced pursuant to this Agreement.

4.3 Upon termination by the Client, all unpaid charges incurred by the Client will immediately become due and payable.

## 5. Termination by Company

5.1 Immediately upon the occurrence of any of the events detailed herein, EC Infosystems shall have the right to terminate this Agreement: (i) Client fails to pay when due any amounts owed or other undisputed amounts hereunder and such failure shall continue for a period of ten (10) days after payment is due, which may be extended for an additional five (5) days after payment is due in Company's sole discretion; (ii) Client breaches any material term or provision not related to a security breach of Company's systems or information, of this Agreement, and fails to cure such breach within ten (10) days of written notice thereof by EC Infosystems, which may be extended for an additional five (5) days in Company's sole discretion; (iii) Client breaches any term or provision of this Agreement which Company, in its sole discretion, considers to be a material security breach, including but not limited to access to the Company's system by any person or entity not an Authorized User as provided for in 5.2 below; (iv) Client commits multiple material breaches of its representations, warranties, or obligations hereunder and fails to cure such breach within ten (10) days of written notice thereof by Company, which may be extended for an additional five (5) days in Company's sole discretion, (v) Client becomes insolvent or makes an assignment for the benefit of its creditors; (vi) any proceeding is instituted by or against Client under any bankruptcy or similar laws for the relief of debtors and such proceeding is not dismissed within ninety (90) days; (vii) Client commits a material breach specifically relating to security or Confidential Information which is not capable of being cured within two (2) days from the date that Client receives written notice of such breach (or such longer cure period as specified by Company in such notice); or (viii) a trustee or receiver is appointed for all or any portion of Client's assets.

5.2 **"Authorized User"** Client acknowledges that it is imperative to EC Infosystems that it know and approve specifically all persons using its systems. Persons authorized to use EC Infosystems systems must be individuals for whom a specific written request has been submitted to and approved by EC Infosystems. All written requests must include the full name, employer, work location and IP address. Under no circumstance shall Client submit the name of any person who provides the same or similar services as Company, or who is employed by, or works for a business that provides the same or similar services as Company. Additionally, Client shall not submit the name of any person who has been convicted of any type of computer hacking or theft to be an Authorized User. It is only after written approval is granted by EC Infosystems that an individual is considered an "Authorized User." An individual affiliated with Client who is not an Authorized User is an "Unauthorized User." No Unauthorized Users are permitted to use the systems at any time. Any access into the system by an Unauthorized User is a material breach of this Agreement. In the event that an Unauthorized User logs onto the EC Infosystems service, EC Infosystems will immediately notify the Client of said breach and suspend service to

the Client until such time as the Client has cured the breach and has paid a reconnect fee of $2,500.00. Alternatively, in EC Infosystems' sole discretion, EC Infosystems has the right to consider such breach a termination of this Agreement by Client. Additionally, Client agrees to provide EC Infosystems with written notice of the names of all Authorized Users within 24 hours of any of the following events: termination of employment with Client; termination of consulting agreement with Client, termination of relationship with Client, conviction of any offense or crime related to computer hacking; conviction of any offense or crime related to computer related theft. Failure to provide such notice is a material breach of this Agreement, and EC Infosystems will notify the Client of said breach and suspend service to the Client until such time as the Client has cured the breach and has paid a reconnect fee of $2,500.00. Alternatively, in EC Infosystems' sole discretion, EC Infosystems has the right to consider such breach a termination of this Agreement by Client.

5.3 Upon termination of this Agreement pursuant to this Section 5, each Party shall promptly return to the other Party, or at the option of the owner, certify the destruction of, all data, programs and materials owned by the other Party which are held by such Party in connection with the performance of the Agreement. Client acknowledges and agrees that nothing contained in this Agreement shall be construed as granting any rights, by license or otherwise, to any data, programs and materials owned by Company.

5.4 Pricing for all services shall be subject to review forty (45) days prior to the beginning of any Subsequent Term and new pricing shall be incorporated into any contract extensions.

6. **Termination By Client**.

Immediately upon the occurrence of any of the events detailed herein, Client shall have the right to terminate this Agreement: (i) Company is incapable of performing any of the Services under this Agreement for an uninterrupted period of twenty-eight (28) days due to a cyber-attack (a "Catastrophic Failure"); (ii) Company breaches any material term or provision of this Agreement other than a Catastrophic Failure and fails to cure such breach within sixty (60) business days of written notice thereof by Client; (ii) Company commits a material breach specifically relating to Confidential Information which is not capable of being cured within thirty (30) days from the date that Company receives written notice of such breach (or such longer cure period as specified by Client in such notice); (iii) upon any proceeding instituted by or against Company under any bankruptcy or similar laws for the relief of debtors and such proceeding is not dismissed within ninety (90) days; (iv) Company becomes insolvent or makes an assignment for the benefit of its creditors; or (v) upon a trustee or receiver being appointed for all or any portion of Company's assets. In any of the above situations, subject to the applicable cure periods, Client may, by written notice to Company terminate this Agreement in whole or in part as of the date specified in the notice of termination. If Client elects to so terminate this Agreement in whole or in part, upon termination all fees payable under this Agreement by the Client shall be due immediately. A termination in accordance with this Section shall not obligate the Client to pay EC Infosystems a Liquidated Damages Fee pursuant to Section 4 herein.

EC Infosystems, Inc. 333 Earle Ovington Boulevard, Suite 102, Uniondale, NY 11553 Tel: (516) 874-8000

CONFIDENTIAL & PROPRIETARY

7. **Transition Billing Services**.

Upon any termination of: (i) this Agreement or (ii) all or any portion of any Statement of Work for any reason under this Agreement, other than a termination under Section 5, and upon Client's written request and verification by Company of payment of all outstanding balances then owed by Client, Company shall, within reasonably acceptable timelines, deliver to Client all fully paid up Billing Services then completed and those in-progress and, upon Client's written request and verification of payment of all outstanding balances then owed by Client, on a time-and-materials basis, at the Company's then current professional Billing Services rates specified in each applicable Statement of Work, document in reasonable detail the status of the performance of the Billing Services that have been terminated under any Statement of Work. The Parties shall reasonably cooperate with the other Party after any such termination and Company may provide, in its sole discretion, such assistance as reasonably requested by Client with respect to given Statement of Work, on a time-and-materials basis, at the Company's then current professional Billing Services rates specified in the terminated and applicable Statement of Work (the "Transition Services"). In Company's sole discretion, it may require Client to pay for Transition Services in advance.

8. **Changes**

EC Infosystems may change its Operational Procedures, Delivery Procedures, and Standards for Client Equipment and may change or withdraw any particular service during the course of this agreement in accordance with industry standards and governmental regulations upon thirty (30) days prior written notice to Client, unless such change is mandated or required by any utility, pipeline, RTO, ISO, any industry standard, a governmental body, or a quasi-governmental body. In such event, EC Infosystems shall use commercially reasonable means to provide Client with notice of the change as soon as practicable under the business circumstances then existing.

9. **Force Majeure**

9.1 **Excused Failure to Comply.** No party shall be liable or responsible to the other party, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (except for any obligations to make payments to the other party hereunder), when and to the extent such failure or delay is caused by or results from a Force Majeure Event. The party claiming a Force Majeure Event shall exercise commercially reasonable efforts and due diligence to remove its inability to perform as soon as it reasonably possible so that the affected delay or failure shall not be longer than is absolutely necessary. The party claiming a Force Majeure Event shall also exercise commercially reasonable efforts and due diligence to end the Force Majeure Event and mitigate the effects of the Force Majeure Event.

9.2 **Force Majeure Event**. For purposes of this Agreement, a Force Majeure Event is an event which is non-economic in nature and which is caused beyond the affected Party's reasonable control, including, but not limited to: (a) acts of God; (b) flood, fire, earthquake, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot, or other civil unrest; (d) government order or law; (e) actions, embargoes, or blockades in effect on or after the date of this Agreement; (f) the failure of facilities or systems not owned by EC Infosystems; (g) governmental actions such as necessity to comply with any court order, law, statute, ordinance or regulation promulgated by a governmental authority; (g) or any other reasonably unplanned or non-scheduled occurrence, condition, situation or threat not covered above, which renders either Party unable to perform its obligations hereunder, provided such event is beyond the reasonable control of the Party claiming such inability.

9.3 **Notification.** The Party claiming a Force Majeure Event, must give written notice to the other Party within seventy-two (72) hours after the start of the Force Majeure Event, stating the period of time the Force Majeure Event is expected to continue, and a specific description of the cause of the Force Majeure Event.

**10. Limitation of Liability; Indemnity.**

10.1 **Indemnification.** To the fullest extent permitted by law, each party (an "Indemnitor") shall fully indemnify, hold harmless, and defend the other and the other's directors, officers, employees, agents, stockholders, and Affiliates (collectively, "Indemnified Parties") from and against all claims, actions, suits, demands, damages, liabilities, obligations, payments, losses, settlements, judgments, costs, and expenses (including without limitation reasonable attorney's fees and costs), arising from personal or bodily injuries (including death), property damage, intangible damage, or otherwise, whether or not involving a third party claim, which arise out of, relate to or result from (1) any breach of any representation or warranty by the Indemnitor contained in this Agreement, (2) any breach of any covenant or other obligation or duty of the Indemnitor under this Agreement or under applicable law, (3) any error, act, or omission of an Indemnitor related to its performance under this Agreement, (4) the violation or nonperformance of this Agreement by the Indemnitor, or (5) the negligent or willful acts or omissions of the Indemnitor, in each case whether or not the relevant Claim has merit, subject to the limitations of liability set forth in this Agreement.

10.2   **Limitation of Liability**. OTHER THAN AS PROVIDED FOR EXPRESSLY IN THIS AGREEMENT, UNDER NO CIRCUMSTANCES AND UNDER NO LEGAL THEORY, TORT, CONTRACT, OR OTHERWISE, SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY OTHER PERSON FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY CHARACTER INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS OR REVENUE, DATA OR INFORMATION LOSS, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES ARISING OUT OF THE SERVICES PROVIDED OR THE USE OR THE USE OR INABILITY TO USE EQUIPMENT, ENVIORNMENT, OR SYSTEMS, INCLUDING, IN CONNECTION WITH THIS SERVICE AGREEMENT, OR RELATED TO SAME, WHETHER IN AN ACTION IN CONTRACT OR TORT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANY DAMAGES A PARTY MIGHT INCUR FOR ANY REASON WHATSOEVER. THE ENTIRE LIABILITY OF A PARTY TO THE OTHER PARTY FOR ANY REASON AND UPON ANY CAUSE OF ACTION OR CLAIM SHALL BE LIMITED TO FIFTEEN PERCENT (15%) OF THE INVOICE DOLLAR AMOUNT FOR THE ONE (1) MONTH PERIOD IMMEDIATELY PRIOR TO THE DATE THE DAMAGES ARE SUSTAINED. THIS LIMITATION APPLIES TO ALL CAUSES OF ACTION OR CLAIMS IN THE AGGREGATE, INCLUDING WITHOUT LIMITATION TO BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATIONS, CLAIMS FOR FAILURE TO EXERCISE DUE CARE IN THE PERFORMANCE OF SERVICES HEREUNDER AND OTHER TORTS. BOTH PARTIES UNDERSTAND AND AGREE THAT THE REMEDIES, EXCLUSIONS AND LIMITATIONS HEREIN ALLOCATE THE RISKS OF SERVICE AND/OR NONCONFORMITY BETWEEN THE PARTIES AS AUTHORIZED BY THE UNIFORM COMMERCIAL CODE AND/OR OTHER APPLICABLE LAWS.  THE PRICES FOR SERVICES AND/OR PRODUCTS HEREIN REFLECT, AND ARE SET IN RELIANCE UPON, THIS ALLOCATION OF RISK AND THE EXCLUSION OF CONSEQUENTIAL DAMAGES AND LIMITATIONS OF LIABILITY SET FORTH IN THIS AGREEMENT.  THIS EXCLUSION ALSO INCLUDES ANY LIABILITY THAT MAY ARISE OUT OF THIRD-PARTY CLAIMS

**10.3   DISCLAIMER.** EC INFOSYSTEMS DOES NOT WARRANT OR GUARANTEE THE UNINTERRUPTED DELIVERY OR RECEIPT OF MESSAGES TO CLIENT DURING FORCE MAJEURE EVENTS. THIS AGREEMENT SHALL BE DEEMED A SERVICES CONTRACT WITH NO IMPLIED WARRANTIES OF ANY KIND. THE PARTIES AGREE THAT THE IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PURPOSE SHALL NOT BE APPLICABLE TO THIS AGREEMENT OR THE SERVICES OR PRODUCTS PROVIDED BY EC INFOSYSTEMS HEREUNDER. ADDITIONALLY, EC INFOSYSTEMS DOES NOT WARRANT, REPRESENT, OR GUARANTEE THAT IT WILL: ADHERE TO MARKET CHANGES; FOLLOW UTILITY STANDARDS WHEN SENDING OR RECEIVING TRANSMISIONS; RESPOND TO ISSUES WITHIN PARTICULAR TIMEFRAMES; DISPLAY ACCURATE INFORMATION; SEND FILES PROPERLY; SEND FILES; BE WITHOUT DELAY IN SENDING OR PROCESSING FILES; TAX CLIENT(S)'S CUSTOMERS PROPERLY, RUN REPORTS, OR PROVIDE SYSTEM MAINENANCE.

**11. Customized Software**

All specifications, documentation and programs developed or used by EC Infosystems, other than those provided by Client, in connection with this Agreement are and shall remain the sole property of EC Infosystems

**12. Confidential Information**

12.1   **Confidential Information.** Any Confidential Information, as defined in Section 12.2 herein, made available pursuant to this Agreement and conspicuously marked or stamped as "**Confidential**" shall be held in confidence by each of the Parties to protect the legitimate business needs and/or privacy interests of the Parties. With respect to multi-page documents that contain Confidential Information, the Parties may make such a designation by marking or stamping only the first page thereof. The Parties shall identify any matter deemed to be Confidential Information at the time the information is provided. Any information not designated, as Confidential Information shall not be covered by the protection contemplated herein, provided, however, that the inadvertent provision of information without a confidential designation shall not itself be deemed a waiver of the Party's claim of confidentiality as to such information, and the Party may thereafter designated the same as confidential, if the information is deemed confidential as set forth herein. The Parties acknowledge and agree that the prior discussions and correspondence of the Parties concerning the terms of this Agreement are expressly deemed to be Confidential Information.

12.2 **Confidential Information Defined.** "Confidential Information" means any and all data and information of whatever kind or nature (whether written, electronic or oral) which is disclosed by one Party (the **"Disclosing Party"**) to the other Party (the **"Recipient"**) regarding itself, its business, and/or the business of its affiliates. Confidential Information does not include information that: (a) is or becomes generally known to, or ascertainable by, the public, except by a wrongful act of the Recipient; (b) is disclosed to the Recipient by another not under an obligation of confidentiality; or (c) is already in the Recipient's possession prior to disclosure by the Disclosing Party.

12.3 **Obligation of Confidentiality.** Each Party agrees, for itself and its authorized representatives, to keep confidential all Confidential Information provided hereunder and to use the Confidential Information solely for purposes in connection with this Agreement, except to the extent that the Recipient determines that release of Confidential Information is required by law or regulation. The Recipient shall make commercially reasonable efforts to notify the Disclosing Party if it intends to release any Confidential Information to afford the Disclosing Party an opportunity to seek a protective order prior to disclosure. The obligations for Confidentiality set forth in this Agreement, including but not limited to the non-disclosure obligations and the duty to return Confidential Information upon written request, shall survive the termination of this Agreement for a period of one (1) year thereafter.

12.4 **Proprietary Rights.** Neither Party makes any representation as to the accuracy or completeness of the Confidential Information, but shall make reasonable efforts to ensure that all Confidential Information disclosed to Recipient is accurate and not misleading. Each Party acknowledges the proprietary rights of the other Party in and to the Confidential Information.

**13. General**

**Entirety of Agreement.** This Agreement (together with Schedules "A") constitute the entire agreement between the parties with respect to the subject matter hereof and supersede and replace any and all prior negotiations, undertakings, understandings, or agreements (whether written or oral).

**Internet Connectivity; Disclaimer.** To the extent that EC Infosystems makes Services available for access via the Internet, Client shall provide, at Client's own expense, all necessary hardware, applications and Internet connectivity necessary to access the Services. Client acknowledges that the Internet is known to be unpredictable in performance and may, from time to time, impede access to the Services or performance hereunder. Customer agrees that EC Infosystems is not in any way responsible for any interference with Client's use of or access to the Services arising from or attributable to the Internet and Client waives any and all claims against EC Infosystems in connection therewith.

**Amendment.** This Agreement may be amended or modified only by a written instrument executed by both the Company and the Client.

**Severability; Judicial Modification.** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable the remainder of this Agreement shall remain in full force and effect.

**Assignability.** This Agreement may not be assigned by Client without the express, prior written consent of Company, such consent not to be unreasonably withheld. Additionally, Client may not utilize Company's services for any third-party without the express, prior written content of Company. This Agreement may be assigned by Company to a successor in interest by sale, merger, operation of law, consolidation, or sale of a controlling interest of the capital stock of the party or sale of all or substantially all of the assets.

**Governing Law; Jurisdiction; Venue.** The laws of the state of New York shall govern the construction and enforceability of this Agreement without regard to its conflict of laws principles.   The parties agree that any action arising under or relating to this Agreement or the Products shall lie within the exclusive jurisdiction of any State or Federal court having jurisdiction over the County of Nassau, State of New York.   Each party consents to the exercise of jurisdiction by any State or Federal court located in or having jurisdiction in the County of Nassau, State of New York and agrees that process may be served on such party in any such action by mailing it to such party at the address set forth below. In each case, this Agreement shall be construed and enforced without regard to the United Nations Convention on the International Sale of Goods.

**Attorneys' Fees and Expenses.** If either party is compelled to seek judicial enforcement of its rights under this Agreement, the prevailing party in any such action shall be entitled to seek recovery of its costs and expenses incurred in such action, including reasonable attorneys' fees

**Authority.**   Each party hereto acknowledges and agrees that they have had the opportunity to consult with their own legal counsel in connection with the negotiation of this Agreement.

**Noncontravention**.  Each party represents and warrants that neither the execution and delivery of this Agreement by such party, nor the consummation by it of the transactions contemplated hereby will constitute a violation of, or be in conflict with, constitute or create a default under, or result in the creation or imposition of any liens or encumbrances upon any of its property pursuant to: (i) its charter documents or bylaws, each as amended to date; (ii) any agreement or commitment to which it is a party or by which it or any of its properties are bound or to which it or any of its properties are subject; or (iii) any Applicable Laws.

**Notices.** All notices from one party to the other shall be deemed to have been duly delivered when hand delivered or sent by United States certified mail, return receipt requested, postage prepaid, as follows:

| If to Client: | If to EC Infosystems: |
|---|---|
| Attn: Richard Curnutte Sr | Attn: Administration Dept. |
| Title: President | EC Infosystems, Inc. |
| Volunteer Energy Services, Inc. | 333 Earle Ovington Boulevard, |
| 790 Windmiller Drive, | Suite 102, |
| Pickerington, OH 43147 | Uniondale, NY 11553 |

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above

**Volunteer Energy Services, Inc.**                    **EC Infosystems, Inc.**

Signature: _____          Signature: _____

Name: Richard Curnutte Sr                              Name: Mohan Wanchoo

Title: President                                              Title: President

Date: 7/6/18 _____                          Date: _____

EC Infosystems, Inc. 333 Earle Ovington Boulevard, Suite 102, Uniondale, NY 11553 Tel: (516) 874-8000

13

CONFIDENTIAL & PROPRIETARY

**Schedule A**

# Proposal

# for

# Utility Billing

# By

ec infosystems.

**Volunteer Energy Services, Inc.**
April 06, 2018

EC Infosystems, Inc. 333 Earle Ovington Boulevard, Suite 102, Uniondale, NY 11553 Tel: (516) 874-8000

CONFIDENTIAL & PROPRIETARY

**Table of Contents**

INTRODUCTION.................................................................................................16
EC INFOSYSTEMS SERVICES OVERVIEW ........................................................16

SCOPE OF PROPOSAL.................................................................................17

DAILY OPERATIONS........................................................................................18
BUSINESS INTELLIGENCE (BI) DASHBOARD APPLET.......................................19
UTILIBILL COMPLEX BILLING FUNCTIONALITY...............................................20
UTILIBILL BILLING SYSTEM SUPPORT............................................................22
ERROR HANDLING...........................................................................................22
RECOVERY.......................................................................................................22
ASSUMPTIONS..................................................................................................22
BILLING............................................................................................................22
BACKUP & RECOVERY.....................................................................................22
CUSTOMER SERVICE........................................................................................22

SCHEDULES AND PAYMENTS ...................................................................23

TRAINING.........................................................................................................26
BILLING............................................................................................................28
LATE FEES.......................................................................................................28
REINSTATEMENT FEES.....................................................................................28
CUSTOMER SERVICE........................................................................................28
OUR TRADING PARTNERS ...............................................................................29

## Introduction

EC Infosystems offers a state of the art Billing System fully integrated with EDI transactions for the Energy Industry. This system is available on a per transaction basis on a hosted outsourcing model. This system will meet the billing needs of Volunteer Energy to bill customers for Natural Gas and/or Electricity in states where energy has been deregulated.

### EC Infosystems Services Overview

EC Infosystems is a Professional Services Firm that offers a full range of services to its customers in the Deregulated Energy Market. We cater to both the needs of companies that are in a Startup Mode as well as organizations that have well-established Operations. Some of the services we provide are:

- Interfacing with TPs
- Software Implementation
- Interface Programming
- Education & Training
- Post Implementation Operational Support
- Gas and Electric Billing services

## Scope of Proposal

This proposal is for using Utilibill on a per transaction basis on Software as a Service (SaaS) model. EC Infosystems supported Utilities in Ohio, Michigan, Pennsylvania and Kentucky as well as in any other EC Infosystems supported utilities in any other States as desired by Client shall be implemented as part of this Proposal.

Utilibill system shall send and receive EDI transactions to and from the above utilities. Client will have the option of previewing the generated postpaid bills and printing them on their local printer or using a 3rd party bill printing facility. If Client opts to use a 3rd party bill printing facility EC Infosystems will produce a file containing billing information and send it electronically to the bill printing facility.

EC Infosystems offers a state of the art Utilibill postpaid billing system for the Energy Industry. Utilibill is a Secure, web-based system and allows for easy access from the office or home from any Internet Explorer capable device. It is a state of the art Billing and CIS tool designed for maximum flexibility as well as ease of use. Some of the functions supported by this system are Customer Setup, Integration of EDI Meter Reading transactions, Generation of Customer Bills, Complex Customer Billing algorithms, Accounts Receivable, Accounts Payable, various Reports and a variety of other features.

Utilibill supports Energy Billing functions in many states where energy is deregulated. It supports various billing methods like Dual and Consolidated billing. Utilibill has strong support for Utility Bill Ready, Utility Rate Ready and Marketer Bill Ready billing scenarios within the Consolidated billing method.

Utilibill has a robust Customer Enrollment, Setup and Management module that enable Clients to organize multiple Service Locations and Meters under one comprehensive Customer record. One can also create and utilize Enrollment Templates to expedite Enrollments and Historical Usage requests. The feature rich Utilibill system provides quick access to Customers via customizable Customer Master List, or by Advanced Search functionality.

The system is very easy to use and reduces manual input by automatically pulling Customer profile information from Enrollments and incoming EDI transactions. The Client can view Meter Readings, Invoices, Historical Usage Profiles, Payments and Charges, and all other EDI transaction information. They can also post Payments, Deposits, and Credits to a Customer record from within the Customer profile. In order to facilitate maximum customer management, Client can set Rate Management and Contract Expiration dates, allowing for automated switching of rate amounts.

Utilibill's companion Customer Service website (EC InfoBill) allows Customers to view their account information and pay bills online.

EC Infosystems, Inc. 333 Earle Ovington Boulevard, Suite 102, Uniondale, NY 11553 Tel: (516) 874-8000

CONFIDENTIAL & PROPRIETARY

Utilibill's Support Ticket subsystem provides a comprehensive and flexible method for tracking Customer issues, designating ticket owners, and setting notification alerts.

Utilibill's powerful Accounts Payable and Receivable module allows Clients to automatically view EDI Remittances. The system automatically calculates taxes based on jurisdiction and allows viewing of unpaid invoices. The system would not be useful without allowing managing Customer payments and adjust accounts accordingly. A/R Aging Reporting to view Customer's unpaid amounts can be viewed easily and also the complete payment history broken down by Customer, Charge Types, and Rate Classes.

The system is loaded with over 70 preconfigured Reports to return desired Accounts, Payable/Receivable, Billing, Customer Service, and Exceptions information. One can filter Reports by desired criteria and easily repackage data into PDF or CSV data formats. One can also schedule Reports to run automatically in the future, notifying users by Email or FTP when results are returned.

EC Infosystems is very conscious of Security Controls and has therefore implemented many User-Level Security Controls. These controls enable Clients to create new System Users and assign them User Types, which regulate their access to system pages and functionalities. They also allow Clients to enable Report-Level security, preventing lower-level Users from accessing confidential Reports and data. Event Logs document system and database changes, identifying the User making the change. One can assign Salesperson Security, granting salesperson access to only their Customers' information.

Utilibill receives regular updates from a sales tax service provider and these tax rates are updated in our system on a monthly basis.

**Daily Operations**

EC Infosystems sends and receives EDI transactions to and from EC Infosystems supported Utilities in Ohio, Michigan, Pennsylvania and Kentucky and in any other states as desired by Client. These transactions are processed and imported into the billing system throughout the day.

**Business Intelligence (BI) Dashboard Applet**

EC Infosystems is pleased to announce the release of Business Intelligence (BI) Dashboard in the Utilibill Billing/CIS platform.  The Utilibill BI Dashboard feature is a visual representation, such as the image below, that gives you a quick and easy way to view your company's performance in near real-time to help you quickly identify Cost-To-Serve and Speed-To-Market issues and opportunities by allowing you to visualize your organization's statistical/analytical information regarding your Financials (Receivables, Billing, Usage), Enrollment and Dropped Customers.



Features
• Robust selection of custom applets designed for real time analytics and statistics.
• Data filters provide customized business oriented views.
• Selected data displayed graphically, in list mode or both.
• Applets operate in dashboard mode or launched standalone for easy access.
• Large selection of predefined dashboard themes.
• Printed output available.
• User definable graphing options including bar, line column, donut and pie charts.
• User definable maximum number of applets on dashboard.
• User definable number of applets per dashboard row.

Applet categories overview:
A/R Aging
Enrollment
Dropped Customers
Billed Amount
Average Rate

**Additional Reporting:**

With over 90 unique preconfigured reports, Clients are in control of their customers and data. Reporting includes financial metrics such as Accounts Receivable (A/R), sales commissions, exception management, actual/historical usage data, as well as automated workflows. Clients have the ability to customize the reporting when scheduling their data to automatically export via FTP. Following is a screen shot



**API Web Services**

Over the last couple of years, web services have expanded to become more popular with application developers — and for good reason. Web services technology represents an important way for businesses to communicate with each other and with clients as well. Unlike traditional client/server models, such as a web server or web page system, web services do not provide the user with a GUI. Instead, web services share business logic, data and processes through a programmatic interface across a network. The applications interface with each other, not with the users. Developers can add the web service to a GUI (such as a web page or an executable program) to offer specific functionality to users.

Web services' distributed computing model allows application-to-application communication. For example, one purchase-and-ordering application could communicate to an inventory application that specific items need to be reordered. Because of this level of application integration, Web Services have grown in popularity and are beginning to improve business processes. In fact, some even call web services the next evolution of the web.

CONFIDENTIAL & PROPRIETARY

**Utilibill Complex Billing Rate Engine**

**Tiered Pricing**

A new tiered pricing model will be introduced as a Rate Class type. This contains definitions for one or more tiers based on monthly energy usage. Each tier can in turn define rates based on one of the current rate class types, Standard, Indexed, Indexed IDR and Indexed Profiled.

**Adder Enhancements**

Adders provide a way of adjusting a base energy rate based on various factors. Many new enhancements will be provided for use with the new Tiered and Block rate class types. Existing rate class types will not be affected.

**Additional Charges**

Additional Charges provides a way of applying extra charges that are not necessarily related to the energy usage such as flat monthly fees. They can also be based on energy usage as well as other factors. Previously additional charges could only be applied at the Customer, Service Location and Meter levels. When used with the Tiered or Block models additional charges will now also be available at the tier and block levels.

**Demand Pricing**

Demand Pricing allows additional charges to be generated based on demand energy usage. It will be implemented as an additional charge.
- A new Demand charge type will be provided.
- The usage source (basis) can be specified as K1 Demand or Peak Load Capacity

**Utilization Charges (Banded)**

Utilization charges are additional penalty charges incurred due to energy utilization that is over or under a predefined threshold. This is a separate charge rather than an adder that is simply bundled into the rate. Previously, utilization charges have been defined only at the meter level. Now, these charges can be defined at the rate class schedule and tier/block levels.

**Additional Complex Billing, pass through and conditional pricing**

Utilibill supports out of the box fully configurable functionality.

EC Infosystems, Inc. 333 Earle Ovington Boulevard, Suite 102, Uniondale, NY 11553 Tel: (516) 874-8000

CONFIDENTIAL & PROPRIETARY

ec infosystems™

## Utilibill Billing System Support

EC Infosystems will provide the following billing support functions to Client.

1. Training on Utilibill System per Statement of Work executed
2. Technical Support of Utilibill System.
3. Troubleshooting EDI Billing data and transactions.

### Error Handling

EC Infosystems shall appoint a single point of contact for Billing issues related to Client.   EC Infosystems shall correct any technical issues and notify the Client right away upon discovering the issue and upon resolution.   Client shall identify business data content issues and make appropriate corrections. The foregoing shall be handled in accordance with the provisions of Schedules "B" and "C", attached to the Agreement.

### Recovery

EC Infosystems shall have data recovery procedures in place in the event of unexpected situations that require transactions to be recreated for any reason.

### Assumptions

This proposal is based on the following assumptions:

1. EC Infosystems will require a time of **2 months- 6 months** from the time of acceptance by Client to provide all services in this proposal.
2. EC Infosystems ensures that transactions will be processed in the prescribed timeframe. However if there are problems outside EC Infosystems' control there will be some delays in sending transactions to Client.   EC Infosystems will make a sincere effort to avoid these situations.
3. Client will use EC Infosystems services for a minimum of 3 years.
4. Pricing information is only valid **60 days** from the date of the proposal.

### Volunteer Energy Billing

Volunteer Energy shall be billed monthly for the total number of meters processed. Invoice Payment terms shall be Net 10 days.

### Backup & Recovery

EC Infosystems backs up all data processed in these stages.
i)  All data is backed up daily, weekly, monthly and yearly and stored offsite.
ii) Every month data is archived on removable media and stored offsite for 7 years for archival purposes.

### Customer Service

Customer Service will be provided Monday through Friday from 8:30 AM to 5:30 PM EST.

ec infosystems

## Schedules and payments

Upfront One Time Utilibill Billing System Setup fee        $ 9,995

(The aforementioned One Time Utilibill Billing System Setup fee includes 1 Utility setup)

Additional One Time Billing System Setup Fee thereafter     $2,495/Utility/State

Additional One Time Billing System Setup Fee for (i) adding a commodity to an existing certified Utility if requested at a different time or, (ii) if the Utility is using different transaction standards per commodity        $1,495/Commodity/Utility/State

Monthly Maintenance Fee        $ 1,000.00

Additional Fixed Maintenance Fee for automation or bulk submission per DUNS number per 3rd Party interface (Optional)        $ 500 / month

### Monthly Processing Charges*

| | |
|---|---|
| 1 – 10,000 Meters | $ 0.39 |
| 10,001 – 25,000 Meters | $ 0.37 |
| 25,001 – 50,000 Meters | $ 0.35 |
| 50,001 – 75,000 Meters | $ 0.33 |
| 75,001 – 100,000 Meters | $ 0.29 |
| 100,001 – 250,000 Meters | $ 30,000/month |
| 250,001 – 500,000 Meters | $ 40,000/month |

*Note: Volume Discounts are all across the board. Client will be charged the per meter rate for all meters at the tier in which their meter count falls. Meter count for Client will be the aggregate of all energy brands owned by Client. **Furthermore the pricing here is only valid with an executed EDI Agreement with EC Infosystems.**

### CCH Tax Database (Required for NY, TX and CA):

*Upfront* One Time Upfront Setup Fees for CCH Tax Database:        $ 4,995
*Ongoing* Monthly Fees for CCH Tax Database:        $ 750
(There *might* be a 3% (or thereabouts) increase/year if CCH increases these prices/year. For those clients who may want to wait till next year to make a decision, please expect the One Time Upfront Setup Fees for CCH Tax Database to increase by 3% (or thereabouts if CCH increases these costs as well.)

### Utilibill Parallel mini SQL Server DB:

*Upfront* One Time Upfront Setup Fees for Parallel mini SQL Server DB:        $ 4,995
*Ongoing* Monthly Fees for Ongoing Parallel mini SQL Server DB:        $ 995

### Utilibill BI Dashboard Applet:

*Upfront* Business Intelligence Dashboard Applet        $ 4,995
*Ongoing* Monthly Charges for Business Intelligence Dashboard Applet        $ 995

ec infosystems

**Utilibill Complex Billing Functionality:**

| | |
|---|---|
| *Upfront* Complex Billing Functionality | $ 4,995 |
| *Additional Ongoing* Monthly Charges for Complex Billing Functionality | $ 995 |
| *Additional Ongoing* Monthly Charges Per meter | $ 0.25 |

**Utilibill Additional Modules:**

One time setup Fee for **Online Customer Service**
*Upfront*                               $ 2,495
*Additional Ongoing*

Monthly Ongoing Charges for Online Customer Service Module:
Monthly Website Hosting Fee:                 $ 95 / month
Monthly SSL encryption fee:                  $ 95 / month

One time setup Fee for **Online Bill Payment** (through Transfirst Payment Systems***)
*Upfront*                               $ 2,495
*Additional Ongoing*

Monthly Ongoing Charges for Online Bill Payment
Monthly SSL encryption fee:                  $ 95 / month

**Additional Development** Fee @ 195/hr (If Any)          Quoted upon review

**One Time Integration, Migration and Implementation** (including data)   Quoted upon review
($ 24,995-$ 49,995 (EST))

**Dedicated Hardware** Environment including configuration (Optional)   Call for pricing

**Note:**
1. Pricing does not include any onsite training or advanced training requested by Client.
2. Professional Services are billed @ $195/hour. All work orders and change control items are billed at the Professional Services rate.
3. Please note that Bill Printing is not included in the above prices. EC Infosystems provides this service through our partners.  EC Infosystems can also work with any other 3rd party Bill Printing Company
4. Pricing does not include Hardware support.
5. ***Client will be required to have a separate and direct Agreement with Transfirst Payment Systems should they decide to go with Credit Card Processing Module.  Client can also select a different Bill Payment processing company, however, software development charges will apply.

ec infosystems℠

6. Pricing does not include "Transition Services" (services to be provided by Company to transition Client to another platform). In the event of a transition by Client to another billing platform, or in the event of a termination of the Agreement or any Statement of Work between the parties for Services, for any reason, either in whole or in part, Client may request Transition Services from Company, to be billed to Client as per this Schedule A (Billing Proposal) as though fully set forth herein. Company will provide Transition Services only after all outstanding invoices are paid in full, and only after the requested scope of Transition Services has been mutually agreed to by Company and Client.

ec infosystems

**Remote Training via Internet**

EC Infosystems offers these training sessions which cover the Utilibill Billing/CIS System. *All clients receive complementary Package 1 (all sessions) via remote Go-To-Meeting at time of sign on.* In addition, Client shall also receive five (5) complementary hours of remote training *via remote Go-To-Meeting. The aforementioned* five (5) complementary hours of remote training is in addition to *Package 1 (all sessions). Thereafter* additional training can be purchased with Sales.

**Section 1:     Overview of Utilibill, Navigation and Basic Configuration Set Up     1.15/hrs.**
This session will provide a high level overview of the Utilibill Billing/CIS System.

**Section 2:     Indexes and Rate Classes
1/hr.**
Overview of how the structure works; How to view meters associated with a Rate Class, modifying Rate Classes- Monitoring contract expirations, rate changes through various reports.

**Section 3:     Enrollments
1/hr.**

Review of the different enrollment Status- what they mean; How to include requesting 867 History with or without an enrollment; When to take action, review of reports – Customer Enrollments, Enrollment/Drop Summary, Enrollments/Drops by Salesperson by State, Contract Expirations, Welcome Letters.

**Section 4:     Master List - Customer Account Level Overview
1/hr.**
Meter- Budget Billing (Bill Ready Consolidated & Dual), Read Cycles (Rate Ready ), Rate changes; Other Charges (MBR, UBR & Dual) Billing- View Invoices; Payments/Charges- View payments and charges.  For Dual/MBR ability to set up payment plans, post payments; transactions; Meter Readings – View meter readings. Utility Charges – MBR; history- All history on the account.

CONFIDENTIAL & PROPRIETARY

ec infosystems™

**Section 5:     Billing & Payment Reconciliation (URR)**
**1/hr.**
Process Flow Overview; Rates; Communicating rates to the Utility pre enrollment; Review current rate set-ups; Reports- Current Rate Analysis report; Meter Read Cycles; Determine meter read cycle; Understanding meter read cycles role in submitting rates; Meter Read Cycle report; Rate Schedule; Change report; Methods to submit rates; Individual meter; Rate Class; Rate Status; Rate Change Status report; Rate Change Report; Billing; Discussion on process flow, what to monitor; Billing Summary; Inbound Meter Readings report; Cancel Re-Bill Overview

**Section 6:     Billing & Payment Reconciliation (UBR) Part 2**
**1/hr.**
Process Flow Overview; Budget Billing Overview; Pre-Billing Preparation; Inbound Meter Reading; Exceptions report; Meter Readings Report; Billing; Create Bills; Billing Register; Printed Bills; Post Billing; Billing Summary report; Meter Readings report Cancel Re-Bill Overview; Cancel/Re-bill Charges;

**Section 7:     Reports**
**1/hr.**
Reports; Tools; Printed Reports; Scheduled Reports; Export Data; Exported Files; Event Log;

**Section 8:     Reports- Part 2**
**1/hr.**
Sales Tax Reports; Preconfigured Accounts Payable/Receivable, Billing, Customer Service, and Exceptions Reports; Forecast Revenue; Compute Sales Commissions; Generate URR Billing Summaries

CONFIDENTIAL & PROPRIETARY

ec infosystems

## Billing

Client shall be billed monthly based on "Utilibill Billable Meter Summary" defined below. Payment terms shall be Net 10 days.

## Utilibill Billable Meter Summary

A billable meter is any meter that is "active" in the Utilibill system during the billing period. A meter may become active in the Utilibill system prior to the service start date and prior to any invoices being generated. The following are the conditions that constitute an active meter.

- The EDI transaction has been received by the Utilibill system on or before the billing period start date.

- The Service Location is NOT dropped or the drop date is after the billing period end date.

- The Meter is still in service or the meters service end date is after the billing period end date.

- The report takes into account from the time we receive an enrollment acceptance (as opposed to just being sent out).

It is important to note that a meter may be considered active even if it is still in the Enrollment List and even if no invoices have been generated. You may begin using Utilibill to manage your accounts and meters immediately upon receipt of enrollments. EC Infosystems charges by "Monthly Processing Charges per Meter" per our Agreement, which literally means that Meters are being processed by Utilibill and not just generating invoices.

## Late Fees

If payment is not received by the due date, a late fee will be added at the rate of one and one half percent (1.5%) per month, to unpaid invoices from the due date thereof.

## Reinstatement Fees

If EC Infosystems shall terminate its Services to Client for non-payment (subject to applicable cure period), and in EC Infosystems' sole reasonable discretion, in accordance with the other terms of the Agreement, and if Client requests the provision of Service to be reinstated, a reconnect fee of $2500.00 shall be due and payable immediately upon notification of reconnection.

## Backup & Recovery

All transactions processed by EC Infosystems are backed up on a daily basis.

## Customer Service

Technical Support will be provided Monday through Friday from 8:30 AM to 5:30 PM EST. Client will be assigned a Customer Service Manager.

ec infosystems

## Our Trading Partners

EC Infosystems works with a large number of Trading Partners in multiple industry segments. We have a major presence in the Deregulated Utility Industry where we work with a large number of utilities in over 23 of the deregulated states.

Following is a partial list of our TPs:

### Utilities We Work With

| State | LDC Name |
|-------|----------|
| ZZ | *Example Gas & Electric* |
| | |
| CA | PACIFIC GAS & ELECTRIC |
| CA | SAN DIEGO GAS & ELECTRIC |
| CA | SOUTHERN CALIFORNIA EDISON |
| CT | CONNECTICUT LIGHT POWER |
| CT | UNITED ILLUMINATING |
| DC | PEPCO DC |
| DC | WGL - DC |
| DE | DELMARVA POWER (DE) |
| GA | ATLANTA GAS & LIGHT (AGL) |
| IL | AMEREN ILLINOIS 006936017 |
| IL | COMMONWEALTH EDISON COMPANY |
| IL | NICOR (GAS) |
| IL | NORTH SHORE |
| IL | PEOPLES GAS - IL |
| IN | NIPSCO |
| KY | COLUMBIA GAS - KY |
| MA | BERKSHIRE GAS |
| MA | BOSTON EDISON |
| MA | CAMBRIDGE ELECTRIC |
| MA | COLUMBIA GAS - MA |
| MA | COMMONWEALTH ELECTRIC |
| MA | FALL RIVER GAS |
| MA | FITCHBURG GAS & ELECTRIC |
| MA | MASS ELECTRIC |
| MA | NANTUCKET ELECTRIC |
| MA | NGRID-BOSTON GAS |
| MA | NGRID-COLONIAL GAS |
| MA | NGRID-ESSEX GAS |

ec infosystems

| MA | NSTAR GAS |
| MA | WMECO |
| MD | BGE (Electric) |
| MD | BGE (Gas) |
| MD | DELMARVA POWER (MD) |
| MD | PEPCO MD |
| MD | POTOMAC EDISON (FE) |
| MD | WGL - MD |
| ME | BANGOR HYDRO ELECTRIC |
| ME | CENTRAL MAINE POWER |
| ME | MAINE PUBLIC SERVICE CO. |
| MI | CONSUMERS ENERGY |
| MI | DTE |
| NH | LIBERTY UTILITIES |
| NH | NH ELECTRIC COOP |
| NH | PUBLIC SERVICE NEW HAMPSHIRE |
| NH | UNITIL |
| NJ | ATLANTIC CITY ELECTRIC |
| NJ | ELIZABETHTOWN |
| NJ | JCP&L (FE) |
| NJ | NEW JERSEY NATURAL GAS |
| NJ | NJR RETAIL |
| NJ | PSE&G |
| NJ | ROCKLAND ELECTRIC |
| NJ | SOUTH JERSEY GAS |
| NY | CENTRAL HUDSON GAS AND ELECTRIC |
| NY | CONSOLIDATED EDISON COMPANY |
| NY | KEYSPAN ENERGY DELIVERY (NY) |
| NY | NATIONAL FUEL GAS |
| NY | NGRID LI GAS |
| NY | NIAGARA MOHAWK POWER |
| NY | NYSEG |
| NY | ORANGE AND ROCKLAND |
| NY | ROCHESTER GAS AND ELECTRIC |
| OH | CLEVELAND ILLUMINATING (FE) |
| OH | COLUMBIA GAS - OH (GAS) |
| OH | COLUMBUS SOUTHERN POWER (AEP) |
| OH | DAYTON POWER AND LIGHT |
| OH | DOMINION EAST OHIO (GAS) |
| OH | DUKE ENERGY |
| OH | DUKE GAS OF OHIO(GAS) |
| OH | OHIO EDISON (FE) |
| OH | OHIO POWER COMPANY (AEP) |
| OH | TOLEDO EDISON (FE) |
| OH | VECTREN ENERGY DELIVERY (GAS) |
| PA | COLUMBIA GAS - PA (GAS) |
| PA | DUQUESNE LIGHT |

ec infosystems

| PA | METED (FE) |
| PA | NATIONAL FUEL GAS (GAS) |
| PA | PECO (Electric) |
| PA | PECO (Gas) (GAS) |
| PA | PENELEC (FE) |
| PA | PENN POWER (FE) |
| PA | PEOPLES NATURAL GAS - PA (GAS) |
| PA | PHILADELPHIA GAS WORKS |
| PA | PIKE COUNTLY LIGHT & POWER |
| PA | PP&L |
| PA | UGI (Electric) |
| PA | UGI CENTRAL PENN GAS |
| PA | UGI PENN NATURAL GAS |
| PA | UGI UTILITIES (Gas) |
| PA | WELLSBORO ELECTRIC |
| PA | WEST PENN POWER (FE) |
| RI | NARRAGANSETT ELEC |
| TX | AEP TEXAS CENTRAL COMPANY |
| TX | AEP TEXAS NORTH COMPANY |
| TX | CENTERPOINT |
| TX | ENTERGY GULF STATES |
| TX | ERCOT |
| TX | NUECES |
| TX | ONCOR |
| TX | SHARYLAND |
| TX | SHARYLAND UTILITIES |
| TX | TEXAS-NEW MEXICO POWER COMPANY |
| VA | COLUMBIA GAS - VA |

**[SIGNATURE PAGE FOLLOWS]**

CONFIDENTIAL & PROPRIETARY

**ec infosystems**

IN WITNESS WHEREOF, the parties have executed this Schedule A as of the date first set forth above

**Volunteer Energy Services, Inc.**        **EC Infosystems, Inc.**

Signature: _Richard A Curnutte Sr_          Signature: _____

Name: Richard Curnutte Sr                    Name: Mohan Wanchoo

Title: President                             Title: President

Date: _7/6/18_____                   Date: _____

CONFIDENTIAL & PROPRIETARY

EXHIBIT B

**Volunteer Energy Services, INC.**
*Petition Date: March 25, 2022*
*Case # 22-50804*
*Payments - EC Infosystems, Inc.*

*Lookback Period: December 25, 2021 through March 25, 2022*

| Transferee Name | Transaction Type | Transaction # | Amount | Date | Clear Date |
|---|---|---|---|---|---|
| EC Infosystems, Inc. | Check | 51319 | 23,593.60 | 12/29/2021 | 1/24/2022 |
| EC Infosystems, Inc. | Check | 51559 | 24,110.64 | 02/03/2022 | 3/7/2022 |
| EC Infosystems, Inc. | Wire | W223NH2039Oxb2Yj7 | 75,000.00 | 03/23/2022 | 3/23/2022 |
| | | Total | $ 122,704.24 | | |